Charles E. Hansberry
Jenny M. Jourdonnais
HANSBERRY & JOURDONNAIS, PLLC
2315 McDonald Avenue, Suite 210
Missoula, MT 59801
Telephone (406) 203-1730
Telefax (406) 205-3170
chuck@hjbusinesslaw.com
jenny@hjbusinesslaw.com

Attorneys for Plaintiffs
Additional counsel of record listed on signature page

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| **PORTLAND GENERAL ELECTRIC COMPANY; AVISTA CORPORATION; PACIFICORP; and PUGET SOUND ENERGY, INC.,** | Case No. 1:21-cv-00047-SPW-KLD |
| Plaintiffs, | **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | **ORAL ARGUMENT REQUESTED** |
| **NORTHWESTERN CORPORATION; TALEN MONTANA, LLC; AUSTIN KNUDSEN, in his official capacity as Attorney General for the State of Montana,** | |
| Defendants. | |

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
152586906.3

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...........................................................................1

II.   STATEMENT OF FACTS ...........................................................3

      A.    Colstrip and the Agreement..............................................3

      B.    State Restrictions on Coal-Fired Electricity and the Future of
            Colstrip ..........................................................................4

      C.    The Colstrip Owners' Budget Dispute and Pending Arbitration .........5

      D.    Talen and NorthWestern Lobbied For—and the Montana
            Legislature Passed—Legislation Aimed at Colstrip and the
            Agreement ......................................................................6

III.  ARGUMENT..............................................................................9

      A.    Legal Standards for a Preliminary Injunction .......................9

      B.    The PNW Owners are Entitled to a Preliminary Injunction ..............10

            1.    The PNW Owners Are Likely to Succeed on the Merits.........10

                  a.    SB 266 Violates the Contract Clause ............................10

                        (i)    The Bill Substantially Impairs the PNW
                               Owners' Rights Under the Agreement...............11

                        (ii)   SB 266 Fails to Advance a Significant and
                               Legitimate Public Purpose ................................14

                  b.    SB 266 Violates the Commerce Clause.........................18

                        (i)    SB 266 Discriminates Against Out-of-State
                               Commerce in Both Purpose and Effect..............19

                        (ii)   Even if SB 266 Were Non-Discriminatory,
                               It Nonetheless Would Violate the
                               Commerce Clause ...............................................22

                  c.    SB 266's Closure Provision Is Unconstitutionally
                        Vague .................................................................23

            2.    The PNW Owners Will Suffer Irreparable Harm if
                  Defendant Is Not Enjoined......................................................25

            3.    The Balance of Harms Favors the PNW Owners ...................27

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – i

## TABLE OF CONTENTS
(continued)

**Page**

4.   The Public Interest Supports Injunctive Relief Here ...............28

5.   At a Minimum, the "Serious Questions" Test Requires Injunctive Relief........................................................................28

IV.   CONCLUSION..............................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*All. for the Wild Rockies v. Pena*,
    865 F.3d 1211 (9th Cir. 2017) ....................................................10, 29

*Allied Structural Steel Co. v. Spannaus*,
    438 U.S. 234 (1978)..........................................................11, 13, 16

*Ass'n des Éleveurs de Canards et d'Oies v. Becerra*,
    870 F.3d 1140 (9th Cir. 2017) ..........................................................20

*Ass'n of Equip. Mfrs.* v. *Burgum*,
    932 F.3d 727 (8th Cir. 2019) ............................................................17

*Assoc. Builders & Contractors, Golden Gate Chapter Inc. v. Baca*,
    769 F. Supp. 1537 (N.D. Cal. 1991)............................................16, 17

*Bacchus Imports Ltd. v. Dias*,
    468 U.S. 263 (1984)..........................................................18, 19, 21

*Baltimore Teachers Union v. Mayor & City Council*,
    6 F.3d 1012 (4th Cir. 1993) ..............................................................15

*Coate v. Omholt*,
    662 P.2d 591 (Mont. 1983)................................................................14

*Coats v. City of Cincinnati*,
    402 U.S. 611 (1971)..........................................................................24

*Cont'l Ill. Nat'l Bank & Tr. Co. v. Washington*,
    696 F.2d 692 (9th Cir. 1983) ............................................................15

*Dean Milk Co. v. City of Madison*,
    340 U.S. 349 (1951)....................................................................19, 22

*Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*,
    459 U.S. 400 (1983)..............................................................14, 15, 16

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Exxon Corp. v. Eagerton*,
    462 U.S. 176 (1983)..................................................................................15

*F.C.C. v. Fox Television Stations*,
    567 U.S. 239 (2012)............................................................................23, 25

*Forbes v. Napolitano*,
    236 F.3d 1009 (9th Cir. 2000) .................................................................25

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) .....................................................................9

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ...................................................................25

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
    480 U.S. 470 (1987)................................................................................13

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ...................................................................28

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)................................................................................26

*Nat'l Audubon Soc'y, Inc. v. Davis*,
    307 F.3d 835 (9th Cir. 2002) ...................................................................10

*Okla. Tax Comm'n v. Jefferson Lines, Inc.*,
    514 U.S. 175 (1995)................................................................................18

*Pac. Nw. Venison Producers v. Smitch*,
    20 F.3d 1008 (9th Cir. 1994) ...................................................................22

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970)...........................................................................19, 22

*Preminger v. Principi*,
    422 F.3d 815 (9th Cir. 2005) ...................................................................28

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Reliable Tractor, Inc. v. John Deere Const. & Forestry Co.*,
   376 F. App'x 938 (11th Cir. 2010) ....................................................12

*Rocky Mountain Farmers Union v. Corey*,
   730 F.3d 1070 (9th Cir. 2013) ...........................................................18

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) .............................................25, 27, 28

*S. Dakota Farm Bureau, Inc. v. Hazeltine*,
   340 F.3d 583 (8th Cir. 2003) .............................................................19

*Senate of Cal. v. Mosbacher*,
   968 F.2d 974 (9th Cir. 1992) .............................................................10

*State of Nev. Emps. Ass'n v. Keating*,
   903 F.2d 1223 (9th Cir. 1990) ...........................................................14

*Sveen v. Melin*,
   138 S. Ct. 1815 (2018).................................................................11, 14

*Union Pac. R. Co. v. California Pub. Utilities Comm'n*,
   346 F.3d 851 (9th Cir. 2003) .............................................................23

*Utd. Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt.
   Auth.*,
   550 U.S. 330 (2007).............................................................................18

*Valle del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ...........................................................28

*VIP of Berlin, LLC v. Town of Berlin*,
   593 F.3d 179 (2d Cir. 2010) ..............................................................24

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008)...................................................................................9

**STATUTES**

Or. Rev. Stat. § 757.518-519 .......................................................................5

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Wash. Rev. Code § 19.405.030(1)(a) ..........................................................................4

Wash. Rev. Code § 19.405.030(4)..............................................................................5

Wash. Rev. Code § 19.405.090(1).............................................................................5

**OTHER AUTHORITIES**

U.S. Const., Art. I, § 8, cl. 3....................................................................................18

U.S. Const., Art. I, § 10, cl. 1..................................................................................11

## I.    INTRODUCTION

Plaintiffs Puget Sound Energy, Inc. ("PSE"), Avista Corporation ("Avista"), Portland General Electric Company ("PGE"), and PacifiCorp (collectively, the "PNW Owners") request an order preliminarily enjoining Montana's Attorney General—Defendant Austin Knudsen—from enforcing Senate Bill 266 ("SB 266") against them.

