Charles E. Hansberry
Jenny M. Jourdonnais
HANSBERRY & JOURDONNAIS, PLLC
2315 McDonald Avenue, Suite 210
Missoula, MT 59801
chuck@hjbusinesslaw.com
jenny@hjbusinesslaw.com
Phone:  406-203-1730
Fax:  406-205-3170

> *Attorneys for Plaintiffs*
> [additional counsel on signature page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| **PORTLAND GENERAL ELECTRIC COMPANY, AVISTA CORPORATION, PACIFICORP**, and **PUGET SOUND ENERGY, INC.**, <br><br> Plaintiffs, <br><br> v. <br><br> **NORTHWESTERN CORPORATION; TALEN MONTANA, LLC; AUSTIN KNUDSEN**, in his official capacity as Attorney General for the State of Montana, <br><br> Defendants. | Case No. 1:21-cv-00047-BLG-SPW-KLD <br><br><br> **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF** |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................1

UNDISPUTED FACTS ...............................................................................2

I.      The ownership and operation of Colstrip. ........................................2

II.     Montana passes SB 266 to control Colstrip. ....................................4

III.    SB 266 harms the PNW Owners. ......................................................7

LEGAL STANDARD ..................................................................................9

ARGUMENT .............................................................................................10

I.      SB 266 violates the Contract Clause. ..............................................10

        A.      SB 266 substantially impairs the PNW Owners' contract
                rights. ....................................................................................11

                1.      SB 266 prohibits the PNW Owners from exercising
                        their contract right to engage in conduct to close
                        Colstrip. ......................................................................11

                2.      SB 266 prohibits the PNW Owners from exercising
                        their contract right to vote "no" on annual budgets. ................16

        B.      SB 266 does not advance a significant and legitimate public
                purpose, nor does it use appropriate and reasonable means. ..............18

II.     SB 266 violates the Commerce Clause. ...........................................22

        A.      The purpose of SB 266 was to favor in-state interests to the
                detriment of out-of-state interests. ......................................23

        B.      SB 266 has a discriminatory effect on out-of-state interests. .............25

        C.      Even if SB 266 were non-discriminatory, it nonetheless
                violates the Commerce Clause. ............................................27

III.    The PNW Owners are entitled to a permanent injunction. ............................27

CONCLUSION ..........................................................................................28

**i -     PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL
          SUMMARY JUDGMENT REGARDING THEIR FOURTH AND
          FIFTH CLAIMS FOR RELIEF**

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Cases</u>

*Allied Structural Steel Co. v. Spannaus*
    438 U.S. 234 (1978)............................................ 11, 13, 14, 17, 18, 20

*Ass'n des Éleveurs de Canards et d'Oies v. Becerra*,
    870 F.3d 1140 (9th Cir. 2017) ....................................................... 24

*Assoc. Builders & Contractors, Golden Gate Chapter Inc. v. Baca*,
    769 F. Supp. 1537 (N.D. Cal. 1991) ............................................. 20

*Bacchus Imps. Ltd. v. Dias*,
    468 U.S. 263 (1984) ..............................................................23, 25

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*,
    476 U.S. 573 (1986) ......................................................................23

*City of Phila. v. New Jersey*,
    437 U.S. 617 (1978)......................................................................23

*Coate v. Omholt*,
    662 P.2d 591 (Mont. 1983) .......................................................... 14

*Cont'l Ill. Nat'l Bank & Tr. Co. v. Washington*,
    696 F.2d 692 (9th Cir. 1983) ....................................................... 18

*Dean Milk Co. v. City of Madison*,
    340 U.S. 349 (1951)...................................................................... 27

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982) .....................................................................23

*Energy Rsrvs. Grp. v. Kansas Power & Light Co.*,
    459 U.S. 400 (1983)................................................................ 18, 20

*Equip. Mfrs. Inst. v. Janklow*,
    300 F.3d 842 (8th Cir. 2002) ....................................................... 19

*Exxon Corp. v. Eagerton*,
    462 U.S. 176 (1983) ..................................................................... 18

*In re LaFortune*,
    652 F.2d 842 (9th Cir. 1981) ....................................................... 13

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
    480 U.S. 470 (1987)................................................................ 13, 17

*Monforton v. Motl*,
    2014 WL 12543855 (D. Mont. Feb. 11, 2014) ........................... 27

*Nat'l Meat Ass'n v. Deukmejian*,
    743 F.2d 656 (9th Cir. 1984)........................................................23

**ii -    PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL
        SUMMARY JUDGMENT REGARDING THEIR FOURTH AND
        FIFTH CLAIMS FOR RELIEF**

*Nieves v. Hess Oil Virgin Islands Corp.*,
  819 F.2d 1237 (3d Cir. 1987)........................................................... 19

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970)................................................................. 26, 27

*RUI One Corp. v. City of Berkeley*,
  371 F.3d 1137 (9th Cir. 2004) ............................................... 10

*S. Dakota Farm Bureau, Inc. v. Hazeltine*,
  340 F.3d 583 (8th Cir. 2003) ................................................. 24, 28

*Stephens v. Union Pac. R.R. Co.*,
  935 F.3d 852 (9th Cir. 2019) ...................................................... 5

*Sveen v. Melin*,
  138 S. Ct. 1815 (2018) ................................................ 10, 11, 15, 18

*Toomer v. Witsell*,
  334 U.S. 385 (1948) ............................................................... 26

*Treigle v. Acme Homestead Ass'n*,
  297 U.S. 189 (1936)............................................................. 19, 22

*Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*,
  310 U.S. 32 (1940)............................................................... 21, 22

*Westinghouse Elec. Corp. v. Tully*,
  466 U.S. 388 (1984)............................................................. 24, 25

*Winter v. NRDC, Inc.*, 5
  55 U.S. 7 (2008)................................................................... 28

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992)................................................................22

Statutes and Rules

Fed. R. Civ. P. 56(a) ....................................................................... 9

Or. Rev. Stat. § 757.518.519.................................................. 3, 4, 5, 6

Montana Code § 30-14-2702 ........................................................... 4

Wash. Rev. Code § 19.405.030.......................................................... 3

Wash. Rev. Code § 19.405.090.......................................................... 3

Other Authorities

Senate Bill 266............................................................... *passim*

U.S. Const., art. I, § 8...................................................................22

**iii -    PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

U.S. Const., art. I, § 10...........................................................................10

**iv -     PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

## INTRODUCTION

Senate Bill 266 is unconstitutional.  Plaintiffs Portland General Electric Company ("PGE"), Avista Corporation, PacifiCorp, and Puget Sound Energy, Inc. ("PSE") (collectively, "the PNW Owners") prevailed on their motion for a preliminary injunction because the Court concluded they were likely to prevail on their claims that SB 266 violates the Contracts Clause and the Commerce Clause of the United States Constitution.

