Stephen D. Bell, Esq.
Dorsey & Whitney LLP
Millennium Building
125 Bank Street, Suite 600
Missoula, Montana 59802-4407
Telephone:  (406) 329-5590
Email:  bell.steve@dorsey.com

J Jackson, Esq. (*Pro Hac Vice*)
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 340-2760
Email:  jackson.j@dorsey.com

*Attorneys for Defendant NorthWestern Corporation*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BILLINGS DIVISION

| | |
|---|---|
| **PORTLAND GENERAL ELECTRIC COMPANY; AVISTA CORPORATION; PACIFICORP; and PUGET SOUND ENERGY, INC.**<br><br>**Plaintiffs,**<br><br>v.<br><br>**NORTHWESTERN CORPORATION; TALEN MONTANA, LLC; AUSTIN KNUDSEN, in his official capacity as Attorney General for the State of Montana,**<br><br>**Defendants.** | Case No. 21-cv-00047-SPW-KLD<br><br>**DEFENDANT NORTHWESTERN CORPORATION'S [CORRECTED] BRIEF IN REPLY TO PLAINTIFFS' AND TALEN'S RESPONSES TO ITS MOTION TO COMPEL ARBITRATION AND APPOINT A MAGISTRATE JUDGE TO OVERSEE ARBITRATION PROCEDURE NEGOTIATIONS**<br><br>**ORAL ARGUMENT REQUESTED** |

4887-6569-9337\1

Plaintiffs (the "PNW Owners") want to shut down Colstrip Units 3 and 4 by the end of 2025. They have made that goal clear and have taken steps to accomplish it. They were driven to their 2025 closure goal by Washington and Oregon legislation that "prohibit[s] (or substantially punish[es]) utilities from supplying customers with electricity produced by coal-fired resources [such as Colstrip]. Washington's act goes into effect on December 31, 2025, and Oregon's prohibition begins January 1, 2030." Findings of Fact, Conclusions of Law, and Order for Preliminary Injunction ("Preliminary Injunction Order"), Doc. 100, at 3 (Findings ¶ 6). "The PNW Owners intend to pursue avenues of transitioning away from Colstrip Units 3 and 4 because they feel they can no longer use power generated from that operation due to changes in Washington and Oregon law and … their intent was frustrated due to the prohibitions imposed by [Montana Senate Bill ("SB")] 266." *Id*. at 12 (Conclusions ¶ 23). Indeed, "[t]he PNW Owners have demonstrated that SB 266 likely interfered with the [O&O] Agreement", and they "have provided evidence that demonstrates how SB 266 caused them to refrain from taking steps they otherwise would toward potential closure of Units 3 and 4 during the budgeting and planning process." *Id*. at 8 (Conclusions ¶ 9).

One step is to call for a vote to close Colstrip Units 3 and 4, and indeed "[t]he issue of the number of votes necessary to shutter the Project under the [Colstrip Ownership and Operation Agreement ("O&O Agreement")] is currently

pending in arbitration under the terms of the Agreement." *Id*. at 5 (Findings ¶ 13). The PNW Owners have provided evidence they planned to call for a vote but abandoned that plan because they "are faced with expensive potential liability should they proceed with their planned course of action to transition away from Colstrip Units 3 and 4." *Id*. at 13 (Conclusions ¶ 24).[1]

The PNW Owners' Integrated Resource Plans each call for closure of Colstrip Units 3 and 4 by at least the end of 2025 (and Plaintiff Portland General Electric Company by 2027). *See* NorthWestern's Opening Br., Doc. 121, at 5-8. During the 2021 budgeting process, the PNW Owners reiterated their focus on closing the Project by 2025 in three letters dated November 25, 2020, December 9, 2020, and January 7, 2021. *See id.* at 9-10. They claim their closure demands arise solely from Washington's CETA, RCW 19.405, *et seq.,* and ORS 757.518(2), as the Washington (and Oregon) legislative directives compel them to close the Project. Pls.' Undisputed Facts, Doc. 103, at ¶¶ 4 & 14.

