Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
3860 Avenue B, Suite C East
Billings, MT 59102
Phone: (406) 403-7066
adrian.miller@sullivanmiller.com
michelle.sullivan@sullivanmiller.com

*ATTORNEYS FOR AMICUS*
*CITY OF COLSTRIP*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| PORTLAND GENERAL ELECTRIC COMPANY; AVISTA CORPORATION; PACIFICORP; AND PUGET SOUND ENERGY, INC. <br><br> Plaintiffs, <br><br> vs. <br><br> NORTHWESTERN CORPORATION; TALEN MONTANA, LLC; AND AUSTIN KNUDSEN, in his official capacity as Attorney General for the State of Montana, <br><br> Defendants. | Case No. CV 21-47-BLG-SPW-KLD <br><br> **CITY OF COLSTRIP'S AMICUS BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THEIR FOURTH AND FIFTH CLAIMS FOR RELIEF** |

The City of Colstrip ("Colstrip"), pursuant to this Court's Order dated March 23, 2022 (Doc. 166), hereby files its amicus brief in opposition to Plaintiffs' Motion for Partial Summary Judgment Regarding Their Fourth and Fifth Claims for Relief (Doc. 102).

## **INTRODUCTION**

Plaintiffs (hereafter, the "PNW Owners") and defendants NorthWestern Corporation ("NorthWestern") and Talen Montana, LLC ("Talen") jointly own a coal-fired steam electric generation facility in Colstrip, Montana (hereafter, the "Power Plant"). *See* Doc. 103, ¶ 1. Units 3 and 4 of the Power Plant went online in 1984 and 1986. *See* Declaration of Mayor John Williams (hereafter, "Williams Dec."), attached hereto as Exhibit 1, at ¶ 6. Together, the net generating capacity of Units 3 and 4 is 1,480 megawatts, enough to meet the electrical needs of a million homes across the Pacific Northwest and Montana. *Id.* at ¶ 8. Before Units 1 and 2 were shuttered at the start of 2020, the Power Plant was the second-largest coal-fired power facility west of the Mississippi River. *Id.* at ¶ 7. Except for the waste-coal fired power plant project located six miles north of Colstrip (which has just 38 megawatts of generating capacity), the Colstrip Power

Plant is the only coal-fired power facility consistently operating in Montana.[1] *Id.* at ¶ 9.

The Power Plant is a key part of Montana's infrastructure. Its continued operation ensures reliable and affordable power for the people of Montana. The Power Plant and neighboring Rosebud Mine – where the Power Plant gets its coal – employ about 550 full-time workers. *Id.* at ¶ 11. Coal taxes provide tens of millions of dollars to state and local governments. *Id.* at ¶ 12. For these reasons and many more, detailed below, the Power Plant and Rosebud Mine are valuable assets to the state of Montana.

To protect those assets, the Montana legislature passed Senate Bill 266 during the 2021 session. In short, SB266 ensures that the Power Plant will continue to generate power so long as there is at least one owner who remains committed to keeping the Power Plant in operation. To be sure, Montana is not forcing the current owners to hold on to their shares of the Power Plant. SB266 does not prohibit the sale by any of the owners of their shares in Units 3 and 4. Rather, SB266 simply guarantees that this vital

---

[1] A 115-megawatt coal-fired power plant is located in Hardin, but only operates sporadically.  Most recently, reports are that it was operating as a means for bitcoin mining power. <<https://www.motherjones.com/environment/2022/02/marathon-bitcoin-miners-revive-dying-montana-hardin-coal-plant-co2-emissions/>>

Montana asset will remain operational until no one is willing to continue owning and operating the Power Plant. Only then will Units 3 and 4 be retired.

The PNW Owners contend that Montana's desire to safeguard the Power Plant from laws and regulations passed in other states somehow violates the Commerce Clause. They are wrong. As explained below, SB266 is constitutional. Because the bill treats all similarly situated entities – i.e., all of the Power Plant owners – evenhandedly, there is no discrimination. In the absence of discrimination, the *Pike* test requires a balancing of the incidental impacts on interstate commerce and the putative local benefits of SB266. A consideration of those local benefits – described below – leads to the conclusion that SB266 passes the *Pike* test. SB266 does not violate the Commerce Clause. The PNW Owners' Motion for Partial Summary Judgment should be denied.