While the PNW Owners, along with Defendants Talen Montana, LLC ("Talen") and NorthWestern Corporation ("NorthWestern"), were preparing to arbitrate certain disputes surrounding a private Ownership and Operation Agreement ("Agreement") governing their shared ownership in two coal-fired electric generation units in Colstrip, Montana ("Colstrip"), Talen and NorthWestern lobbied Montana's legislature to pass two statutes aimed at controlling Colstrip to the detriment of the PNW Owners. The first, Senate Bill 265 ("SB 265"), purports to invalidate the parties' arbitration agreement because it does not provide for arbitration in Montana under Montana arbitration laws. The second, SB 266, is the subject of this motion.[1] It impermissibly impairs the Agreement because it punishes—with fines of up to $100,000 per day—an owner that engages in any "conduct … to bring about permanent closure" of one or both

---

[1] SB 266 is attached as Appendix 1.

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 1
152586906.3

Colstrip units without the unanimous consent of owners, contrary to the terms of the Agreement; because the act's vague language could be interpreted to punish the PNW Owners for exercising their contract rights when deciding whether to vote against proposed operating, maintenance, and capital budgets for Colstrip; and because the law's vague language could be interpreted to punish the PNW Owners for even proposing or voting on closure of either Colstrip unit without Talen's and NorthWestern's consent.

Driven by narrow self-interest, the Montana legislature passed SB 266 for the benefit of Montana, Talen, and NorthWestern and to the detriment of the PNW Owners. This motion seeks to enjoin Defendant Knudsen ("Defendant") from enforcing SB 266 pending a trial on the merits because the PNW Owners are likely to prevail on their claims that SB 266 violates the Contract, Commerce, and Due Process Clauses of the United States Constitution.[2]

---

[2] Plaintiffs also assert claims against Talen and NorthWestern seeking declarations that SB 265 is unconstitutional as applied to the Agreement. Those claims are not the subject of this motion. There are two other ongoing actions concerning SB 265. Roberts Decl. ¶ 48.

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 2
152586906.3

## II.    STATEMENT OF FACTS

### A.    Colstrip and the Agreement

Colstrip Units 3 and 4 are coal-fired electric generation units in Colstrip,

Montana. The units are operated by Talen and owned by PSE, Avista, PGE,

PacifiCorp, Talen, and NorthWestern, with the following ownership interests:

| Owner | Unit 3 | Unit 4 |
|---|---|---|
| PSE | 25% | 25% |
| PGE | 20% | 20% |
| Avista | 15% | 15% |
| PacifiCorp | 10% | 10% |
| Talen | 30% | — |
| NorthWestern | — | 30% |

Roberts Decl. ¶ 9. The Agreement, signed in 1981, refers to Colstrip Units 3 and 4,

along with certain rights to property, as the "Project." *Id.*, Ex. A, § 1(n).

The Agreement establishes a five-member Committee "to facilitate effective

cooperation, interchange of information and efficient management of the Project."

*Id.*, Ex. A, § 17(a); Amend. No. 1, § 2(k). Committee members' voting rights are

based on the ownership interests or "Project Shares" they represent, as reflected

below:

| Owner | Project Share |
|---|---|
| Avista | 15% |
| PacifiCorp | 10% |
| PGE | 20% |
| PSE | 25% |
| Talen | 30% |

*Id.* ¶ 11, Ex. A, § 17(a). A vote sharing agreement purports to allocate Talen's vote to Talen or NorthWestern in certain circumstances. *Id.* ¶ 12.

For most matters, the Committee may act if certain voting requirements are met and members representing at least 55% of Project Shares agree on the action. *Id.*, Ex. A, § 17(f). A decision to close one or both units of Colstrip falls within broad categories of Committee votes requiring 55% approval, including sections 17(f)(i), 17(f)(xi), and 17(i). *Id.*, Ex. A.

## B.    State Restrictions on Coal-Fired Electricity and the Future of Colstrip

Washington and Oregon have passed laws to eliminate the use of electricity produced by coal. In 2019, Washington enacted the Clean Energy Transformation Act, which requires "each [Washington] electric utility [to] eliminate coal-fired resources from its allocation of electricity" by December 31, 2025. Wash. Rev. Code § 19.405.030(1)(a). Thus, by the end of 2025, PSE, Avista, and PacifiCorp will no longer be able to use Colstrip to serve Washington customers (without paying substantial penalties designed to make that option economically irrational).

Wash. Rev. Code §§ 19.405.030(4), 19.405.090(1); Roberts Decl. ¶ 16. Oregon

enacted a similar statute that prohibits Oregon utilities, including PGE and

PacifiCorp, from using coal-fired resources to serve Oregon customers as of

January 1, 2030. Or. Rev. Stat. § 757.518–519.

   While the PNW Owners are under state mandate to transition from Colstrip,

NorthWestern has stated publicly that it intends to keep Colstrip running until at

least 2042, and Talen has publicly expressed its belief that Colstrip has a "long life

cycle." Hanson Decl., Exs. A (12:3–4), C (5:12–14, 59:2–7).

## C.    The Colstrip Owners' Budget Dispute and Pending Arbitration

   In September 2020, Talen, as Operator, submitted a proposed 2021 budget to

the Committee that failed to reflect budget reductions and address inefficiencies

that the PNW Owners had been requesting for months. Roberts Decl. ¶¶ 29–30.

The PNW Owners objected, proposed reductions, requested additional information,

and asked Talen to prepare an alternative budget reflecting scenarios for closing

Units 3 and 4. *Id.* ¶ 30. ¶ The PNW Owners approved a revised operations and

maintenance budget on March 22, 2021, but the revised budget did not resolve

their concerns. *Id.* ¶ 34. They asked Talen to "[i]mmediately begin the budgeting

process for the 2022 operating year with full line item detail" and to actively

identify opportunities for budget reductions and efficiencies. *Id.* Ex. B.