The Court issued a preliminary injunction enjoining defendant Attorney General Austin Knudsen from enforcing SB 266 against the PNW Owners. (Doc. 100.)  The Court should grant plaintiffs' motion for summary judgment on their fourth and fifth claims for relief, declare that SB 266 is unconstitutional under the Contracts and Commerce Clauses of the Constitution as applied to the Colstrip Ownership and Operation Agreement ("Agreement"), and permanently enjoin Attorney General Knudsen from enforcing SB 266 against the PNW Owners concerning the Agreement.[1]

---

[1] In this motion, Plaintiffs do not seek a ruling on their Sixth Claim that SB 266 is unconstitutional under the Due Process Clause based on vagueness.  As the Court noted in its order, "the statute is broad and relatively indefinite about what conduct is specifically prohibited" and "arguments on this point might be suitable for development at a later stage[.]"  (Doc. 100 at 11, ¶ 19.)  Accordingly, Plaintiffs reserve the right to seek a ruling on that claim either in a later dispositive motion or at trial.

**1 -    PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

## UNDISPUTED FACTS

**I.    The ownership and operation of Colstrip.**

The PNW Owners, Talen, and NorthWestern jointly own two coal-fired steam electric generation units in Colstrip, Montana (collectively, "Colstrip"). (Statement of Undisputed Facts ("Undisputed Facts") ¶ 1.)  The owners have the following ownership interests:

| Owner | Unit 3 | Unit 4 |
|---|---|---|
| PSE | 25% | 25% |
| PGE | 20% | 20% |
| Avista | 15% | 15% |
| PacifiCorp | 10% | 10% |
| Talen | 30% | — |
| NorthWestern | — | 30% |

(*Id.* ¶ 2.)

The six companies are parties to the Agreement.  (*Id.*)  The Agreement establishes a five-member Committee "to facilitate effective cooperation, interchange of information and efficient management of the Project."  (*Id.* ¶ 3.) (Talen and NorthWestern share one of the five seats.  (*Id.*)  The Agreement provides that an "Operator" manages Colstrip daily operations; Talen is the current Operator.  (*Id.*)  The Operator prepares the annual operating budget each September 1 and the Committee votes on whether to approve that budget.  (*Id.*)

**2 -    PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

The PNW Owners face legislative mandates to eliminate coal-fired resources like Colstrip from their allocation of electricity for their customers in Washington and Oregon. (*Id.* ¶ 4.) Starting January 1, 2026, PSE, Avista, and PacifiCorp cannot use Colstrip to serve Washington customers without paying substantial penalties designed to make that option economically irrational. Wash. Rev. Code §§ 19.405.030(4), 19.405.090(1)(a)(i) (imposing $150 per megawatt hour penalty for using coal-fired electricity to meet load in Washington). The penalty is almost twice as much as the utilities charge to customers per megawatt hour. (Undisputed Facts ¶ 13.) Oregon enacted a statute that prohibits Oregon utilities, including PGE and PacifiCorp, from using coal-fired resources to serve Oregon customers as of January 1, 2030. Or. Rev. Stat. § 757.518.519.

Talen and NorthWestern want to keep Colstrip open for the indefinite future. (Undisputed Facts ¶ 4.) NorthWestern has stated publicly that it intends to keep Colstrip running until at least 2042, and Talen has publicly expressed its belief that Colstrip has a "long life cycle." (*Id.*)

NorthWestern contends that the Agreement requires unanimous consent to close Colstrip. (*Id.*) The PNW Owners disagree. (*Id.*) On February 9, 2021, NorthWestern noticed its intent to initiate an arbitration to "obtain a definitive answer to the questions of what vote is required to close Units 3 and 4 and what is the obligation of each co-owner to fund operations of the plant." (*Id.* ¶ 5.) The

3 -    **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

arbitration has not begun, in part, because the parties have been unable to agree on the number of arbitrators and the selection process.[2] (*Id.* ¶ 6.)

## II. Montana passes SB 266 to control Colstrip.

During Montana's 2021 legislative session, Montana State Senator Fitzpatrick sponsored SB 266. (*Id.* ¶ 7.) Sections 2(1)(a) and (b) of SB 266 amended the Montana Unfair Trade Practices and Consumer Protection Act to create two new unfair or deceptive acts or practices: (1) "failure or refusal of an owner of a jointly owned electrical generation facility in the state to fund its share of operating costs" and (2) "[c]onduct by one or more owners of a jointly owned electrical generation facility in the state to bring about permanent closure of a generating unit of a facility without seeking and obtaining the consent of all co-owners of a generating unit[.]" (*Id.*)[3] The law authorizes the Montana Department of Justice to pursue injunctive relief and request a court to impose a civil fine of up

---

[2] SB 266 also impairs the ability to move forward with arbitration because it may prohibit parties from asserting that some or all of Colstrip can be shut down with less than a unanimous vote of the owners. (*See* Doc. 100 at 12, ¶ 22 (Court's preliminary injunction opinion finding PNW Owners' harmed in arbitration due to constraint on advocacy).)

[3] SB 266 is codified as Montana Code § 30-14-2702, and sections 2(1)(A) and 2(1)(B) of SB 266 are codified as Montana Code § 30-14-2702(1)(a) and (b). This brief refers to the SB 266 sections.