The PNW Owners' plans and actions to bring about closure of Colstrip caused NorthWestern to commence arbitration pursuant to O&O Agreement § 18. The fundamental issue raised in that arbitration focuses on the number of votes

---

[1] *See* Pls.' Undisputed Facts, Doc. 103, at ¶ 14.

necessary to shutter the Project under the O&O Agreement.[2] The PNW Owners assert the O&O Agreement allows a vote of a simple majority of the Project's Owners, while NorthWestern contends unanimity is required. As this Court accurately stated, "the parties are seeking declaratory judgment [in arbitration] as to whether a unanimous vote is required to close Units 3 and 4 and to determine the corresponding funding obligations." *Id*. at 3 (Findings at ¶ 5).

Though the parties stand at the precipice of actions to bring about closure, Talen baselessly claims the dispute is not ripe and this Court lacks jurisdiction to provide the relief NorthWestern seeks—an order compelling the parties to arbitration. Talen's position is misplaced both as a matter of law and fact.

The PNW Owners other than Plaintiff Puget Sound Energy, Inc. ("PSE") (the "Plaintiff Co-Owners") take a different but nonetheless shortsighted approach to resisting NorthWestern's motion. Pl. Co-Owners' Resp., Doc. 142. They claim NorthWestern's motion is "premature" until the issue of the enforceability of Senate Bill ("SB") 265 is resolved.[3] In making that claim, they ignore the

---

[2] The O&O Agreement governs the operation of the Project and the rights and obligations of its Owners, the non-governmental parties to this lawsuit.

[3] The PNW Owners' motions for partial summary judgment declaring SB 265 and 266 unconstitutional and/or preempted are pending before this Court. Pls.' Partial Summ. J. SB 265, Doc. 88, and Pls.' Partial Summ. J. SB 266, Doc. 102.

3

provisions of SB 265,[4] which allow the parties to waive the requirements of SB 265, and that the claims in arbitration are independent of the issues raised by the PNW Owners' motions for partial summary judgment. *See* PSE's Resp., Doc. 144, at 2 n.1.

Because NorthWestern depends on Colstrip Units 3 and 4 to generate electricity to meet the needs of its Montana customers, it commenced arbitration to address that real threat, following the procedures in O&O Agreement § 18. As development of new utility assets can take many years, long-range resource planning is necessary to identify a multi-year course of action to ensure there are enough utility resources to meet customer needs at a reasonable price and to comply with applicable laws and regulations. To address this long lead-time, it is imperative that the parties proceed promptly to arbitration.

The parties' squabbling over the arbitrator selection process and the manner by which the arbitration will proceed has held captive the arbitration that NorthWestern commenced eleven months ago. The O&O Agreement, while requiring resolution of the present controversy by arbitration, did not address these two aspects of the arbitration process. While the parties have had discussions to

---

[4] SB 265 is codified at MCA § 27-5-323. Subdivisions (1) and (2) allow the parties to waive the requirements of SB 265.

resolve this impasse, they have made little progress, partly because Defendant Talen prefers delay. *See* NorthWestern's Opening Br. Doc. 121 at 12-15; Talen's Opp'n, Doc. 141, at 3-4. The litigation pending before this Court, addressing SB 265 and 266, has added to that delay.

NorthWestern urges the Court to enter an order compelling arbitration and referring the matter to a magistrate judge to oversee the negotiations of the processes and procedures by which that arbitration will proceed. Time is of the essence.

## ARGUMENT

### A. Talen's Unfounded Ripeness Argument

Relying heavily on the Fifth Circuit's decision in *Lower Colorado River Authority v. Papalote Creek II, LLC*, 858 F.3d 916 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 747 (2018), Talen claims this Court lacks subject matter jurisdiction to compel arbitration because the underlying dispute, now awaiting resolution in arbitration, is not ripe. Talen claims the matter pending before the Court is not ripe, because "not one of the co-owners has asked that Colstrip be closed, let alone undertaken the procedures required by the O&O Agreement to propose a closure vote at any time in the future." Talen's Opp'n, Doc. 141, at 6.

Talen's ripeness argument misreads the record and the O&O Agreement. As summarized above and in NorthWestern's Opening Brief, the PNW Owners have

5

taken substantial steps to bring about the closure of the Project only to be foiled by the passage of SB 266. *See* Preliminary Injunction Order, Doc. 100, at 8 (Conclusions ¶ 9).