## FACTS

*Colstrip's History*

Colstrip was originally established in the 1920s. *See* Williams Dec. at ¶ 3. Mining started in 1924, and the coal was used by steam locomotive boilers on the Northern Pacific Railway. *Id.* at ¶ 4. In 1958, mining

operations ended after diesel engines replaced the coal-fired steam locomotives. *Id.*

A year later, Montana Power Company purchased the rights to the Mine and the town. *Id.* at ¶ 5. Mining operations resumed in 1967 to supply the Corette power plant in Billings *Id.* Plans to build coal-fired electrical plants in Colstrip quickly developed. *Id.* at ¶ 6. Units 1 and 2 went online in 1975 and 1976, and Units 3 and 4 went online in 1984 and 1986. *Id.* Shortly thereafter, the owners of the Units entered into an agreement that would supply reliable and reasonable power to Portland, Seattle, Spokane and the surrounding areas. *See* Doc. 39-2.

Colstrip incorporated in 1998. *Id.* at ¶ 10. With a population of around 2,300, it is the largest city in Rosebud County. *Id.* The Power Plant and Mine are, far and away, the primary industries in Colstrip. *Id.* at ¶ 11. Nearly all the remaining employers in Colstrip – education, retail, dining, medical, government, etc. – support the families that reside in Colstrip because of the Power Plant and Mine. *Id.*

*Colstrip's Infrastructure*

The source of Colstrip's drinking water is Castle Rock Lake. Williams Dec. at ¶ 13. The lake is a 160-acre reservoir that was originally built in 1975 to supply cooling water to the Power Plant. *Id.* Water is pumped into

Castle Rock Lake from the Yellowstone River by way of two pipelines. *Id.*
at ¶ 14. Colstrip takes its water from the lake, which is then treated at the
Colstrip Water Treatment Plant. *Id.*

Though manmade, Castle Rock Lake has been declared a surface
water of the state of Montana. *Id.* at ¶ 15. The Montana Department of
Environmental Quality has issued a permit authorizing Colstrip to discharge
from its Water Treatment Plant into Castle Rock Lake within the limits and
criteria of the permit. *Id.*

Castle Rock Lake is owned by the Power Plant, and Colstrip depends
on the continued viability of the Power Plant for the operation of the water
pipelines that supply Colstrip with its drinking water. *Id.* at ¶ 16. In
anticipation of the eventual closure of the Power Plant, a bill was introduced
in the 2021 legislative session that would have required the Power Plant
owners to protect the water rights for Colstrip and ensure Colstrip could
afford to maintain access and conveyance. *Id.* at ¶ 17. Several owners spoke
against the early version of the bill. As a result of this opposition, the
language of the bill as passed requires the Power Plant owners to complete a
water feasibility study by November 2022. *See* Mont. Code Ann.
§ 75-8-110.

Castle Rock Lake also has a conservation easement with Montana Fish, Wildlife & Parks ("FWP") for fishing and a recreation easement with Colstrip Park and Recreation District ("CPRD"). *Id.* at ¶ 18; *see also* A.R.M. 12.11.5101. There are walking/biking trails around the lake, a boat ramp area, and a recreation area with shelters, picnic tables, and playground equipment. *Id.* FWP regularly stocks Castle Rock Lake with bass, walleye, and catfish. *Id.*

*Colstrip's Contribution to the State*

Beyond Colstrip, the Mine and Power Plant provide vital electricity to the northern plains of Montana, which regularly experience sub-zero winter temperatures. Williams Dec. at ¶ 19. NorthWestern currently owns a 30% share of Unit 4. *Id.* at ¶ 20. Northwestern reports having over 700,000 customers in Montana, South Dakota, and Nebraska, with over 370,000 of those customers from Montana alone. *Id.* Northwestern serves customers across the State, including customers in Butte, Billings, Bozeman, Missoula, Great Falls, and Helena. *Id.*

The Power Plant and Mine also support the state and local coffers through excise taxes. As reported by the Helena Independent Record, coal taxes provided $81 million to state and local governments in 2016. *See* *https://helenair.com/news/state-and-regional/coal-mining-remains-*

*significant-source-of-revenue-for-montana/article_332acea7-b019-5f10-8123-1c864d6cff36.html.* Without Colstrip and its industry, those tax dollars would disappear.