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 5
152586906.3

On March 12, 2021, during the budget dispute, NorthWestern sent an arbitration demand to the other Colstrip owners, which it amended on April 2. *Id.* ¶¶ 35–36. NorthWestern seeks declaratory relief as to the owners' rights and obligations under the Agreement, including whether unanimity is required to close one or both units and what the owners' funding obligations are prior to unanimous consent to close a unit. *Id.* ¶¶ 35–36. NorthWestern earlier raised these issues in a February 9, 2021, letter that triggered a contractual 30-day negotiation period before it could initiate arbitration. *Id.* ¶ 36 & Ex. A § 18. An arbitrator has not yet been appointed, and the parties are litigating the terms governing the arbitration. *Id.* ¶¶ 38, 48.

In short, arbitration will resolve whether the Agreement provides that a single minority owner of Colstrip, such as NorthWestern or Talen, can force the PNW Owners to keep both Colstrip units open and to fund a 70% share of operating costs.

## D.    Talen and NorthWestern Lobbied For—and the Montana Legislature Passed—Legislation Aimed at Colstrip and the Agreement

While Colstrip's owners were starting arbitration, Talen and NorthWestern lobbied in support of SB 266. Hanson Decl., Exs. A–D. The bill, now enacted, aims to ensure that Talen or NorthWestern can control Colstrip for the benefit of Montana (supposedly) and to the detriment of the PNW Owners. The focus of the

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 6

legislative hearings was Colstrip, the Agreement, and the PNW Owners. *See id.*,

Exs. A, C.[3]

For example, Senator Fitzpatrick, the sponsor of SB 266, introduced the bill

as "an important piece of legislation because it allows us to have greater control

over the Colstrip facility." *Id.* Ex. A (2:20–22). He complained that "[Montana]

ha[s] out-of-state corporations who are acting in a way … that could destroy a

valuable asset [Colstrip] for the people of Montana." *Id.* (51:4–6). That asset (70%

owned by the PNW Owners), he emphasized, "pays a tremendous amount of taxes,

is important for our economy[, and is] important for users of energy facilities in the

state." *Id.* Ex. C (3:3–5). Thus, Senator Fitzpatrick proposed that Montana "push[]

back" by forcing the PNW Owners to keep running and subsidizing Colstrip:

> [W]hat we're doing is we're pushing back against really regulators in
> other states who are trying to impose kind of their new green deal type
> of public policy in the state of Montana, and it's hurting Montana.
> And so I think we have every right to stand up and say no, and use
> any means necessary here at the legislature to make sure that our
> interests aren't trampled by the environmental views in the states of
> Washington and Oregon.

*Id.* Ex. A (49:14–22). In his comments discussing SB 266, Senator Fitzpatrick did

not reference any other electric generation facility in Montana. *Id.* Exs. A, C.

---

[3] When asked about the genesis of the bill, Senator Fitzpatrick said it was because
of concerns over Colstrip after discussions with senators whose districts include or
are near Colstrip. Hanson Decl., ¶ 7 & Ex. C (53:10–25). One of those senators,
Senator Ankney, described SB 266 as "a Colstrip bill." *Id.*, Ex. A (5:23–24).

The focus on Colstrip was not limited to Senator Fitzpatrick. Review of transcripts for the committee hearings confirms that Colstrip was the target of SB 266. *See id.* Every speaker's prepared comments concerned Colstrip, and Colstrip was the topic of the vast majority of questions and statements by legislators. *See id.* No other facility's operating agreement was referenced at the hearings. *See id.*

Talen and NorthWestern appeared at the legislative hearings in support of SB 266. *Id.* Exs. A–D. Their efforts were rewarded: SB 266 was signed into law on May 3, 2021. *Id.* ¶ 9. Upon signing SB 266 (and SB 265), Montana's Governor confirmed that the bill was aimed at Colstrip and was a direct attack on the Pacific Northwest and the utilities that operate there:



**Governor Greg Gianforte** ✔
@GovGianforte

Affordable power generated in Colstrip helped build Seattle's big tech economy, but now woke, overzealous regulators in Washington State are punishing the people of Colstrip with their anti-coal agenda.

Montana stands with Colstrip, which is why I proudly signed SB 265 and 266.

4:41 PM · May 3, 2021 · Twitter Web App

*Id.* ¶ 8.

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION – 8

SB 266 amends the Montana Unfair Trade Practices and Consumer Protection Act to create two new unfair or deceptive acts or practices. The first is a "failure or refusal of an owner of a jointly owned electrical generation facility in the state to fund its share of operating costs." SB 266 § 2(1)(a). The second is "[c]onduct by one or more owners of a jointly owned electrical generation facility in the state to bring about permanent closure of a generating unit of a facility without seeking and obtaining the consent of all co-owners of a generating unit." *Id.* § 2(1)(b). The law authorizes the Department of Justice to pursue injunctive relief and request a civil fine of up to "$100,000 for each violation," with "[e]ach day of a continuing violation" counting as "a separate offense." *Id.* § 2(2)(a)–(b).

## III.    ARGUMENT

### A.    Legal Standards for a Preliminary Injunction

A party is entitled to a preliminary injunction if it "establishes that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Although not dispositive by itself, the first factor—likelihood of success— is the "most important." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Plaintiffs may obtain a preliminary injunction "under the 'sliding scale' variant of the *Winter* standard" even if they are unlikely to succeed on the merits.

*All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). Under that standard, the plaintiff must show that there are "serious questions going to the merits,"[4] that "'the balance of hardships tips *sharply* in the plaintiff's favor,' and [that] the other two *Winter* factors are satisfied." *Id.*[5]

## B.    The PNW Owners are Entitled to a Preliminary Injunction

In this case, a preliminary injunction is both necessary and appropriate because the PNW Owners are likely to succeed on the merits, they will suffer irreparable harm if Defendant is not barred from enforcing SB 266, and neither Montana nor the public have an interest in immediate enforcement of the bill.

### 1.    The PNW Owners Are Likely to Succeed on the Merits

#### a.    SB 266 Violates the Contract Clause

SB 266 violates the Contract Clause of the United States Constitution. While SB 266's purported *objective* is to advance Montanans' interests, the bill's *substance* benefits two companies—Talen and NorthWestern—by substantially impairing a private contract to give them leverage to dictate the future of Colstrip.