**4 -     PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL
         SUMMARY JUDGMENT REGARDING THEIR FOURTH AND
         FIFTH CLAIMS FOR RELIEF**

to "$100,000 for each violation," with "[e]ach day of a continuing violation" counting as "a separate offense." (*Id.*)

The intent of SB 266 was to strip the PNW Owners of their rights in the Agreement. Senator Fitzpatrick introduced the bill to a Senate committee as "an important piece of legislation because it allows us to have greater control over the Colstrip facility." (*Id.* ¶ 8.) He complained that "[Montana] ha[s] out-of-state corporations who are acting in a way . . . that could destroy a valuable asset [Colstrip] for the State of Montana." (*Id.*) Senator Fitzpatrick proposed that Montana force the PNW Owners to keep running and subsidizing Colstrip:

> I think we have every right to . . . use any means
> necessary here at the legislature to make sure that our
> interests aren't trampled by the environmental views in
> the states of Washington and Oregon.

(*Id.*) In his comments to the Senate Committee considering SB 266, Senator Fitzpatrick did not make more than a passing reference to any other electric generation facility in Montana. (*Id.*)

During the House Committee hearing, Senator Fitzpatrick was even more explicit that SB 266 was directed at Colstrip and meant both to limit the PNW Owners' right to vote to close the plant, (*id.* ¶ 9), and their right to vote against a Talen-proposed budget. (*Id.*) The focus on Colstrip was not limited to Senator Fitzpatrick. Every speaker in favor of the bill referenced Colstrip or

5 -    **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING THEIR FOURTH AND
FIFTH CLAIMS FOR RELIEF**

adopted prior statements about SB 266's impact on Colstrip (*id.* ¶ 10), and Colstrip was the topic of nearly all the questions and statements by legislators.  (*See* Doc. 39-6 at 6-60, 71-144.)  And, while there were many questions and comments about the details of the Agreement, speakers referenced no other facility's operating agreement.[4]  (*See id.*)

Talen and NorthWestern supported SB 266.  (Undisputed Facts ¶ 11.)  SB 266 was signed into law on May 3, 2021.  (*Id.* ¶ 12.)  Upon signing the Bill, Montana's Governor confirmed that the bill targeted Colstrip and was a direct attack on the Pacific Northwest and the utilities that operate there:



**Governor Greg Gianforte** ✔
@GovGianforte

Affordable power generated in Colstrip helped build Seattle's big tech economy, but now woke, overzealous regulators in Washington State are punishing the people of Colstrip with their anti-coal agenda.

Montana stands with Colstrip, which is why I proudly signed SB 265 and 266.

4:41 PM · May 3, 2021 · Twitter Web App

(Doc. 39-6 ¶ 8; Doc. 100 at 4, ¶ 8.)

---

[4] *See* Doc. 39-6 at 7-59, 72-143 (Colstrip is discussed on nearly every page of the transcripts for the SB 266 portions of committee hearings).

**6 -     PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

### III.    SB 266 harms the PNW Owners.

SB 266 is so extreme it has already harmed the PNW Owners.  The PNW

Owners had planned to call a vote to close Colstrip Unit 3 at a date several years in

the future at the Committee meeting on May 19, 2021, under the terms of the

Agreement.  (Undisputed Facts ¶ 14.)  They chose not to call for that vote due to

the risk of aggressive enforcement of SB 266.  (*Id.*)  The threat of enforcement of

SB 266 further harms the PNW Owners by creating uncertainty about whether

advocating their position in arbitration—i.e., pursuant to the terms of the

Agreement, all or part of Colstrip can be shut down by a less than unanimous vote

of the Committee—could be a violation of SB 266.  (*Id.* ¶ 19.)

SB 266 also harms the PNW Owners because the Montana Attorney General

might bring an enforcement action relating to the Colstrip budget process after the

preliminary injunction expires.  (*Id.*)  Senator Fitzpatrick was explicit that the

genesis of SB 266 was the budget dispute between the six owners that led to the

PNW Owners initially voting "no" on both the 2021 operations and capital

budgets.  (*See id.* ¶ 9.)[5]

---

[5] Senator Fitzpatrick requested an initial draft of SB 266 on October 28, 2020, in the middle of discussions between the PNW Owners and Talen concerning the 2021 budget. *See* http://laws.leg.mt.gov/legprd/LAW0210W$BSIV.ActionQuery?P_BILL_NO1=266&P_BLTP_BILL_TYP_CD=SB&Z_ACTION=Find&P_SESS=20211.

7 -    PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL
        SUMMARY JUDGMENT REGARDING THEIR FOURTH AND
        FIFTH CLAIMS FOR RELIEF

Attorney General Knudsen took no position in response to the motion for a preliminary injunction to enjoin enforcement of SB 266, but his rationale and failure to provide clarification suggest he might seek to impose the $100,000 per day fine for a budget dispute and impasse. He stated, "Plaintiffs have represented that there is an operations and maintenance budget in place for Colstrip for the 2021 operating year, and that there is no risk they will close Colstrip in the immediate future. In the same vein, the State does not anticipate enforcing SB 266 in the immediate future." (*Id.* ¶ 17.) At oral argument on the preliminary injunction motion, Attorney General Knudsen clearly linked the annual operations budget with imposition of a daily $100,000 fine by stating that "The AG has no intent to enforce the statute anytime soon, and indeed there is an O&M budget in place currently." (*Id.*) Attorney General Knudsen's statements strongly indicate that the State will enforce SB 266 against the PNW Owners if they do not approve subsequent budgets.

The owners of Colstrip annually engage in budget negotiations for the following year, and the PNW Owners' actions and options in those negotiations will be constrained without a permanent injunction because the Attorney General may seek to impose fines under SB 266 if they exercise their voting rights to vote "no" to budget proposals that contain excessive or unnecessary spending and are

**8 -     PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

not consistent with the terms of the Agreement.[6]  (*Id.* ¶ 18; *see also* Doc. 100 at 8,

¶ 9 (stating that "PNW Owners have provided evidence that demonstrates how

SB 266 caused them to refrain from taking steps they otherwise would [have]

toward potential closure of Units 3 and 4[.]").)  The statements of the Attorney

General and Senator Fitzpatrick create a significant and chilling concern that

voting "no" on a Talen-proposed budget will lead Attorney General Knudsen to

file an action against the PNW Owners under SB 266 asking a court to impose

$100,000-per-day fines.[7]  (Undisputed Facts ¶ 18.)