Throughout its Opposition Brief, Talen claims the O&O Agreement requires the parties to address Prudent Utility Practice in bringing a vote before the Project Committee. However, Talen's interpretation of the O&O Agreement's requirements, which NorthWestern and the PNW Owners dispute, is a matter for resolution in the arbitration and not for this Court. O&O Agreement § 18.[5]

Talen's ripeness argument does not go to NorthWestern's vote issue, but rather to "Colstrip's ability to produce electricity consistent with prudent utility practice, now and in the future" and the budgeting process, neither of which are implicated by a call to vote on whether to close the Project—the core issue of NorthWestern's arbitration demand. There is no question of ripeness: the threat of closure of Colstrip by 2025 is real and palpable. Delay threatens NorthWestern's ability to meet the electricity needs of its Montana customers.

For purposes of this motion, the only relevant section of the O&O

---

[5] Talen's Opposition relies heavily on *its own* interpretation of the O&O Agreement and what it requires (*see*, *e.g.*, Talen's Opp'n, Doc. 141 at 11, 13, etc.), ignoring it is the arbitrator's/s' responsibility to interpret the O&O Agreement.

Agreement is Section 18, which requires, "Any controversies arising out of or relating to this Agreement which cannot be resolved through negotiations among the Project Users within thirty (30) days after inception of the matter in dispute shall, upon demand of any Project User involved in the controversy, be submitted to an Arbitrator." NorthWestern complied with the 30-day notice requirement to all Owners via its February 9, 2021 letter. As the Parties could not resolve the matter, NorthWestern served its demand for arbitration on March 12, 2021, which it amended on April 2, 2021. NorthWestern had the right to commence arbitration under Section 18 to resolve what vote is required to close the Project and the obligations of each co-owner to fund its operations. Talen's interpretations of Sections 17 and 32 are irrelevant and ultimately for the arbitrator/s to decide.

Talen's heavy reliance on *Lower Colorado River Authority*, as "squarely on point," also is misplaced.[6] *Lower Colorado River Authority* presents a far different set of facts not present here. There, the parties' dispute concerned different interpretations of whether a contract provision capped the plaintiff's liability. The Fifth Circuit noted that the dispute would not need to be resolved unless the plaintiff first stopped taking energy. But the plaintiff continued to perform fully

---

[6]   Talen's Opp'n, Doc. 141, at 12.

under the agreement by taking energy. *Id.* Importantly, the court found there was "no evidence Plaintiff threatened to stop taking energy or that such decision was even likely." 858 F. 3d at 925.[7] Instead, the court found the plaintiff "consistently maintained that, even if it received a favorable ruling, there was only a possibility that it would opt to stop taking energy." *Id.* Based on the record, including the plaintiff's own actions and statements, the plaintiff failed to establish the issue was ripe for adjudication when the district court compelled arbitration.[8]

Here, the issue is ripe because the PNW Owners have been clear with their intentions. Plaintiffs acknowledge they "have a concrete plan to close Colstrip by the end of 2025." *See* Pls.' Reply for Partial Summ. J. SB 266, Doc. 146 ("Pls.'

---

[7] "[N]either party appears to have threatened to breach the PPA [Power Purchase Agreement]." 858 F. 3d at 919. The plaintiff "also noted that it 'intends to continue to fully perform its obligations under the PPA during this arbitration process.'" *Id*. at 920.

[8] The Fifth Circuit, relying on its interpretation of *Vaden v. Discover Bank*, 556 U.S. 49, 58 (2009), "looked through" the petition to compel arbitration to matters in dispute in the underlying arbitration. In so doing, the court acknowledged "*Vaden* concerned whether there was federal question jurisdiction," but it saw "no reason that the holding is limited only to the specific jurisdictional issue," 858 F.3d at 923, and applied the "look through" analysis to diversity jurisdiction. While the Ninth Circuit has followed a similar analysis (*see Countrywide Home Loans, Inc. v. Mortgage Guar. Ins. Corp*., 642 F.3d 849, 855 n.2 (9th Cir. 2011)), several courts have disagreed. *See Northport Health Servs. of Arkansas, LLC v. Rutherford*, 605 F.3d 483, 488-91 (8th Cir. 2010); *Hermes of Paris, Inc. v. Swain*, 867 F.3d 321, 325-26 (2d Cir. 2017). Regardless, with or without a "look through," the matter before this Court is ripe.