*Other Significant Local Impacts*

The Power Plant provides far-reaching benefits to the local community. For example:

- For years, there have been agreements between the Power Plant and the Northern Cheyenne Tribe, and the Mine and the Northern Cheyenne Tribe, that allow for preferential treatment of tribal members in employment opportunities. Williams Dec. at ¶ 21. In addition, the Power Plant and Mine have long sponsored several scholarships each year that are awarded to local Native American high school graduates. *Id.*

- A hospital district, known as the Colstrip Medical District, was created and facilitated years ago by the Montana Power Company (as the Power Plant's operating owner) to provide medical services in Colstrip. Williams Dec. at ¶ 22. The Colstrip Medical District levies a tax on property within the district to support the operation of the Colstrip Medical Center, which provides outpatient and emergency services. *Id.* Closure of the

Power Plant would result in a dramatic decrease in tax revenues for the Colstrip Medical District. *Id.*

- Colstrip's school system has often been recognized for quality education. *Id.* at ¶ 23. The student body consists of a 35% (or more) Native American population. *Id.* Closure of the Power Plant would likely result in a downsizing of the school system and a loss of revenue, which would negatively impact the quality of education provided to Colstrip's students. *Id.*

- Colstrip's tax base also pays for water treatment and wastewater treatment facilities, law enforcement, fire protection, garbage collection, the CPRD, weed control, mosquito abatement, snow plowing, and street maintenance. *Id.* at ¶ 24. All of these services are dependent for their funding on the Power Plant, the Mine, and their combined workforce. *Id.*

- In recent years, the Mine has provided assistance and the use of their heavy equipment to prevent the spread of coal seam fires.

## *Colstrip's Future*

The fate of the Power Plant and Mine – and thus Colstrip itself – has been the subject of much attention and speculation in recent years. In early 2020, Units 1 and 2 were shuttered prematurely – the result of a different

lawsuit – even though they had a remaining productive life of 20-25 years. Williams Dec. at ¶ 26. Units 3 and 4 remain operational, as does the Mine. *Id.*

If either the Power Plant or the Mine were to prematurely shutter, the community of Colstrip would effectively collapse. *Id.* at ¶ 27. Five hundred families would immediately be forced to leave for lack of work. *Id.* The remainder of Colstrip's residents would likely follow, and what is now a vibrant and successful community would become a ghost town. *Id.* Colstrip needs the Power Plant and Mine to survive.

And yet, Colstrip is not naïve. The Power Plant and Mine will close one day, but Colstrip and its citizens deserve an orderly winding-down of the industry that has sustained not only their way of life, but the lives of those across the region who have benefitted from the energy supplied by Colstrip for nearly 50 years. Colstrip's citizens deserve to continue making a living in the energy industry for as long as it is feasible to do so. SB266 provides that opportunity.

## ARGUMENT

The Ownership and Operation Agreement (Doc. 39-2) governing the Power Plant's owners has allowed the owners to sell power to their customers and profit from those sales for more than 40 years. While that

Agreement controls the owners' conduct as to one another, if the owners' conduct unfairly impacts their consumers, it is the job of the legislature to intervene.