---

[4] "Serious questions" are questions that are "substantial, difficult, and doubtful as to make them a fair ground for litigation and thus more deliberative investigation." *Senate of Cal. v. Mosbacher*, 968 F.2d 974, 977 (9th Cir. 1992) (cleaned up).

[5] "Under the principle of *Ex Parte Young*, private individuals may sue state officials for prospective relief against ongoing violations of federal law." *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 847 (9th Cir. 2002).

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 10

The Contract Clause prohibits any state "Law impairing the Obligation of Contracts." U.S. Const., Art. I, § 10, cl. 1. The two-step inquiry for applying the Clause asks (1) "whether the state law has operated as a substantial impairment of a contractual relationship" and (2) whether it is "an appropriate and reasonable way to advance a significant and legitimate public purpose." *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018) (cleaned up). SB 266 fails at both steps.

### (i)    The Bill Substantially Impairs the PNW Owners' Rights Under the Agreement

SB 266 substantially impairs the contractual relationship established by the Agreement. A law substantially impairs a contract if, among other things, the law "nullifies express terms of the company's contractual obligations and imposes a completely unexpected liability in potentially disabling amounts." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247 (1978). That is what SB 266 does by subjecting each PNW Owner to a $100,000 per-day penalty for exercising rights under the Agreement.

First, SB 266 "nullifies" the PNW Owners' right to close one or both of Colstrip's generating units with less-than-unanimous consent. *Spannaus*, 438 U.S. at 247. The Agreement gives Committee members the right to close a generating unit by submitting a proposal and obtaining the support of members with 55% of the Project Shares. SB 266 overrides the 55% vote-threshold and imposes a unanimous-consent requirement, thereby giving Talen and NorthWestern veto

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 11
152586906.3

power over Colstrip's future. *See* § 2(1)(b).[6] Altering the PNW Owners' ability to remove a generating unit from service substantially impairs their rights under the Agreement. *See Reliable Tractor, Inc. v. John Deere Const. & Forestry Co.*, 376 F. App'x 938, 942 (11th Cir. 2010) (collecting cases holding that statutes retroactively requiring good cause to cancel a contract are substantial impairments).

Second, Defendant will likely use SB 266 to nullify the PNW Owners' right to refuse to fund unreasonable budget items. Under the Agreement, a Committee member may refuse to approve the budget for operating costs so long as the member does not "unreasonably" withhold its approval, Roberts Decl., Ex. A, § 10(a), and a member may refuse to approve the budget for capital additions for any reason at all, *id.* § 7. Thus, when deciding whether to approve a proposed budget, a Committee member can consider a variety of factors, including regulations the member is subject to and Colstrip's long-term viability. Defendant will likely try to render these factors off-limits by prosecuting the PNW Owners under SB 266 should they object to a budget proposed by Talen, under a theory that it is "conduct ... to bring about permanent closure" (§ 2(1)(b)) or a "failure or

---

[6] NorthWestern contends that the Agreement requires a 100% vote to close a unit. That dispute is subject to the mandatory arbitration clause in the Agreement, Roberts Decl., Ex. A § 18, which NorthWestern and the PNW Owners have invoked. *See supra* Part II.C.

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 12
152586906.3

refusal ... to fund its share of operating costs" (§ 2(1)(a)).[7] The threat of such a

prosecution unquestionably impairs the PNW Owners' rights to reject a proposed

budget.

Finally, SB 266 "imposes a completely unexpected liability in potentially

disabling amounts." *Spannaus*, 438 U.S. at 247. It subjects each PNW Owner to a

staggering $100,000-per-day "civil fine" for exercising their contractual rights—

effectively writing a liquidated damages clause into the Agreement. *See* § 2(2)(b).

The Supreme Court has held that a statute operates as "a substantial impairment of

a contractual relationship" if the statute subjects a party to "damages" that were not

available under the existing contract. *Keystone Bituminous Coal Ass'n v.*

*DeBenedictis*, 480 U.S. 470, 504 (1987) (holding that nullifying contractual

waivers of liability for surface damage substantially impaired mining contracts).

---

[7] To be clear, SB 266 does not authorize such a prosecution. The act prohibits an owner from "fail[ing] or refus[ing] ... to fund *its share of operating costs*." § 2(1)(a). An owner's "share of operating costs" is set by the budget that the Committee passes. Thus, an owner cannot be prosecuted for failing to pass a budget. Nor should the conduct prong in Section 2(1)(b) be read to reach budget-related decisions. In any event, the conduct prong is unconstitutionally vague. *See infra* Part III.B.1.c.

Despite SB 266's plain language, the bill's history makes clear that Defendant will use Section 2(1)(a) to force Plaintiffs to approve budgets Talen proposes. SB 266 was passed after a budget impasse discussed extensively by the bill's proponents. *See* Hanson Decl., Exs. A (2:22–3:2, 28:25–40:11), C (3:20–24; 7:17–8:17; 39:6–20). They blamed the PNW Owners for the impasse and wanted to prevent similar disputes. *Id.* Ex. C (53:10–19) (Colstrip budget dispute "led to the creation of this bill").

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 13

Likewise, the Ninth Circuit has held that "[t]he elimination of the right of public employees to withdraw pension contributions *without penalty* … substantially impair[s] the State's contractual obligations" with its employees. *State of Nev. Emps. Ass'n v. Keating*, 903 F.2d 1223, 1227 (9th Cir. 1990). And the Montana Supreme Court has held that statutory "penalty provisions," which diminished the salary for judges who did not issue opinions within 90 days of submission, violated the federal Contract Clause. *Coate v. Omholt*, 662 P.2d 591, 593, 597–98 (Mont. 1983). The same conclusion applies here. SB 266 impairs the contractual relationship by subjecting the PNW Owners to massive fines that are designed to make it economically impossible for them to exercise their rights under the terms of the Agreement.

   (ii) **SB 266 Fails to Advance a Significant and Legitimate Public Purpose**

SB 266 fails at the second step because it does not "advance a significant and legitimate public purpose." *Sveen*, 138 S. Ct. at 1822 (cleaned up). As the Supreme Court has held, a law with "a very narrow focus" that is "aimed at specific" companies is not addressing "an important general social problem." *Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. 400, 412 n.13 (1983). And SB 266 is certainly "narrowly targeted to modify" the Agreement, "rather than being part of a broad public program with incidental impairing

benefits." *Cont'l Ill. Nat'l Bank & Tr. Co. v. Washington*, 696 F.2d 692, 702 (9th Cir. 1983).