## LEGAL STANDARD

Summary judgment is warranted if "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  "To survive a motion for summary

judgment, a nonmoving party must present evidence from which a reasonable jury

---

[6] Under the Agreement, the Operator is required to pay costs only that are in accordance with Prudent Utility Practice, and both the Agreement and SB 266 define Prudent Utility Practice as practices "expected to accomplish the desired result *at the lowest reasonable cost* consistent with reliability, safety, and expedition."  (Doc. 39-2 at 24 & Doc. 32-1 at 2 (emphasis added).)

[7] When the PNW Owners initially voted "no" on the proposed 2021 budget, they continued to pay their share of each monthly bill; at no point did they fail or refuse to pay any bill that Talen as operator presented.  (Undisputed Facts ¶ 16.)

**9 -    PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

could return a verdict in its favor." *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 854 (9th Cir. 2019) (quotation marks and citation omitted).

## ARGUMENT

There is no genuine dispute of any material fact, and SB 266 is, as a matter of law, unconstitutional under the Contract and Commerce Clauses of the United States Constitution.

## I.    SB 266 violates the Contract Clause.

The Contract Clause prohibits states from passing any "Law impairing the Obligation of Contracts."  U.S. Const., art. I, § 10, cl. 1.  SB 266 substantially impairs the PNW Owners' voting, budgeting, and arbitration rights in the Agreement and subjects them to disabling penalties for exercising their contractual rights.  Accordingly, SB 266 is unconstitutional.

The United States Supreme Court has articulated a "two-step test" to determine whether a law unconstitutionally impairs a contract.[8]  *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).  A court must resolve (1) "whether the state law has operated as a substantial impairment of a contractual relationship," and if so, (2)

---

[8] The Ninth Circuit had previously described the test as "a three-step inquiry."  *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004). The difference is cosmetic, as the second and third steps in *RUI* are covered by the second step in *Sveen*.  *Compare RUI One Corp.*, 371 F.3d at 1147, *with Sveen*, 138 S. Ct. at 1822.

**10 -    PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

"whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Id.* at 1821-22 (cleaned up).

## A.    SB 266 substantially impairs the PNW Owners' contract rights.

A law substantially impairs a contract if, among other things, the law "nullifies express terms of the company's contractual obligations and imposes a completely unexpected liability in potentially disabling amounts." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247 (1978).  When analyzing "the first prong, the Court considers the extent to which the law undermines the contractual bargain[.]"  (Doc. 100 at 8, ¶ 8, citing *Sveen*, 138 S. Ct. at 1822.)  SB 266 effectively nullifies the terms of the Agreement and undermines the contractual bargain by modifying essential terms and imposing an unexpected liability of $100,000 per day on each PNW Owner for exercising their contract rights.

### 1.    SB 266 prohibits the PNW Owners from exercising their contract right to engage in conduct to close Colstrip.

First, SB 266, Section 2(1)(b), effectively eliminates the PNW Owners' contract right to arbitrate whether a less than unanimous vote is required to close Colstrip.  The Agreement provides that project users who are unable to resolve a dispute through negotiations may demand arbitration of the dispute.  (Doc. 39-2 at

11 -    **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

42.)  The arbitrator's decision "shall be conclusive and binding upon the Project

Users." (*Id.*)

Unless the Court declares that SB 266 is unconstitutional and issues a

permanent injunction, SB 266 nullifies a significant contract right.  It nullifies the

PNW Owners' right to advocate their position that, under the Agreement, some or

all of Colstrip can be shut down with less than a unanimous vote of the owners

because simply advancing such argument could be "[c]onduct . . . to bring about

permanent closure of [Colstrip] without seeking and obtaining the consent of all

co-owners" in violation of SB 266.  (Doc. 32-1 at 2-3.)  SB 266 authorizes the

Attorney General to punish PNW Owners for their advocacy in negotiations and

arbitration concerning that issue.[9]

As this Court has concluded, "[a]t minimum, given the broad swath of

prohibited conduct under SB 266, PNW Owners are harmed at the bargaining and

arbitration stages of the proceedings because they cannot freely advocate for non-

unanimous closure of Units 3 and 4.  Additionally, they are harmed by the

retroactivity of SB 266—they could be punished for positions taken even prior to

the law going into effect."  (Doc. 100 at 12, ¶ 22.)  Using the threat of $100,000-

---

[9] The PNW Owners are not asking this Court to rule whether the Agreement
provides that a less than unanimous vote can close one or both units of Colstrip or
whether it requires a unanimous vote; that is a question for the arbitrator.

**12 -    PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING THEIR FOURTH AND
FIFTH CLAIMS FOR RELIEF**

per-day fines, SB 266 eliminates, or at a minimum substantially impairs, the PNW Owners' rights under the Agreement to have this contract interpretation dispute conclusively determined via arbitration. *See Spannaus*, 438 U.S. at 247 (holding unconstitutional narrow "statute . . . [that] nullifies express terms of the company's contractual obligations"); *In re LaFortune*, 652 F.2d 842, 847 (9th Cir. 1981) (holding that retroactive application of statute exempting debtor from making timely homestead declaration substantially impaired pre-existing contractual obligations).

Second, SB 266 is unconstitutional because it provides for up to a $100,000-per-day fine on each PNW Owner for any "conduct" that could bring about a closure without unanimous consent. The United States Supreme Court has held that a statute operates as "a substantial impairment of a contractual relationship" if the statute subjects a party to "damages" that were not available under the contract. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504 (1987) (quotation marks and citation omitted) (holding that nullifying contractual waivers of liability for surface damage substantially impaired mining contracts); *see also Spannaus*, 438 U.S. at 247 (holding unconstitutional statute that "imposes a completely unexpected liability in potentially disabling amounts" for acts otherwise allowed under pre-existing contracts). The Montana Supreme Court has held that statutory "penalty provisions," which diminished the salary for judges

13 -    **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

who did not issue opinions within 90 days of submission, violated the federal Contract Clause. *Coate v. Omholt*, 662 P.2d 591, 593, 597-98 (Mont. 1983). Penalizing the PNW Owners for exercising their rights under the Agreement can only be characterized as imposing "completely unexpected liability in potentially disabling amounts[.]" *Spannaus*, 438 U.S. at 247.