8

Reply"), 7 (citing Pls.' Undisputed Facts, Doc. 103, ¶ 14 (describing plan to call for vote to close Unit 3)). Plaintiffs' plan to close Colstrip is "public knowledge based on Washington and Oregon statutes and Plaintiffs' regulatory filings" *Id.* (citing App., Pls.' Mot. for Prelim. Inj., Doc. 39-2 ¶¶19-21; Doc. 39-3 ¶¶ 10-12; Doc. 39-4 ¶¶ 11-13; Doc. 39-5 ¶¶ 5-6 (each Plaintiff describing statutory restrictions on using coal-fired electricity and transition plans as part of their Integrated Resource Plans filed with their regulators)).[9]

Talen's reliance on *Oil, Chem. & Atomic Workers Int'l Union v. Gillette Co.*, 905 F.2d 1176, 1176 (8th Cir. 1990), also misses the mark. There, a union employee inquired about certain service credits he expected to receive as pension benefits under his employer's retirement plan. *Id.* at 1176. The union filed a grievance against the employer on the employee's behalf. *Id.* The employer refused

---

[9] Talen grasps onto but misinterprets Plaintiffs' statement they have no intent to close the Project now. Talen's Opp'n, Doc. 141, at 5 & 14 n.3 (referencing Pls.' Prelim. Inj. Doc. 38 ("Pls.' Prelim. Inj.") at 28). Plaintiffs stated, "Nor is there any risk that the PNW Owners will close Colstrip in the immediate future. In January 2021, they approved tens of millions of dollars in capital expenditures to overhaul Unit 3 to keep it operating until its next scheduled overhaul in 2025; they approved an overhaul for Unit 4 in 2020. Roberts Decl. ¶ 33." Doc. 38 at 28. In endorsing that statement, Talen ignores the obvious: that the PNW Owners intend to seek closure of the Project by 2025 in compliance with their legislative mandates. Given the lead-time necessary for NorthWestern to add electrical generating resources, the PNW Owners' ongoing threat to close the Project by 2025 has immediacy for NorthWestern. We are not addressing a contingent future event.

9

to comply with the arbitration provisions and instead argued that the pension benefits arose solely under the retirement plan. The terms of the retirement plan required the employee to follow appeal procedures, which the employee had not done. *Id.* The court affirmed the district court's decision that the employee failed to file a claim with the retirement plan and had not been denied benefits. Therefore, unlike here, the employee's claim for benefits was not ripe, because "'this Court cannot properly rule on the conjectural possibility that the plan may decline his claim.'" *Id*. at 1177 (quoting the district court's opinion).

Further, Talen's argument that NorthWestern's motion to compel is unripe because the parties have not initiated the procedural steps contractually required to close the Project is incorrect. In their November 19, 2020 letter regarding the 2021 Colstrip budget, the PNW Owners identified "[c]losure of one or both units within the next 60 months" as a key objective. In fact, the PNW Owners "had planned to call a vote to close Colstrip Unit 3 at the Committee meeting on May 19, 2021, under the terms of the O&O Agreement." *See* Pls.' Undisputed Facts, Doc. 103 ¶ 14. The PNW Owners "chose not to call for that vote … now due to the risk of aggressive enforcement of Senate Bill 266." *Id.*

The PNW Owners admit they have been prevented from taking any additional steps to close Colstrip because of SB 266. *See* Pls.' Reply, Doc. 146, at 3. The PNW Owners have been pressing to close the Project, and their efforts will

not subside given the Washington and Oregon legislation.

Colstrip's operation is vital to NorthWestern's ability to meet customer demand, especially during peak demand, and acquisition of electrical energy in the open marketplace, with varying and perhaps prohibitive prices, is not a workable solution. NorthWestern would need years to plan and perhaps build alternate generating sources to meet customer demand were Colstrip to close. Because of the recent actions taken by the PNW Owners and Talen, the dispute regarding whether the PNW Owners can bring about the Project's closure without the unanimous support of all the Owners, requires resolution in the arbitration proceeding.

The PNW Owners intend to do what they can to close the Project by 2025. This dispute is ripe for arbitration.

### B. The Plaintiff Co-Owners Unfounded Prematurity Argument

The Plaintiff Co-Owners, while emphasizing they "want the Arbitration to move forward promptly,"[10] argue NorthWestern's motion is premature "[u]ntil the issues regarding the legality of Senate Bill 265 raised by the Plaintiffs in this proceeding are resolved." Pl. Co-Owners' Resp., Doc. 142, at 5.