SB266 has been codified at Mont. Code Ann. § 30-14-2701 and 2702, as part of the Unfair Trade Practices and Consumer Protection statutes. The purpose of the consumer protection statutes is "to protect the public from unfair or deceptive practices," which is a "high legislative priority." *Tripp v. Jeld-Wen, Inc.*, 2005 MT 121, ¶ 37, 327 Mont. 146, 156, 112 P.3d 1018, 1026. The legislature has protected Montana consumers under Title 30, Chapter 14 from monopolies (§ 30-14-201), high-pressure personal solicitation sales tactics (§ 30-14-501), price discrimination (§ 30-14-901), unregistered telemarketers (§ 30-14-1402), and identity theft (§ 30-14-1701), as well as under Title 33, Chapter 18 from unfair trade practices by insurance companies. Montana's legislature is well within its rights to pass laws that protect Montana's consumers.

The PNW Owners, however, contend that the Montana Attorney General should be enjoined from enforcing SB266 on the basis that it violates the dormant Commerce Clause. In considering such a challenge, courts must consider "whether, as a matter of law, Plaintiffs have provided sufficient evidence of a violation of the dormant Commerce Clause." *Nat'l*

*Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012). Here, Plaintiffs have failed to provide such evidence and their Motion must therefore be denied.

To determine whether a law violates the "dormant" aspect of the Commerce Clause, a Court must "first ask whether [the law] discriminates on its face against interstate commerce." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338, (2007).; *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008). If there is no discrimination, "the law 'will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *Dep't of Revenue of Ky.*, 553 U.S. at 338 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

## I.    SB 266 IS NOT DISCRIMINATORY.

"Discrimination" in the context of the dormant Commerce Clause – often referred to as economic protectionism – "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Ass'n, Inc.*, 550 U.S. at 338; *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013). The PNW Owners' analysis of whether SB266 discriminates against out-of-state interests wholly misses the mark. "[A]ny notion of discrimination

assumes a comparison of <u>substantially similar entities</u>." *Rocky Mountain Farmers Union,* 730 F.3d at 1987 (quoting *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997)) (emphasis added). "[W]hen the allegedly competing entities provide different products, … there is a threshold question whether the companies are indeed similarly situated for constitutional purposes." *Gen. Motors Corp.*, 519 U.S. at 299.

Here, the PNW Owners claim discrimination – or economic protectionism – on the basis that they are being discriminated against in favor of in-state interests. But the in-state interests are not "similarly situated for constitutional purposes," because the in-state interests are not "competing entities" that are providing a similar product or service that the out-of-state owners are providing. Rather, the "protected" in-state interests identified by the PNW Owners in their brief are "the people of Montana". *See* Doc. 104 at p.30. The "people of Montana" are not competing with the PNW Owners in any arena. There is no discrimination under the dormant Commerce Clause.

Had SB266 prohibited only the out-of-state owners of a jointly owned electrical generation facility from refusing to fund operating costs or from bringing about the permanent closure of a generating unit, that would have been grounds to argue discrimination. Or if SB266 only applied to electrical

generation facilities with out-of-state owners, that would also give rise to a discrimination argument. But SB266 applies even-handedly to any owner of any jointly owned electrical generation facility, whether that owner is based in Montana or elsewhere. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 471–72 (1981) (Minnesota statute did not "effect 'simple protectionism,' but 'regulate[d] evenhandedly' by prohibiting all milk retailers from selling their products in plastic, nonreturnable milk containers, without regard to whether the milk, the containers, or the sellers are from outside the State.").

The in-state interests of Montana's workers and electricity consumers are not competitors and thus are not "similarly situated" to the interests of the PNW Owners. There is no discrimination against the out-of-state PNW Owners in favor of in-state owners that would violate the dormant Commerce Clause.

## II.   SB 266 PASSES THE *PIKE* TEST.

Given that SB266 does not discriminate against out-of-state interests, the next step is to weigh local interests against the impact on interstate commerce. "If a statute 'regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is

clearly excessive in relation to the putative local benefits.'" *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1271 (9th Cir. 2011) (quoting *Pike,* 397 U.S. at 142).

### A.    There Is No Burden on Interstate Commerce.

As an initial matter, the PNW Owners have failed to articulate the burden that SB266 will have on interstate commerce. SB266 does not attempt to regulate the actual product of the Power Plant, so there is no burden on interstate commerce in that regard. Rather, the PNW Owners argue that it is their own investment in the Power Plant that is burdened by SB266, asserting that they should be able to move their investment out of Montana and into another state if they choose.