First, Section 2(1)(b) applies only to "owners of a jointly owned electrical generation facility." When a "statute applie[s] only to" parties that have "entered into [certain] agreements, its sole effect [i]s to alter contractual duties." *Exxon Corp. v. Eagerton*, 462 U.S. 176, 192 (1983). SB 266's impact on the Agreement is not "incidental to its main effect." *Id.* It is the "main effect." *Id.* The "special interest character of the legislation" is evident from its "target[ing a] specific class[]" of plant owner, instead of "extend[ing] to all" plant owners. *Baltimore Teachers Union v. Mayor & City Council*, 6 F.3d 1012, 1021 (4th Cir. 1993); *see also Exxon Corp.*, 462 U.S. at 191 (upholding a "prohibition" that "applied to all oil and gas producers").

Second, the circumstances of SB 266's passage indicate Montana "ha[s] not acted to meet an important general social program." *Energy Reserves Grp.*, 459 U.S. at 412 n.13. As explained above, the timing, legislative record, signing statement, and substance of SB 266 irrefutably prove it is aimed at preventing Plaintiffs from taking action to close either of Colstrip's generating units.[8] SB 266 is just like the pension statute struck down in *Spannaus*, which "had a very narrow focus" and "may have been directed at one particular employer planning to

---

[8] *See supra* Part II.D.

terminate its pension plan when its collective-bargaining agreement expired."
*Energy Reserves Grp.*, 459 U.S. at 412 n.13. Likewise, Section 2(1)(b) "has an
extremely narrow focus," because "[i]t applies only to" joint owners of electrical
generation facilities that operate in Montana, "[a]nd it applies only when such" an
owner or owners attempt to "clos[e]" a generating unit without obtaining consent
of all co-owners. *Spannaus*, 438 U.S. at 248. SB 266 "can hardly be characterized"
as a law "enacted to protect a broad societal interest rather than a narrow class." *Id.*
at 249.

It does not matter that SB 266's recitals assert as a pretense that its purpose
is to promote "environmental remediation," ensure a "reliable supply of
electricity," and secure "the safety of workers at the facility." SB 266 at 1. "The
*stated* objectives" of a law are irrelevant if "the *substance* of the" law "serve[s] a
different objective." *Assoc. Builders & Contractors, Golden Gate Chapter Inc. v.
Baca*, 769 F. Supp. 1537, 1550 (N.D. Cal. 1991). In *Associated Builders*, an
ordinance conditioned the issuance of building permits on the builder agreeing "to
pay the general prevailing *per diem* wages" and stated it was promoting "safety,"
reducing "dependence on government subsidies," and promoting "the local
economy." *Id.* at 1540, 1550. The court acknowledged that "safety" was a public
purpose and the others might qualify in some cases, but the actual provisions of the
law were simply "economic legislation for the benefit of certain groups, primarily

the members of certain unions." *Id.* at 1537. The same dynamic applies here. SB 266 purports to serve public purposes. But in practice, all it does is give Talen and NorthWestern contractual leverage—with no statutory provision guaranteeing that they will use that leverage for the benefit of Montanans. A law that "primarily benefits a particular economic actor" with only potential "incidental public benefits" does not satisfy the Contract Clause. *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 733 (8th Cir. 2019).

Careful consideration of SB 266's provisions makes that clear. It does not empower Defendant to act based on *actual* effects on the "supply of electricity for Montanans," "the safety of workers," or "environmental remediations." Rather, it makes "unanimous consent of all co-owners" a de facto contractual condition, granting newfound leverage to Talen and NorthWestern. Nor is the unanimous consent rationally related to the purported purposes. Under SB 266, if *all* the facility's owners agree to permanently close the entire "facility" tomorrow, there is no violation—even if doing so would disrupt the "supply of electricity for Montana consumers." SB 266 at 1, § 2(1)(b). But if *most* owners, consistent with the terms of the Agreement, elect to permanently close one "generating unit" in a gradual

manner that will not affect Montana consumers, they would still be subject to substantial civil fines. *Id.*[9]

### b.    SB 266 Violates the Commerce Clause

SB 266 also violates the Commerce Clause, which grants Congress the exclusive power "[t]o regulate Commerce ... among the several States." U.S. Const., Art. I, § 8, cl. 3. The Clause "insure[s]... against discriminating State legislation." *Bacchus Imports Ltd. v. Dias*, 468 U.S. 263, 270 (1984) (cleaned up). It thus places "an implicit restraint on state authority, even in the absence of a conflicting federal statute." *Utd. Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). This "negative command" is "known as the dormant Commerce Clause." *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

State laws can violate the Dormant Commerce clause in two ways. First, under the "virtually *per se* rule of invalidity," a state law whose goal is "simple economic protectionism" is subject to strict scrutiny. *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1097 (9th Cir. 2013) (cleaned up). A state law triggers this rule if it has a "discriminatory purpose ... or discriminatory effect." *Bacchus*, 468 U.S. at 270. Second, under the so-called *Pike* test, a law that is

---

[9] SB 266 is not necessary to keep Colstrip open. Under the Agreement, the Operator can sell the units removed from service as complete units to a new owner that wants to continue to operate them. Roberts Decl., Ex. A § 31.

"even[]handed[]" and imposes only "incidental" burdens on interstate commerce is unconstitutional if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The "local benefits" that can be considered under *Pike* do not include a state's narrow interests, such as "protecting a major local industry." *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951). SB 266 fails both tests.

### (i)    SB 266 Discriminates Against Out-of-State Commerce in Both Purpose and Effect

SB 266 is subject to virtually per se invalidity because it has a "discriminatory purpose" and "discriminatory effect." *Bacchus*, 468 U.S. at 270. A law is discriminatory if it uses out-of-state businesses to prop up a "struggling" local industry. *Id.* at 272 (invalidating an excise tax that "subsidize[d] liquor industries peculiar to Hawaii"). Here, SB 266's purpose and effect is to force out-of-state companies to continue owning and funding an increasingly uneconomic Montana power plant.

As to purpose, there is no need to "guess at the legislature's motivation" here. *Bacchus*, 468 U.S. at 271. The legislative record is replete with "direct evidence" that SB 266's "drafters" and ratifiers were targeting Colstrip's out-of-state owners. *S. Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 593–94 (8th Cir. 2003). Senator Fitzpatrick, the sponsor of SB 266, introduced the bill as "an

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 19

important piece of legislation because it allows us to have greater control over the Colstrip facility." Hanson Decl., Ex. A (2:20–22). He repeatedly made clear SB 266 was aimed at "the West Coast owners of the facility," who were "out-of-state corporations," "coming into the state of Montana." *Id.*, Ex. A (2:25, 51:4), Ex. C (3:1–2). And he stressed that the ultimate goal was to ensure Colstrip continued to operate because "it's an important facility…. for the people of Montana" that provides "jobs" and "tax revenue" to Montanans. *Id.*, Exs. A (3:18–4:9), C (3:7–10).