Third, SB 266, Section 2(1)(b), subjects each PNW Owner to a staggering $100,000-per-day "civil fine" simply for exercising their contractual rights to propose the closure of, or to vote to close, one or both units. (*See* Doc. 32-1 at 3.) The PNW Owners have a contract right to propose closure of the plant or one of its units and a contract right to vote in favor of such a proposal. Sections 17(f)(i), 17(f)(xi), and 17(i) of the Agreement provide that non-operators such as the PNW Owners can make proposals and that the Project Committee can vote on them. (Doc. 39-2 at 39-41.) The PNW Owners also have the contract right under Sections 17(f)(vi), 19(a), and 19(b) to vote "no" on repairs to damage to Colstrip and whether to remove some or all of the Project from service, which could lead to closure of the plant. (*Id.* at 40, 42-43.) Because the Attorney General may interpret SB 266 to impose fines under SB 266 simply for making closure proposals and for voting for them or for voting against repairing significant damage to the units, SB 266 substantially impairs the contract right to make proposals and vote on them.

**14 -    PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

In *Sveen v. Melin*, the Supreme Court held that when a contracting party can easily escape the law's effect, the degree of impairment is minimal. *Sveen*, 138 S. Ct. at 1824-25 (holding that statute's impairment of the contractual right was minimal because the policyholder could have "easily and entirely escaped the law's effect[.]") (quotation marks and citation omitted). In contrast to the facts of *Sveen*, the PNW Owners cannot easily and entirely escape the law's effect. As described above, because of SB 266 they cannot—easily or otherwise—(1) exercise their contract right to advocate in arbitration that the Agreement does not require unanimous consent to close; (2) propose closure of Colstrip and vote in favor of closing it; or (3) close Colstrip without unanimous consent. And they cannot change their past conduct in that regard, which SB 266 threatens to punish with its retroactivity provision. Thus, the degree of impairment of SB 266 on the PNW Owners' contract rights is substantial, and the first step of the test is met as to Section 2(1)(b) of SB 266.

SB 266 impairs the contractual relationship by subjecting the PNW Owners to massive fines designed to make it economically irrational for them to exercise their rights under the Agreement.

15 -     **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

### 2.    SB 266 prohibits the PNW Owners from exercising their contract right to vote "no" on annual budgets.

SB 266, Section 2(1)(a), provides that the PNW Owners can be enjoined and subjected to penalties if they "refus[e] or fail[]" to pay their share of operating costs.  (Doc. 32-1 at 2.)  But, as discussed above, it appears that the intent of the legislation (as described by Senator Fitzpatrick) is to penalize the PNW Owners simply for voting "no" on the proposed budgets (or pressure them into voting "yes" because of the threat of substantial fines), even if the owners continue to pay the monthly bills in full.  The Attorney General's notice in response to the motion for a preliminary injunction appears to indicate that he would seek to impose the fines if the PNW Owners did not approve an annual budget proposed by Talen, the operator.  (Doc. 57 at 2.)  He stated in that June 17, 2021, filing that "the State does not anticipate enforcing Senate Bill 266 in the *immediate future*" because the 2021 budget was approved, *id.* (emphasis added), implying that he would seek fines if any subsequent annual budget was not approved.

Section 2(1)(a) impairs several contract rights.  One of the most fundamental contractual rights SB 266 impairs is the right under Section 17(f)(ii) to vote "no" on an annual budget.  Examples of other contractual rights impaired by Section 2(1)(a) of SB 266 include the right (1) to vote against awards of certain contracts, change orders, or payment of controverted claims (Section 17(f)(iv)); (2) to vote

against construction budgets for repair of the Project (Section 17(f)(vi)); and (3) to vote against settlement of substantial third-party claims (Section 17(f)(viii)). (Doc. 39-2 at 40.) Section (2)(1)(a) of SB266 also impairs the right in Section 17 of the Agreement to arbitrate disputes, including a budget dispute. If a budget is rejected, Section 17(h) provides that the parties can arbitrate that dispute pursuant to the arbitration clause in Section 18. (*Id.* at 41.) SB 266 violates the Contract Clause because it makes exercising those rights unlawful and would subject the PNW Owners to unexpected and potentially disabling fines if they exercise those rights.

Finally, if a PNW Owner did more than vote "no" on a budget and refused to pay a monthly bill for operation of Colstrip, SB 266, Section 2(1)(a), is still unconstitutional because it imposes a draconian fine of up to $100,000 per day for what would otherwise trigger default provisions and remedies under the Agreement.[10] As discussed above (*supra*, Section I.A.1), imposing substantial unexpected liability under Section 2(1)(a) for exercising a pre-existing contract right violates the Contract Clause. *Keystone*, 480 U.S. at 504; *Spannaus*, 438 U.S. at 247; *Coate*, 662 P.2d at 593, 597-98.

---

[10] The Agreement has its own damages provision for breach or default, including actual damages plus 2% per month interest on amounts due, loss of right to take power from the units, and attorneys' fees. (Doc. 39-2 at 44-46, § 21.)

17 -    **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

**B.    SB 266 does not advance a significant and legitimate public purpose, nor does it use appropriate and reasonable means.**

SB 266 fails at the second step in determining whether a law unconstitutionally impairs a contract because it does not "advance a significant and legitimate public purpose." *Sveen*, 138 S. Ct. at 1822 (quotation marks and citation omitted). Severe impairment of a pre-existing contract right requires the court to conduct a careful examination of the nature and purpose of the legislation. *Spannaus*, 438 U.S. at 245. A law with "a very narrow focus" that is "aimed at specific" companies does not address "an important general social problem." *Energy Rsrvs. Grp. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 n.13 (1983). SB 266 is "narrowly targeted to modify" the Agreement, "rather than being part of a broad public program with incidental impairing benefits." *Cont'l Ill. Nat'l Bank & Tr. Co. v. Washington*, 696 F.2d 692, 702 (9th Cir. 1983).