In making this argument, the Plaintiff Co-Owners overlook the provisions of SB 265, which allow the parties to agree in writing to waive procedures dictated by

---

[10] Pl. Co-Owners' Resp., Doc. 142, at 4.

11

SB 265. While the language of MCA § 27-5-323, as amended by SB 265, allows the parties to agree to a single arbitrator, subdivision (2)(a), subdivision (1) allows the parties to agree to a venue outside Montana, and Talen has suggested a venue of Denver, Colorado, for the arbitration hearing. *See* Jackson Decl., NorthWestern's Mot. to Compel, Doc. 122-1, ¶ 8. The Owners may also agree to amend O&O Agreement § 18. A fundamental benefit of having a magistrate judge oversee the parties' negotiations is to encourage agreement on arbitration protocol—important processes and procedures not addressed in Section 18.

No party has asked the Court to address the merits of the issues pending in the underlying arbitration. Rather, the issues before this Court relate to the enforceability (the constitutionality) of SB 265 and SB 266. The Court can enter an order compelling arbitration and compelling the parties to enter into mediation before a magistrate judge while the Court addresses the enforceability issues raised in these proceedings. There is no need for a stay of proceedings, which applies only when the judicial proceedings mimic the matters to be litigated in

arbitration.[11] 9 U.S.C. § 3 ("the court … upon being satisfied that the issue involved in such suit … is referable to arbitration … shall … stay the trial of the action until such arbitration has been had").

If the Court is not prepared to address the enforceability of SB 265 before compelling arbitration, the Court may compel the parties to arbitration while mediating procedure and protocol issues. The parties' efforts to reach agreement so far have fallen short in part because Talen prefers delay.[12] Appointing a magistrate judge to oversee the process would substantially improve the likelihood of reaching an agreement, which would allow the arbitration to proceed.

The PNW Owners have joined with NorthWestern on a proposed arbitrator selection protocol, and they have worked together to address arbitration procedures. Only Talen has resisted fair and open negotiations, instead focusing on

---

[11] The Plaintiff Co-Owners "question whether NorthWestern's Motion seeking to compel arbitration is appropriately filed in this proceeding." Plaintiff Co-Owners' Resp., Doc. 142, at 2-3 n.4. But, they fail to recognize that the enforceability of SB 265 and SB 266 needs to be addressed in all three matters: 21-cv-00047-SPW-KLD, 21-cv-00058-SPW-TJC, and 21-cv-00090-SPW-TJC.

[12] Talen's claim it "remains willing to continue working with the other parties to agree on a protocol that would govern the details of any future arbitration proceeding relating to potential closure of Colstrip," Talen's Opposition, Doc. 141, at 2, n.1, is craftily written to suggest willingness without commitment. Note in particular the reference to "future arbitration" and not to the pending arbitration. Talen is engaging in the proverbial game of kicking the can down the road.

13

unfounded arguments about ripeness. Removing the ripeness issue by rejecting Talen's feeble arguments will open the possibilities for agreement.

## CONCLUSION

For the reasons stated above and in its opening brief, NorthWestern urges the Court to enter an order compelling the parties to move forward promptly with arbitration and appointing a magistrate judge to oversee negotiations ensuring they will.

DATED:  January 13, 2022

Respectfully submitted,

DORSEY & WHITNEY LLP

By:  */s/ Stephen D. Bell*
Stephen D. Bell, Esq.
Millennium Building
125 Bank Street, Suite 600
Missoula, Montana 59802-4407
Telephone:  (406) 329-5590
Email: bell.steve@dorsey.com

J Jackson, Esq. (*pro hac vice*)
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 340-2760
Email: jackson.j@dorsey.com

*Counsel for Defendant NorthWestern Corporation*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(d)(2)(E), I certify that NorthWestern's Brief in Reply to Plaintiffs' and Talen's Responses to Its Motion to Compel Arbitration and Appoint a Magistrate Judge to Oversee Arbitration Procedure Negotiations is printed with proportionately spaced Times New Roman text typeface of 14 points; is double-spaced; and the word count calculated by Microsoft Office Word is 3,210 words.

By: */s/ Stephen D. Bell*
Stephen D. Bell, Esq.
Millennium Building
125 Bank Street, Suite 600
Missoula, Montana 59802-4407
Telephone: (406) 329-5590
Email: bell.steve@dorsey.com