What the PNW Owners fail to acknowledge is that SB266 does not prevent the PNW Owners from divesting themselves of their interests in the Power Plant. SB266 puts no restraint on the ability of any owner to sell its shares at any time. Rather, SB266 simply provides that (1) if an entity owns part of an electrical generation facility, it must continue to fund its share of the operating costs, and (2) if any owner wants to continue operating the electrical generation facility, the other owners cannot force its closure. These mandates do not burden interstate commerce; they protect Montana's critical infrastructure.

**B.    The Local Benefits Are Many and Far-Reaching.**

In the preamble to SB266, the legislature expressed that the electrical

generation facilities in this state "have significant implications for economy,

environment, and health and welfare of Montana consumers." *See*

*<<https://leg.mt.gov/bills/2021/SB0299/SB0266_1.pdf>>.* The stated

purpose of SB266 was to ensure workers' safety, environmental remediation

of the facility, and a reliable supply of electricity for Montana consumers.[2]

*Id.* Those benefits – along with the other local benefits outlined above – far

outweigh any incidental impact on interstate commerce.

Without the Power Plant, Montana loses its own source of reliable

electricity. Its residents and tribal members lose jobs and opportunities.

Colstrip loses its source of drinking water and significant source of

recreation. Its schools lose students and funding, and graduates lose

scholarship opportunities. The Colstrip Medical Center and CPRD lose

funding. A diminished tax base means less funding for roads, law

enforcement, fire protection, and public utilities. Colstrip has been a

thriving community for decades, proud of its contributions to the Pacific

---

[2] Reliable energy is also a matter of national security. "Reliable and
affordable energy is critical to our economic security, our national security,
and our homeland security." Statement By the President, 2003 WL
22714102, at *1.

Northwest region's economic advancements that were possible because of the energy generated in Colstrip. Now, Colstrip faces the prospect of becoming a ghost town.

Allowing the Power Plant to remain operational if at least one owner is willing to continue producing energy has little, if any, impact on interstate commerce. But the local benefits to continuing to operate the Plant are clear and significant. On balance, these local benefits tip the scales in favor of upholding the constitutionality of SB266. *See Clover Leaf Creamery*, 449 U.S at 473 (substantial state interest in promoting conservation of energy and other natural resources and easing solid waste disposal problems outweighed minor burden on interstate commerce). The PNW Owners' Motion for Summary Judgment should be denied.

## CONCLUSION

Protection of Montana's consumers and its energy supply is a proper function of the state legislature. SB266 ensures that the Colstrip Power Plant will remain open as long as there is one owner willing to continue its operations. Disinterested owners are not prohibited from divesting themselves of their ownership in Units 3 and 4 under SB266, but they are required to fund their share of the operations while they reap the benefits of

ownership. SB266 ensures Montanans are treated fairly by the owners of the Power Plant.

SB266 treats all of the Power Plant owners evenhandedly, and the local benefits of the legislation far outweigh any impact on interstate commerce. The PNW Owners' Motion should be denied.

DATED this 1st day of April, 2022.

/s/ Adrian A. Miller
Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
3860 Avenue B, Suite C East
Billings, MT 59102
*ATTORNEYS FOR CITY OF COLSTRIP*

## CERTIFICATE OF COMPLIANCE

The undersigned, Adrian A. Miller, certifies that this Amicus Brief complies with the requirements of Rule 7.1(d)(2). The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman Font typeface consisting of fourteen characters per inch. The total word count of this Brief is 3,279 words, excluding caption and certificates of compliance and service. The undersigned relies on the word count of the word processing system used to prepare this document.

    /s/ Adrian A. Miller
Adrian A. Miller

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of April, 2022, I filed the foregoing document electronically through the CM/ECF system, which caused all counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.


<u>     /s/ Adrian A. Miller          </u>
Adrian A. Miller