The legislative record confirms that Colstrip was the sole focus of SB 266. Every speaker's prepared comments concerned Colstrip, and questions and statements by legislators overwhelmingly focused on Colstrip. *See id.*, Exs. A, C. Colstrip is discussed on *every* page of the transcript for the SB 266 portion of the committee hearing in the Senate, and the same is true for nearly every page for the House hearing. *See id.*[10] The Governor reiterated SB 266's protectionist purpose in his signing statement, declaring it was designed to ensure "[a]ffordable power generated in Colstrip"—based in Montana—and to punish "woke, overzealous regulators in Washington State" (and thereby the PNW Owners). The legislative record provides direct, uncontradicted evidence of SB 266's discriminatory purpose. *See Ass'n des Éleveurs de Canards et d'Oies v. Becerra*, 870 F.3d 1140,

---

[10] *See also supra* Part II.D.

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION – 20

1144 (9th Cir. 2017) (citing statements from "[t]he law's author" and the Governor's "signing statement" to establish legislative purpose). What's more, SB 266 was passed on the same day as SB 265—also sponsored by Senator Fitzpatrick—which mandates arbitration in Montana for disputes "involving an electrical generation facility." SB 265 § 1(2)(a); Dkt. 32-2. SB 266 is part of a legislative scheme aimed at creating leverage over the PNW Owners to ensure they continue to fund Colstrip in perpetuity.

SB 266 also has a discriminatory practical effect as it "promote[s] a local industry" by "impos[ing] a burden on" out-of-state companies. *Bacchus*, 468 U.S. at 273. SB 266 ensures that Colstrip will continue generating electricity and jobs for Montana residents—but not Washington or Oregon residents—for far longer than 2025 or 2030. And it does so by shifting most of the expense of these ongoing operations to out-of-state companies that are subject to governmental mandates to eliminate Colstrip from their allocation of electricity to serve their customers.

Because SB 266 is discriminatory in both purpose and effect, and just one will suffice, it is subject to a "virtually *per se* rule of invalidity" under the Commerce Clause. Defendant bears the burden of demonstrating that the state's interests here could not be advanced through any non-discriminatory means. But even at the preliminary-injunction stage, it is clear that he cannot meet this near-

impossible burden. For example, Montana could fund alternative sources of energy without imposing a discriminatory burden on the PNW Owners.

> **(ii)** **Even if SB 266 Were Non-Discriminatory, It Nonetheless Would Violate the Commerce Clause**

Even if this Court were to somehow conclude that SB 266 does not have a discriminatory purpose or effect, it would still violate the Commerce Clause.

Under *Pike*, SB 266 fails if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142. There is no ascertainable interest for Montana in this statute other than keeping Colstrip open. Montana's interests in tax revenue, jobs for its citizens, and reliable power in the future cannot support SB 266: A state's narrow interests cannot be considered under *Pike*. *See Dean Milk Co.*, 340 U.S. at 354. The "impacts" of SB 266, in contrast, are significant and "fall more heavily on out-of-state interests." *Pac. Nw. Venison Producer*s v. *Smitch*, 20 F.3d 1008, 1015 (9th Cir. 1994). The PNW Owners would be required to continue funding a source of power that Washington and Oregon have prohibited them from using to serve their customers in those states by as early as the end of 2025. By effectively mandating that out-of-state companies continue to own and fund a coal-fired power plant, SB 266 not only has an "extra-territorial effect," but also threatens "a patch-work regulatory scheme" whereby states attempt to dictate the business model of out-of-state companies.

*Union Pac. R. Co. v. California Pub. Utilities Comm'n*, 346 F.3d 851, 871 (9th Cir. 2003).

For these reasons, the PNW Owners are likely to succeed on their claims that SB 266 violates the Commerce Clause. At a minimum, those claims raise "serious questions" that suffice for injunctive relief under the Ninth Circuit's sliding-scale approach given the serious irreparable harm the PNW Owners would likely suffer absent an injunction.[11]

### c.    SB 266's Closure Provision Is Unconstitutionally Vague

SB 266's closure provision is constitutionally deficient for yet another reason: the phrase "conduct ... to bring about permanent closure" could encompass such a wide-range of behavior that it fails to notify owners what they cannot do, while inviting Defendant to arbitrarily enforce the law.

The Due Process Clause invalidates "laws that are impermissibly vague." *F.C.C. v. Fox Television Stations*, 567 U.S. 239, 253 (2012). A law is void for vagueness if it (1) "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or (2) "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* (cleaned up). SB 266's closure provision offers neither fair notice nor standards.

---

[11] *See infra* Part III.B.2.

Starting with notice, the provision is so broad and ill-defined that an owner "must necessarily guess at its meaning." *Coats v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (cleaned up). The provision reaches any "[c]onduct" that might "bring about" the "closure of a generating unit of a facility without ... the consent of all owners." SB 266 § 2(1)(b). But the provision fails to specify whether it prohibits conduct that *actually* "bring[s] about" closure, is *likely* to "bring about" closure, or *might* "bring about" closure. Thus, the provision might prohibit (1) forcibly shutting down an electrical generation facility; (2) voting to shut down a facility under an operating agreement that allows a non-unanimous vote to prevail; (3) demanding an arbitration to determine whether a facility's operating agreement requires unanimous consent to shut down the facility; (4) deciding not to fund a budget that assumes the facility will operate for decades to come; or (5) advocating—in litigation or to the Montana's legislature—closure of a fossil-fuel facility or replacement with a renewable alternative.[12] An owner has no way of knowing which of these actions are, in fact, prohibited because the closure provision does not "provide any clues about how the statute [will] be applied." *See*

---

[12] Because the breadth of SB 266 means it "might infringe constitutional rights," it is subject "to the strictest" vagueness test. *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (cleaned up).

*Forbes v. Napolitano*, 236 F.3d 1009, 1013 (9th Cir. 2000). And a wrong

prediction could expose an owner to $100,000 per-day fines.

The provision is also impermissibly "standardless." *Fox*, 567 U.S. at 253

(cleaned up). It covers all "conduct"—even constitutionally protected conduct—

that might "bring about" the closure of a generational unit, without defining "a

core of proscribed behavior." *Forbes*, 236 F.3d at 1012. Its failure to give any

"guidance as to where the state should draw the line" renders it invalid. *Id.* at 1013.

And here, the risk of arbitrary enforcement is particularly acute because the law is

aimed at a disfavored group and was passed in a politicized environment.