Examination of the text and the circumstances of the passage of SB 266 makes this evident. First, SB 266 applies only to "owners of a jointly owned electrical generation facility in the state." (Doc. 32-1 at 2.) When a "statute applie[s] only to" parties that have "entered into [certain] agreements, its sole effect [i]s to alter contractual duties." *Exxon Corp. v. Eagerton*, 462 U.S. 176, 192 (1983). SB 266's impact on the Agreement is not incidental; it is the primary effect as intended by the bill's sponsor. It thus fails the second part of the test for

constitutionality because "[t]here is no broad public policy interest in readjusting contractual rights and obligations in pre-existing contracts." *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 861 n.22 (8th Cir. 2002); *see, e.g. Treigle v. Acme Homestead Ass'n*, 297 U.S. 189, 197-98 (1936) (holding law that adjusted only private rights among existing owners violated Contract Clause); *Nieves v. Hess Oil Virgin Islands Corp.*, 819 F.2d 1237, 1249 (3d Cir. 1987) ("Legislation aimed retroactively to benefit or burden a few identifiable persons is particularly vulnerable to the charge that it is not reasonably related to the asserted public purposes.").

It is clear on its face and in the legislative history that SB 266 aims only to impair the ability to exercise contractual rights that otherwise exist between the owners of Colstrip, with the intent of benefiting some and burdening others. Section 2(1)(b) does not actually prevent the closure of Colstrip, it merely gives a minority ownership share greater leverage in negotiating the terms of the closure or other management of Colstrip by requiring unanimity to close the plant. Section 2(1)(a) does not improve funding for operations for Colstrip, it merely nullifies the rights of experienced power plant operators such as the PNW Owners to vote "no" to budgets and repairs proposed by Talen even if the proposed budgets and repairs are inconsistent with Prudent Utility Practices or the best interests of their customers and shareholders.

**19 -    PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

Second, the circumstances of SB 266's passage demonstrate that Montana "ha[s] not acted to meet an important general social program." *Energy Rsrvs. Grp.*, 459 U.S. at 412 n.13. The timing, legislative record, signing statement, and substance of SB 266 demonstrate it is aimed at preventing the PNW Owners from taking action to close either of Colstrip's units or to object to budgets that Talen proposes, as permitted in the Agreement. SB 266, like the pension statute struck down in *Spannaus*, has "a very narrow focus" directed at specific owners of Colstrip. *See Energy Rsrvs. Grp.*, 459 U.S. at 412 n.13 (describing *Spannaus*).

SB 266 "can hardly be characterized" as a law "enacted to protect a broad societal interest rather than a narrow class." *Spannaus*, 438 U.S. at 249. And it does not matter that SB 266's recitals assert as a pretense that its purpose is to promote "environmental remediation," ensure a "reliable supply of electricity," and secure "the safety of workers at the facility." (Doc. 32-1 at 1.) "The *stated* objectives" of a law are irrelevant if "the *substance* of the" law "serve[s] a different objective." *Assoc. Builders & Contractors, Golden Gate Chapter Inc. v. Baca*, 769 F. Supp. 1537, 1550 (N.D. Cal. 1991) (emphasis in original). The substance of SB 266 does not address any of the stated objectives. (*See* Doc. 100 at 9, ¶ 12 ("the Court fails to see . . . how non-unanimous closure imperils those [stated] interests differently than unanimous closure.").) It does not empower the Attorney General to act based on *actual* effects on the "supply of electricity," "the safety of

**20 -    PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

workers," or "environmental remediations." It does not prevent the closure of Colstrip; it just changes the vote required to do so.[11] It does not require that the operator propose budgets that are consistent with Prudent Utility Practices or that protect the safety of workers and the environment; it just punishes owners for exercising their contract rights to vote "no" on budgets the owners find objectionable. There is no public policy interest served and no social problem solved by SB 266's requirements and fines.[12] Consequently, SB 266 fails the second step of the two-step test because it merely alters the private rights of a small number of owners and does not "protect a broad societal interest" as required by *Spannaus.*

Defendants may contend again that because the electric generation industry is heavily regulated, the State has greater leeway to impair contracts. The question, however, is not whether an industry is regulated generally, but whether it is "regulated *in the particular* to which [the plaintiff] now objects," such that the plaintiff could have expected "further legislation upon *the same topic*." *Veix v.*

---

[11] SB 266 is not necessary to keep Colstrip open: under the Agreement, the Operator can sell the units removed from service as complete units to a new owner that wants to continue to operate them. (Doc. 39-2 at 51.)

[12] In fact, if the Operator proposes a budget that fails to protect workers and the environment, SB 266 authorizes punishment of owners that vote against that budget but does not punish the Operator that proposes that budget.

**21 -    PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

*Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 38 (1940) (emphasis added).  Further, where the law merely changes the balance of power of private rights, the existence of a larger regulatory scheme is irrelevant.  In *Treigle*, the United States Supreme Court invalidated a law that changed the rights to withdraw from a building and loan association.  297 U.S. at 197-98.  Even though the banking industry was heavily regulated by 1936, and even though there was significant public interest in keeping financial institutions solvent during the Great Depression, the Court struck down a law that merely re-adjusted the contract rights of existing shareholders.  *Id.*

SB 266 substantially impairs the Agreement without a significant and legitimate public purpose.  The Court should grant summary judgment to the PNW Owners on their fifth claim for relief.

## II.    SB 266 violates the Commerce Clause.

The Commerce Clause grants Congress the exclusive power "[t]o regulate Commerce . . . among the several States."  U.S. Const., art. I, § 8, cl. 3.  The Commerce Clause also limits the power of the states to discriminate against interstate commerce.  *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992).  This "negative" command—known as the "dormant Commerce Clause"—prohibits economic protectionism: "that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."  *Id.* (citation omitted).

22 -    **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

When a statute amounts to simple economic protectionism, courts apply a "virtually *per se* rule of invalidity." *City of Phila. v. New Jersey*, 437 U.S. 617, 624 (1978); *see, e.g.*, *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986) ("When a state statute . . . favor[s] in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry."). "A finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose or discriminatory effect." *Nat'l Meat Ass'n v. Deukmejian*, 743 F.2d 656, 659 (9th Cir. 1984) (citation omitted). The Commerce Clause applies both to discrimination against products that cross state lines and also to cross-border investments, such as the situation here. *See Edgar v. MITE Corp.*, 457 U.S. 624, 642-44 (1982) (holding unconstitutional state law regulating out-of-state purchases of in-state companies).