### 2.    The PNW Owners Will Suffer Irreparable Harm if Defendant Is Not Enjoined

If Defendant is not enjoined from enforcing SB 266 and infringing the PNW

Owners' constitutional rights, then the PNW Owners will be irreparably injured.

"It is well established that the deprivation of constitutional rights unquestionably

constitutes irreparable injury." *Hernandez* v. *Sessions*, 872 F.3d 976, 994 (9th Cir.

2017) (cleaned up). Where, as here, a state law "raises serious constitutional

concerns," then "it follows" that "'irreparable harm is likely.'" *Rodriguez v.

Robbins*, 715 F.3d 1127, 1144–45 (9th Cir. 2013) (cleaned up).

Beyond infringing constitutional rights, SB 266 will also injure the PNW

Owners by prohibiting them—on pain of $100,000 fines each day—from taking

the business steps necessary to transition away from Colstrip's coal-based

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 25

152586906.3

electricity. Plaintiffs face irreparable injury where they must make the so-called "choice" whether to "continually violate the [challenged] law and expose themselves to potentially huge liability; or violate the law once as a test case and suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). That is precisely the case here: The PNW Owners must either abandon plans to transition away from Colstrip or face penalties of up to $100,000 for each day they proceed with their plans.

There is no dispute that, absent SB 266, the PNW Owners will necessarily transition away from Colstrip in the near future. As discussed above, each PNW Owner is subject to a mandate to stop using electricity generated by Colstrip by the end of 2025 in Washington or by 2030 in Oregon. Accordingly, under their respective long-term plans, the PNW Owners have signaled their intent to remove Colstrip Units 3 and 4 from their Washington and Oregon electricity portfolios in the interest of their customers.[13] "Transitioning from sources of electricity is a complex and costly process that requires long-term planning to ensure utilities have sufficient generation for their customer load." Roberts Decl. ¶ 21. Thus, the PNW Owners "must take steps now to transition away from Colstrip Units 3 and

---

[13] *See* Roberts Decl. ¶¶ 19–21; Thackston Decl. ¶¶ 10–12; Greene Decl. ¶¶ 11–13; Johanson Decl. ¶¶ 5–6.

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 26

4," as mandated under the laws and regulations in place in Washington and Oregon. *Id.*

SB 266 will put a stop to those efforts. Indeed, the PNW Owners have already delayed proposing a Committee vote on the closure of Colstrip's Unit 3 because of SB 266 and the threat of enforcement by Defendant. *See* Roberts Decl. ¶ 42. If the PNW Owners cannot transition from Colstrip, they will be saddled with a generating asset they cannot use for their customers in Washington or Oregon, but will be required to continue to pay to provide power to Montana residents. And they will be unable to take steps toward closing either of Colstrip's two remaining units or even to meaningfully engage in the Colstrip budget process, consistent with their obligations to customers, without subjecting themselves to significant potential liability. Put simply, the PNW Owners and their customers will be irreparably injured unless Defendant is enjoined from enforcing SB 266.

### 3.    The Balance of Harms Favors the PNW Owners

This factor considers "the balance of the equities" between the parties. *Rodriguez*, 715 F.3d at 1145. In contrast to the significant harm that the PNW Owners face, Defendant will suffer no harm from a preliminary injunction. Neither Defendant nor his client Montana can "suffer harm from an injunction that merely ends an unlawful practice." *Id.* Defendant therefore "cannot reasonably assert" that

he or Montana is "harmed in any legally cognizable sense by being enjoined from constitutional violations." *Id.* (cleaned up).

### 4.    The Public Interest Supports Injunctive Relief Here

"The public interest inquiry primarily addresses the impact on non-parties rather than parties." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) (cleaned up). Here, the factor significantly favors a preliminary injunction: "It is clear that it would not be equitable or in the public's interest to allow [Montana] to violate the requirements of federal law." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (cleaned up). For that reason, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up). Nor is there any risk that the PNW Owners will close Colstrip in the immediate future. In January 2021, they approved tens of millions of dollars in capital expenditures to overhaul Unit 3 to keep it operating until its next scheduled overhaul in 2025; they approved an overhaul for Unit 4 in 2020. Roberts Decl. ¶ 33.

### 5.    At a Minimum, the "Serious Questions" Test Requires Injunctive Relief

At a minimum, the PNW Owners are entitled to a preliminary injunction under the sliding-scale *Winter* standard because they have raised "serious questions going to the merits," the balance of hardships tips sharply towards them, they have

shown a likelihood of irreparable injury, and the injunction is in the public interest.

*Wild Rockies*, 632 F.3d at 1135.

## IV.   CONCLUSION

The PNW Owners respectfully request that their motion for a preliminary

injunction be granted.

DATED this 27th day of May, 2021.

HANSBERRY & JOURDONNAIS, PLLC

*/s/ Charles E. Hansberry*
Charles E. Hansberry
Jenny M. Jourdonnais

*Attorneys for Plaintiffs Portland
General Electric Company, Avista
Corporation, PacifiCorp, and Puget Sound
Energy, Inc.*

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 29

/s/ Harry H. Schneider, Jr.

Harry H. Schneider, Jr.
(*Pro Hac Vice forthcoming*)
Jeffrey M. Hanson
(*Admitted Pro Hac Vice*)
Gregory F. Miller
(*Pro Hac Vice forthcoming*)
PERKINS COIE LLP
HSchneider@perkinscoie.com
JHanson@perkinscoie.com
GMiller@perkinscoie.com
Perkins Coie, LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Ph: (206) 359-8000
Fax: (206) 359-9000
*Attorneys for Plaintiff Puget Sound Energy, Inc.*


/s/ Gary M. Zadick

Gary M. Zadick
gmz@uazh.com
UGRIN ALEXANDER ZADICK, P.C.
#2 Railroad Square, Suite B
PO Box 1746
Great Falls, MT 59403
Ph: (406) 771-0007
Fax: (406) 452-9360
*Attorneys for Plaintiff Portland General Electric Company*

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 30

/s/ Dallas DeLuca
Dallas DeLuca
David B. Markowitz
Harry B. Wilson
(*Admitted Pro Hac Vice*)
DavidMarkowitz@MarkowitzHerbold.com
DallasDeLuca@MarkowitzHerbold.com
HarryWilson@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Ph: (503) 295-3085
Fax: (503) 323-9105
*Attorneys for Plaintiff Portland General
Electric Company*


/s/ William J. Schroeder
William J. Schroeder
(*Admitted Pro Hac Vice*)
KSB LITIGATION P.S.
William.schroeder@Ksblit.legal
510 W Riverside, Suite 300
Spokane, WA 99201
Ph: (509) 624-8988
Fax: (509) 474-0358
*Attorneys for Plaintiff Avista Corporation*