SB 266 is economic protectionism, both in its purpose and its effect, and is thus unconstitutional under the Commerce Clause.

### A. The purpose of SB 266 was to favor in-state interests to the detriment of out-of-state interests.

"Discriminatory intent, whether conferring a benefit on a local producer or a harm on an out-of-state producer, violates the Commerce Clause." (Doc. 100 at 10, ¶ 15, citing *Bacchus Imps. Ltd. v. Dias*, 468 U.S. 263, 272 (1984).) And a law

23 -   **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

that is "intended . . . to prevent the loss of economic activity already in the State"
by "prevent[ing] [that] current business from being diverted elsewhere" is
"discriminatory." *Westinghouse Elec. Corp. v. Tully*, 466 U.S. 388, 406 (1984).
SB 266's purpose is to protect Colstrip and the jobs it provides in Montana by
preventing the PNW Owners from closing Colstrip. *See supra*, Undisputed Facts
§§ II & III. It achieves that purpose by burdening out-of-state utilities with a
choice between paying an exorbitant $100,000 per day fine or, to avoid the fine,
remaining invested in a Montana electrical plant that produces power that those
utilities will not be able to use to serve their customers in Washington and
Oregon after 2025 and 2029. In other words, it requires utility companies and/or
ratepayers in Oregon and Washington to subsidize Montana jobs and tax
revenues.

There is no genuine dispute that the purpose was economic protectionism.
The legislative record is replete with direct evidence that SB 266's drafters and
supporters targeted Colstrip's out-of-state owners to benefit in-state interests. *See*
*Ass'n des Éleveurs de Canards et d'Oies v. Becerra*, 870 F.3d 1140, 1144 (9th Cir.
2017) (citing statements from "[t]he law's author" and Governor's "signing
statement" to establish legislative purpose); *S. Dakota Farm Bureau, Inc. v.*
*Hazeltine*, 340 F.3d 583, 593-94 (8th Cir. 2003) (citing direct evidence from
legislature that demonstrated intent to discriminate against out-of-state business).

24 -    **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL**
        **SUMMARY JUDGMENT REGARDING THEIR FOURTH AND**
        **FIFTH CLAIMS FOR RELIEF**

Senator Fitzpatrick described the bill as "an important piece of legislation because it allows us to have greater control over the Colstrip facility." (Undisputed Facts ¶ 8.) He repeatedly made clear SB 266 targeted "the West Coast owners of the facility," who were "out-of-state corporations . . . coming into the state of Montana." (*Id.*) SB 266's goal was to ensure Colstrip continued to operate because "it's an important facility . . . for the people of Montana" that provides "jobs" and "tax revenue" to Montanans. (*Id.* ¶¶ 8-9.)[13] Montana's Governor reiterated SB 266's protectionist purpose in his signing statement, declaring it was designed to ensure "[a]ffordable power generated in Colstrip" and to punish "woke, overzealous regulators in Washington State" (and thereby punish the PNW Owners and/or their Washington and Oregon customers). (Doc. 100 at 4, ¶ 8.)

## B.    SB 266 has a discriminatory effect on out-of-state interests.

SB 266's effect is also discriminatory. The Supreme Court has consistently invalidated laws that "promote a local industry" by "impos[ing] a burden on" out-of-state companies. *Bacchus*, 468 U.S. at 273; *see also Westinghouse*, 466 U.S. at 406-07. SB 266's intended effect is to force the PNW Owners to continue operating Colstrip, generating electricity, tax revenue, and jobs for Montana

---

[13] It is not necessary to know the intent of all legislators voting in favor of the provision if the intent of the drafter is publicly known. *S. Dakota Farm Bureau, Inc.*, 340 F.3d at 596.

**25 -    PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

residents—but not Washington or Oregon residents—for far longer than 2025 or 2029.  It does so by punishing PNW Owners—out-of-state utilities that the Montana legislature knows are subject to governmental mandates that effectively require them to divest from coal-fired electrical generation—if they attempt to close Colstrip.

Further, the Supreme Court has invalidated laws that use the threat of fines "to divert to [one state] employment and business which might otherwise go to" another state.  *Toomer v. Witsell*, 334 U.S. 385, 403 (1948).  Here, SB 266 requires the PNW Owners to continue to operate and source electricity from Montana instead of obtaining that same amount of power from other states, forcing them to "divert" resources to continue operating Colstrip, resources that "might otherwise go to" other states.  (Undisputed Facts ¶ 20.)  Thus, SB 266's effect is to "impose a straitjacket on the" PNW Owners "with respect to the allocation of [their] interstate resources."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 146 (1970).

There is no genuine dispute of any material fact, and SB 266 is unconstitutionally discriminatory and protectionist in both its purpose and effect.  Consequently, SB 266 violates the Commerce Clause, and the Court should grant summary judgment to the PNW Owners on their fourth claim for relief.

**26 -     PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

**C.    Even if SB 266 were non-discriminatory, it nonetheless violates the Commerce Clause.**

Courts also strike non-discriminatory statutes under the dormant Commerce Clause doctrine.  The so-called *Pike* test holds that a law that is "even[]handed[]" and imposes only "incidental" burdens on interstate commerce is unconstitutional if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.  So even if this Court were to conclude that SB 266 were "even handed," it still fails the *Pike* balancing test.  As explained above, SB 266 "impose[s] a straitjacket on the" PNW Owners "with respect to [their] interstate resources." *Id.* at 146; *supra*, Section II.B.  And there is not a sufficiently "compelling state interest" to justify that burden. *Pike*, 397 U.S. at 146.  The "local benefits" that can be considered under *Pike* do not include a state's narrow interests, such as "securing employment for its people," *id.*, or "protecting a major local industry," *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951).  The substance of SB 266 is aimed at ensuring Colstrip's continued operation, not any broad public purpose. *See supra*, Facts §§ II & III.