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 31
152586906.3

/s/ Michael G. Andrea
_____
Michael G. Andrea
(*Admitted Pro Hac Vice*)
Avista Corporation
Michael.Andrea@avistacorp.com
1411 W. Mission Ave.
Spokane, WA 99202
Ph: (509) 495-2564
Fax: (509) 777-5468
*Attorney for Plaintiff Avista Corporation*


/s/ Troy Greenfield
_____
Troy Greenfield
Connie Sue Martin
(*Admitted Pro Hac Vice*)
SCHWABE WILLIAMSON & WYATT
TGreenfield@Schwabe.com
CSMartin@Schwabe.com
US Bank Centre
1420 Fifth Avenue, Suite 3400
Seattle, WA 98101
Ph: (206) 407-1581
Fax: (206) 292-0460
*Attorneys for Plaintiff PacifiCorp*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(d)(2)(E), I certify that this Plaintiffs' Brief in Support of Motion for Preliminary Injunction is printed with proportionately spaced Times New Roman text typeface of 14 points; is double-spaced; and the word count, calculated by Microsoft Office Word, is 6,472 words long, excluding Caption, Certificate of Service, Table of Contents and Authorities, and Certificate of Compliance.

DATED this 27th day of May, 2021.

HANSBERRY & JOURDONNAIS, PLLC

*/s/ Charles E. Hansberry*
Charles E. Hansberry
Jenny M. Jourdonnais

*Attorneys for Plaintiffs Portland General Electric Company, Avista Corporation, PacifiCorp, and Puget Sound Energy, Inc.*

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2021, a copy of the foregoing document was

served on the following persons:

Via ECF:

| | |
|---|---|
| 1. | Dallas DeLuca<br>MARKOWITZ HERBOLD, PC<br>1455 SW Broadway, Suite 1900<br>Portland, OR 97201<br>503-295-3085<br>Fax: 503-323-9105<br>Email: dallasdeluca@markowitzherbold.com<br>PRO HAC VICE<br><br>David B. Markowitz<br>MARKOWITZ HERBOLD, PC<br>1455 SW Broadway, Suite 1900<br>Portland, OR 97201<br>503-295-3085<br>Fax: 503-323-9105<br>Email: davidmarkowitz@markowitzherbold.com<br>PRO HAC VICE<br><br>Gary M. Zadick<br>UGRIN ALEXANDER ZADICK & HIGGINS<br>PO Box 1746<br>Great Falls, MT 59403-1746<br>406-771-0007<br>Fax: 452-9360<br>Email: gmz@uazh.com<br><br>Harry B. Wilson<br>MARKOWITZ HERBOLD, PC<br>1455 SW Broadway, Suite 1900<br>Portland, OR 97201<br>503-295-3085<br>Fax: 503-323-9105 |

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 34

<table>
<tr><td></td><td>Email: harrywilson@markowitzherbold.com<br>PRO HAC VICE<br><br>*Attorneys for Portland General Electric Company*</td></tr>
<tr><td>2.</td><td>Michael G. Andrea<br>AVISTA CORPORATION<br>1411 W. Mission Ave., MSC-17<br>Spokane, WA 99202<br>509-495-2564<br>Fax: 509-777-5468<br>Email: michael.andrea@avistacorp.com<br>PRO HAC VICE<br><br>William J. Schroeder<br>KSB LITIGATION, P.S.<br>510 W. Riverside Ave., #300<br>Spokane, WA 99201<br>509-624-8988<br>Fax: 509-474-0358<br>Email: william.schroeder@ksblit.legal<br>PRO HAC VICE<br><br>*Attorneys for Avista Corporation*</td></tr>
<tr><td>3.</td><td>Connie Sue Martin<br>SCHWABE WILLIAMSON & WYATT - SEATTLE<br>1420 5th Ave., Suite 3400<br>Seattle, WA 98101<br>206-407-1556<br>Fax: 206-292-0460<br>Email: csmartin@schwabe.com<br>PRO HAC VICE<br><br>Troy D. Greenfield<br>SCHWABE WILLIAMSON & WYATT - SEATTLE<br>1420 5th Ave., Suite 3400<br>Seattle, WA 98101<br>206-407-1581<br>Fax: 206-292-0460</td></tr>
</table>

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 35

| | |
|---|---|
| | Email: tgreenfield@schwabe.com<br>PRO HAC VICE<br><br>*Attorneys for PacifiCorp* |
| 4. | Jeffrey M. Hanson<br>Perkins Coie<br>1201 Third Avenue<br>Suite 4800<br>Seattle, WA 98101-3099<br>206-359-3206<br>Fax: 206-359-4206<br>Email: jhanson@perkinscoie.com<br>PRO HAC VICE<br><br>*Attorneys for Puget Sound Energy, Inc.* |
| 5. | J. David Jackson<br>DORSEY & WHITNEY<br>50 South Sixth Street<br>Suite 1500<br>Minneapolis, MN 55402-1498<br>612-340-2600<br>Fax: 340-2868<br>Email: jackson.j@dorsey.com<br>PRO HAC VICE<br><br>Stephen D. Bell<br>DORSEY & WHITNEY LLP - MISSOULA<br>125 Bank Street<br>Millennium Building, Suite 600<br>Missoula, MT 59802-4407<br>406-721-6025<br>Fax: 406-513-0863<br>Email: bell.steve@dorsey.com<br><br>*Attorneys for NorthWestern Corporation* |
| 6. | Via Email Only (by consent): |

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 36

|   | Robert L Sterup<br>Brown Law Firm, P.C.<br>315 North 24th Street<br>Billings, Montana 59101<br>Email: rsterup@brownfirm.com<br><br>*Attorney for Defendant Talen Montana, LLC* |
|---|---|
| 7. | Via Email Only (courtesy copy):<br><br>David Dewhirst<br>  Solicitor General<br>Stuart Segrest<br>  Assistant Attorney General<br>555 Fuller Ave.<br>P.O. Box 200151<br>Helena, MT 59620-0151<br>David.Dewhirst@mt.gov<br>SSegrest@mt.gov |

DATED this 27th day of May, 2021.

HANSBERRY & JOURDONNAIS, PLLC

*/s/ Charles E. Hansberry*
Charles E. Hansberry
Jenny M. Jourdonnais

*Attorneys for Plaintiffs Portland
General Electric Company, Avista
Corporation, PacifiCorp, and Puget Sound
Energy, Inc.*

PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION – 37
152586906.3