**III.    The PNW Owners are entitled to a permanent injunction.**

A permanent injunction is appropriate where the challenged statute "is unconstitutional and should not be enforced" against the plaintiffs. *Monforton v. Motl*, 2014 WL 12543855, at *3 (D. Mont. Feb. 11, 2014).  This Court has already

27 -    **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

granted a preliminary injunction to the PNW Owners.  (See Doc. 100 at 7-15, ¶¶ 5-32.)  The standard for granting a permanent injunction is "essentially the same," except for the requirement of "actual success" on the merits.  *Winter v. NRDC, Inc.*, 555 U.S. 7, 32 (2008).  The PNW Owners have demonstrated actual success. *See supra* Argument §§ I, II.  The Court has already found that the other factors favor relief, so a permanent injunction is warranted.  (See Doc. 100 at 11-14, ¶¶ 20-31.).

## CONCLUSION

For the reasons described above, the Court should grant plaintiffs' motion for summary judgment on their fourth and fifth claims for relief and permanently enjoin the Montana Attorney General from enforcing SB 266 against Plaintiffs.

Dated this 29th day of October, 2021.

MARKOWITZ HERBOLD PC

__*s/ Dallas DeLuca*_____
David B. Markowitz (admitted *pro hac vice*)
Dallas DeLuca (admitted *pro hac vice*)
Harry B. Wilson (admitted *pro hac vice*)
*Attorneys for Plaintiff Portland General Electric Company*

HANSBERRY & JOURDONNAIS, PLLC
Charles E. Hansberry
Jenny M. Jourdonnais
chuck@hjbusinesslaw.com
jenny@hjbusinesslaw.com
*Attorneys for Plaintiffs*

28 -    **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

Gary M. Zadick
gmz@uazh.com
UGRIN ALEXANDER ZADICK, P.C.
#2 Railroad Square, Suite B
PO Box 1746
Great Falls, MT 59403
Ph: (406) 771-0007
Fax: (406) 452-9360
*Attorneys for Plaintiff Portland General Electric Company*

PERKINS COIE LLP
Harry H. Schneider, Jr.
(Admitted Pro Hac Vice)
Jeffrey M. Hanson
(Admitted Pro Hac Vice)
Gregory F. Miller
(Admitted Pro Hac Vice)
*Attorneys for Plaintiff Puget Sound Energy, Inc.*

KSB LITIGATION P.S.
William J. Schroeder
(Admitted Pro Hac Vice)
William.schroeder@Ksblit.legal
*Attorneys for Plaintiff Avista Corporation*

AVISTA CORPORATION
Michael G. Andrea
(Admitted Pro Hac Vice)
Michael.Andrea@avistacorp.com
*Attorney for Plaintiff Avista Corporation*

SCHWABE WILLIAMSON & WYATT
Troy Greenfield
Connie Sue Martin
(Admitted Pro Hac Vice)
TGreenfield@Schwabe.com
CSMartin@Schwabe.com
*Attorneys for Plaintiff PacifiCorp*

29 -    **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(d)(2)(E), I certify that Plaintiffs' Brief In Support Of Motion For Partial Summary Judgment Regarding Their Fourth And Fifth Claims For Relief is:  printed with proportionately spaced Times New Roman text with 14-point typeface; is double-spaced; and the word count, calculated by Microsoft Office Word, is 6,335 words long, including footnotes, but excluding the Caption, Signature Blocks, Certificate of Service, Tables of Contents and Authorities, and Certificate of Compliance.

DATED this 29th day of October, 2021.

MARKOWITZ HERBOLD PC

By:  _s/ Dallas DeLuca_
      David B. Markowitz (admitted _pro hac vice_)
      Dallas DeLuca (admitted _pro hac vice_)
      Harry B. Wilson ((admitted _pro hac vice_)

      _Attorneys for Plaintiff Portland General Electric Company_

30 -    **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 29, 2021, a copy of the foregoing document

was  served on the following persons, via ECF:

| |
|---|
| Charles E. Hansberry<br>Jenny M. Jourdonnais<br>HANSBERRY & JOURDONNAIS, PLLC<br>2315 McDonald Avenue, Suite 210<br>Missoula, MT 59801<br><br>*Attorneys for Plaintiffs* |
| Gary M. Zadick<br>UGRIN ALEXANDER ZADICK & HIGGINS<br>PO Box 1746<br>Great Falls, MT 59403-1746<br><br>*Attorneys for Plaintiff Portland General Electric Company* |
| Michael G. Andrea<br>AVISTA CORPORATION<br>1411 W. Mission Ave., MSC-17<br>Spokane, WA 99202<br><br>William J. Schroeder<br>KSB LITIGATION, P.S.<br>510 W. Riverside Ave., #300<br>Spokane, WA 99201<br><br>*Attorneys for Avista Corporation* |
| Connie Sue Martin<br>Troy D. Greenfield<br>SCHWABE WILLIAMSON & WYATT<br>1420 5th Ave., Suite 3400<br>Seattle, WA 98101<br><br>*Attorneys for PacifiCorp* |

Jeffrey M. Hanson
Gregory F. Miller
Harry H. Schneider
PERKINS COIE
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099

*Attorneys for Puget Sound Energy, Inc.*

J. David Jackson
DORSEY & WHITNEY
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498

Stephen D. Bell
DORSEY & WHITNEY LLP
125 Bank Street, Millennium Building, Suite 600
Missoula, MT 59802-4407

*Attorneys for NorthWestern Corporation*

Adam Carlis
Barry Barnett
SUSMAN GODFREY LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002-5096

Alexander P. Frawley
SUSMAN GODFREY LLP
1301 Avenue of the Americas
32nd Floor
New York, NY 10019

Robert L Sterup
BROWN LAW FIRM, P.C.
315 North 24th Street
Billings, Montana 59101
*Attorneys for Defendant Talen Montana, LLC*

Aislinn W. Brown
MONTANA DEPARTMENT OF JUSTICE
PO Box 201440
Helena, MT 59620-1440

Derek J. Oestreicher
MONTANA ATTORNEY GENERAL
215 N Sanders
PO Box 201401
Helena, MT 59620-1401

Jeremiah R. Langston
MONTANA ATTORNEY GENERAL
PO Box 201401
215 North Sanders
Helena, MT 59620-1401

*Attorneys for Defendant Austin Knudsen, in his official capacity as Attorney General for the State of Montana*

Dated this 29th day of October, 2021.

MARKOWITZ HERBOLD PC

By:  *s/ Dallas DeLuca*
Dallas DeLuca (admitted *pro hac vice*)

*Attorneys for Plaintiff Portland General Electric Company*