IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| PORTLAND GENERAL ELECTRIC COMPANY, AVISTA CORPORATION, PACIFICORP, and PUGET SOUND ENERGY, INC., | CV-21-47-BLG-SPW-KLD |
| Plaintiffs, | |
| vs. | FINDINGS and RECOMMENDATION |
| | and |
| NORTHWESTERN CORPORATION; TALEN MONTANA, LLC; AUSTIN KNUDSEN, in his official capacity as Attorney General for the State of Montana, | ORDER |
| Defendants. | |

Four out-of-state co-owners of a Montana coal-fired electricity generation facility bring this action for declaratory and injunctive relief challenging the constitutionality of recent legislation amending the Montana Uniform Arbitration Act's venue provision, Mont. Code Ann. § 27-5-323, and amending the Montana Unfair Trade Practices and Consumer Protection Act to add two new unfair or deceptive acts or practices, Mont. Code Ann. § 30-14-2702. This matter comes before the Court now on the following motions, which have been fully briefed and

1

argued: (1) Plaintiffs' Motion for Partial Summary Judgment Regarding their First, Second, and Third Claims for Relief (Doc. 88); (2) Plaintiffs' Motion for Partial Summary Judgment Regarding their Fourth and Fifth Claims for Relief (Doc. 102); (3) Defendant State of Montana's Motion to Stay (Doc. 116); (4) Northwestern Corporation's Motion to Compel Arbitration and Appoint a Magistrate Judge to Oversee Arbitration Procedure Negotiations (Doc. 120); and (5) Talen Montana's Motion for Leave to Supplement its Opposition to Plaintiffs' motion for partial summary judgment on their fourth and fifth claims for relief (Doc. 153).

## I.    **Background**

Plaintiffs Portland General Electric Company,  Avista Corporation, PacifiCorp, and Puget Sound Energy, Inc. (collectively "PNW Owners"), and Defendants NorthWestern Corporation ("NorthWestern") and Talen Montana LLC ("Talen") are the joint owners of a coal-fired electricity generating plant located in Colstrip, Montana. (Doc. 90, at ¶ 1). The Colstrip plant presently consists of two coal-fired electric generation units: Units 3 and 4 (collectively "Colstrip" or "the Project"). PNW Owners collectively own a 70 percent interest in Colstrip, with Talen owning the remaining 30 percent interest in Unit 3 and NorthWestern owning the remaining 30 percent interest in Unit 4. (Doc. 90, at ¶ 1; Doc. 39-2, at 4 ¶ 9).

PNW Owners, Talen, and NorthWestern are parties to an Ownership and Operation Agreement ("O&O Agreement"), signed in 1981, that governs operation of Colstrip. (Doc. 90, at 2 ¶2; Doc. 39-2). The O&O Agreement establishes a five-member project committee "to facilitate effective cooperation, interchange of information and efficient management of the Project." (Doc. 39-2, at 38 ¶ 17*). The O&O Agreement establishes how committee members may use their project ownership shares to vote on matters pertaining to Colstrip. (Doc. 39-2, at 38-42). The O&O Agreement further provides that an "Operator" be responsible for managing the Project on a day-to-day basis. (Doc. 39-2, at 26-27). The Operator also prepares an annual operating budget, and the Committee then votes to approve that budget. (Doc. 103, at 3 ¶ 3). Talen is the Project's current Operator. (Doc. 39-4, at ¶ 8).

Also relevant here, the O&O Agreement contains an arbitration provision requiring that arbitration of disputes arising under or relating to the O&O Agreement be venued in Spokane, Washington, held before a single arbitrator with "demonstrated experience in the matter submitted," and governed by the Washington Uniform Arbitration Act. (Doc. 39-2, at 42 ¶ 18). Although the O&O Agreement has been amended four times since 1981, the arbitration provision has never been altered or amended. (Doc. 103, at 3 ¶ 3).

Collectively, PNW Owners do business in several northwestern states, including Oregon and Washington. PGE serves customers in Oregon, PSE serves customers in Washington, and Avista and PacifiCorp do business in both states. (Doc. 32, at 6). In 2016, Oregon enacted legislation requiring each electric utility in Oregon to eliminate coal-fired resources from its allocation of electricity serving Oregon customers by January 1, 2030. (Doc. 39-4, at ¶ 11). See Or. Rev. Stat. § 757.518(2) ("On or before January 1, 2030, an electric company shall eliminate coal-fired resources from its allocation of electricity."). In 2019, Washington enacted similar legislation obligating each electric utility in Washington to cease using coal-fired resources to serve Washington customers by the end of 2025, or pay substantial penalties. (Doc. 39-3, at ¶ 10). See RCW 19.405.030(1)(a) ("On or before December 31, 2025, each electric utility must eliminate coal-fired resources from its allocation of electricity.").

In light of this legislation, PNW Owners intend on transitioning towards the eventual closure of the Project. (See e.g. Docs. 105, at 3 ¶ 4; 39-2, at 7 ¶ 20; 39-3, at 5 ¶ 12; 39-5, at 3 ¶ 5). NorthWestern, however, wants to keep the Project open for the indefinite future (Doc. 96, at 3 ¶4), and Talen intends on keeping the Project "running as long as it is economically viable and consistent with Prudent Utility Practice to do so." (Doc. 93-2, at ¶ 4). NorthWestern, Talen, and PNW

Owners disagree on whether the O&O Agreement requires the unanimous consent of the co-owners to close Colstrip. (Doc. 90, at ¶ 4).

On February 9, 2021, NorthWestern noticed its intent to initiate arbitration in order to "obtain a definitive answer to the question of what vote is required to close Units 3 and 4 and what is the obligation of each co-owner to fund operations of the plant." (Doc. 90, at ¶ 5). NorthWestern served an arbitration demand on March 12, 2021, and an amended arbitration demand on April 2, 2021. (Doc. 90, at ¶5; Doc. 124, at 5). PNW Owners served responses and their own arbitration demands in April 2021. (Doc. 39-2, at ¶ 38).

On April 13, 2021, the Montana Legislature passed Senate Bills 265 and 266, both of which were signed into law on May 3, 2021. S.B. 265, 67th Leg., § 1 (Mont. 2021); S.B. 266, 67th Leg., § 2 (Mont. 2021); (Docs. 32-1; 32-2; 103, ¶ 12). Representatives of Talen and NorthWestern testified in support of Senate Bills 265 and 266 during committee hearings in the Montana legislature, and representatives of PNW Owners testified in opposition to both bills.

Senate Bill 265 amends the Montana Uniform Arbitration Act to effectively invalidate "[a]n agreement concerning venue involving an electrical generation facility" in Montana "unless the agreement requires that arbitration occur within the state before a panel of three arbitrators selected under the [Montana] Uniform Arbitration Act unless all parties agree in writing to a single arbitrator."

Mont. Code Ann. § 27-5-323(2)(a). (Doc. 32-2). Senate Bill 265 thus differs from the O&O Agreement's arbitration provision in that it requires arbitration to be venued in Montana, held before a panel of three arbitrators, and governed by the Montana Uniform Arbitration Act. Senate Bill 265 applies retroactively to petitions to compel arbitration made on or after January 1, 2021. (Doc. 32-2).

Senate Bill 266, in turn, amends the Montana Unfair Trade Practices and Consumer Protection Act to create two new unfair or deceptive acts or practices. S.B. 266, 67th Leg., § 2 (Mont. 2021); (Doc. 32-1). Section 2(1)(a), which is codified at Mont. Code Ann. § 30-14-2702(1)(a), prohibits "[t]he failure or refusal of an owner of a jointly owned electrical generation facility in the state to fund its share of operating costs associated with a jointly owned electrical generation facility." (Doc. 32-1). Section 2(1)(b), which is codified at Mont. Code Ann. § 30-14-2702(1)(b), prohibits "[c]onduct by one or more owners of a jointly owned electrical generation facility in the state to bring about permanent closure of a generating unit of a facility without seeking and obtaining the consent of all co-owners of a generating unit." (Doc. 32-1). Senate Bill 266 further authorizes civil fines of up to 100,000 for each violation, with each day of a continuing violation constituting a separate offense, and applies retroactively to actions taken by an owner on or after January 1, 2021. (Doc. 32-1).

In May 2021, PNW Owners commenced this action for declaratory and injunctive relief challenging the enforceability and constitutionality of Senate Bills 265 and 266. (Docs. 1, 32). PNW Owners bring three claims for declaratory relief against Talen and Northwestern related to Senate Bill 265. Their First and Second Claims for Relief seek a declaration that Senate Bill 265 is unconstitutional as applied to the O&O Agreement under  the Contracts Clause of the United States Constitution and the Contracts Clause of the Montana Constitution, respectively. (Doc. 32, at ¶¶ 84-96; ¶¶ 97-104)). PNW Owners' Third Claim for Relief seeks declaration that Senate Bill 265 is preempted as applied to the O&O Agreement under  the Federal Arbitration Act. (Doc. 32, at ¶¶ 105-114).

PNW Owners also bring three claims for declaratory and injunctive relief under 42 U.S.C. § 1983 against Defendant Austin Knudsen, in his official capacity as Attorney General for the State of Montana ("Knudsen" or "the State") related to Senate Bill 266. In their Fourth and Fifth Claims for Relief, PNW Owners seek a declaration that Senate Bill 266 violates the Commerce Clause and Contracts Clause of the United States Constitution, respectively. (Doc. 32, at ¶¶ 115-145). Their Sixth Claim for Relief seeks a declaration that Senate Bill 266 is unconstitutional under the Due Process Clause of the United States Constitution based on vagueness. (Doc. 32, at ¶¶ 146-57). PNO Owners also request permanent injunctive relief prohibiting Knudsen from enforcing or seeking to enforce Senate

Bill 266. (Doc. 32, at 43). On October 13, 2021, presiding United States District Court Judge Susan P. Watters granted PNO Owners' motion for a preliminary injunction enjoining Knudsen from enforcing Senate Bill 266 while this action is pending. (Doc. 100).

In mid-2021, PNW Owners filed motions for summary judgment on their first through fifth claims for relief. (Docs. 88, 102). As it did at the preliminary injunction stage, the State has chosen to take no position on PNW Owners' motions for partial summary judgment or the underlying merits at this time, as evidenced by the fact that it did not file any summary judgment response briefs. Instead, the State responded with a motion to stay resolution of PNW Owners' claims challenging Senate Bill 266 pending the outcome of arbitration proceedings between PNW Owners, Talen, and Northwestern.[1] (Doc. 116). NorthWestern, in turn, filed a motion in December 2021 seeking to compel arbitration and asking the Court to appoint a United States Magistrate Judge or special master to oversee arbitration procedure negotiations. (Doc. 120).

---

[1] For the first time at oral argument, the State made substantive arguments in opposition to PNW Owners' summary judgment motion and addressing the constitutionality of SB 266, none of which would alter the analysis and result that follow. (Doc. 177, at 92-97, 115, 118-123). Because the State chose not to respond to PNW Owners' summary judgment motions on the merits, the Court does not address the State's newly raised arguments in this Findings & Recommendation.

On April 26, 2022, the Court heard oral argument on all pending motions. (Doc. 174). Two weeks later, on May 10, 2022, Talen filed a Notice of Suggestion of Bankruptcy. (Doc. 178). As explained in the Notice, on May 9, 2022, Talen (along with its debtor affiliates) filed voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of Texas under Chapter 11 of Title 11 of the United States Code. (Doc. 178, at 1). Those filings triggered an automatic stay of these proceedings under 11 U.S.C. § 362.

On August 30, 2022, PNW Owners and NorthWestern filed a Notice to Court on Lifting of Automatic Stay. (Doc. 184). The notice advises that on August 25, 2022, the Bankruptcy Court entered a Stipulation and Order modifying the automatic stay on the terms set forth therein to permit this lawsuit and the arbitration to proceed through resolution. (Docs. 184, at 3, 9). On September 2, 2022, the Court held a status conference with all parties to address the effect of the Bankruptcy Court's Stipulation and Order. (Doc. 187).

On September 9, 2022, PNW Owners, NorthWestern and Talen filed a Stipulation Regarding Arbitration Procedures and Pending Motions.[2] (Doc. 189). The parties stipulated to engage in arbitration pursuant to the Bankruptcy Court's Stipulation and Order, and listed additional arbitration terms to which they have

---

[2] The State takes no position on the matters addressed in the Stipulation. (Doc. 189, at 4).

agreed. (Doc. 189, at 2). The parties have not however, reached an agreement as to the venue for arbitration, and stipulate that their agreement to engage in arbitration does not eliminate the need for a ruling on PNW Owners' Motion for Partial Summary Judgment Regarding their Fourth and Fifth Claims for Relief on Montana Senate Bill 266. (Doc. 189, at 3). The parties further advise the Court that they disagree on whether the Bankruptcy Court's Stipulation and Order moots PNW Owners' Motion for Partial Summary Judgment challenging Senate Bill 265. PNW Owners take the position that the motion is not moot, NorthWestern takes the position that the Court should decide whether the motion is moot, and Talen takes the position that the motion is moot. (Doc. 189, at 4). The parties also disagree on whether NorthWestern's Motion to Compel Arbitration and Appoint a Magistrate to Oversee Arbitration Procedure Negotiations is moot. NorthWestern takes the position that the motion is not moot until the parties have resolved all issued regarding arbitration procedures, Talen takes the position that the motion is moot, and PNW Owners take no position on whether the motion is moot. (Doc. 189, at 4).

Given the parties' conflicting positions, and in the interest of advancing this litigation as expeditiously as possible, the Court will address all pending motions at this time.

## II.    <u>Summary Judgment Standard</u>

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).

Once the moving party has satisfied its initial burden with a properly supported motion, summary judgment is appropriate unless the non-moving party designates by affidavits, depositions, answers to interrogatories or admissions on file "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. 317, 324 (1986). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials" of the pleadings. *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249-50. The court must view the evidence in the light most favorable to the non-moving party and draw all

11

justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255;

*Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

## III.   PNW Owners' Motion for Partial Summary Judgment on their First, Second, and Third Claims for Relief

PNW Owners move for summary judgment on their first three claims for

relief against Talen and NorthWestern, seeking declaratory relief that: (1) Senate

Bill 265 is unconstitutional as applied to the O&O Agreement under the Contracts

Clause of the United States Constitution; (2) Senate Bill 265 is unconstitutional as

applied to the O&O Agreement under the Contracts Clause of the Constitution of

the State of Montana; and (3) Senate Bill 265 is preempted as applied to the O&O

Agreement under the Federal Arbitration Act.

For purposes of this motion, NorthWestern does not dispute the facts set

forth in PNW Owners Statement of Undisputed Facts. (Docs. 90; 95, at 8).

NorthWestern's response brief primarily provides additional background

information and makes no effort to refute PNW Owner's preemption and

constitutional arguments on the merits. (Doc. 95). In fact, NorthWestern agrees

that "PNW Owners have raised significant issues about the enforceability of SB

265." (Doc. 95, at 19). Focusing instead on its stated "need to move forward with

the arbitration now without substantial delay," NorthWestern takes the position

that regardless of how the Court rules on PNW Owners' motion for partial

summary judgment on its claims challenging Senate Bill 265, the Court should

grant its motion to compel arbitration and refer this matter to a magistrate judge or settlement master to oversee arbitration procedure negotiations. Given NorthWestern's response, and the fact that the State takes no position on the merits at this time, Talen is the only defendant to raise any substantive opposition to the PNW Owners' motion.

Because federal courts must consider statutory grounds for decision before constitutional ones, the Court begins with PNW Owners' argument that Senate Bill 265 is preempted by the Federal Arbitration Act. See *Jean v. Nelson*, 472 U.S. 846, 854 (1985) ("Prior to reaching any constitutional questions, federal courts must consider non-constitutional grounds for decision."); *Harris v. McRae*, 448 U.S. 297, 306-07 (1980) ("[I]f a case may be decided on either statutory or constitutional grounds, [courts] will inquire first into the statutory question.")

### A. Whether Senate Bill 265 is preempted by the Federal Arbitration Act

In their third claim for relief against Talen and NorthWestern, PNW Owners request a declaratory judgment that Senate Bill 265 is preempted as applied to the O&O Agreement under the Federal Arbitration Act ("FAA"). (Doc. 32, at 29).

The primary purpose of the FAA "is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (quoting *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1990)). Section 2

of the FAA provides that "[a] written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract … shall be valid, irrevocable, and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract…." 9 U.S.C. § 2. The United States Supreme Court has described § 2 "as reflecting both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *Concepcion*, 563 U.S. at 339 (internal citations and quotations eliminated).

There are two ways that the FAA can preempt a state-law rule. *Blair v. Rent-A-Car Center, Inc.*, 928 F.3d 819, 825 (9th Cir. 2019) (citing *Concepcion*, 563 U.S. at 339, 341). First, a state-law rule is preempted by the FAA "if it is not a 'generally applicable contract defense' and so does not fall within the saving clause as a 'ground[] . . . for the revocation of any contract.'" *Blair*, 938 F.3d at 825 (quoting 9 U.S.C. § 2 and *Concepcion*, 563 U.S. at 339). Second, even a generally applicable state-law rule is preempted by the FAA if the rule "stand[s] as an obstacle to the FAA's objectives." *Blair*, 928 F.3d at 825 (quoting *Concepcion*, 563 U.S. at 341).

The state-law rule at issue here is Senate Bill 265, which amends the Montana Uniform Arbitration Act's venue provision to add the following:

> An agreement concerning venue involving an electrical generation facility in this state is not valid unless the agreement requires that arbitration occur

14

> within the state before a panel of three arbitrators selected under the [Montana] Uniform Arbitration Act unless all parties agree in writing to a single arbitrator.

Mont. Code Ann. § 27-5-323(2)(a).

PNW Owners argue that Senate Bill 265 is preempted under both tests articulated above because it (1) is not a generally applicable contract defense and (2) presents an obstacle to accomplishing the objectives of the FAA.

    1.    <u>Senate Bill 265 is not a generally applicable contract defense</u>

Agreements to arbitrate may "be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion,* 563 U.S. at 339. PNW Owners maintain that Senate Bill 265 is not a generally applicable contract defense for two reasons: (1) it specifically targets arbitration; and (2) it applies only to venue provisions in a subset of contracts, those involving a Montana electrical generation facility.

The United States Supreme Court has made clear that the FAA's savings clause "cannot save from preemption general rules 'that target arbitration either by name or more subtle methods.'" *Lamps Plus, Inc. v. Varela*, 139 S.Ct. 1407, 1418 (2019) (quoting *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1622 (2018)). The FAA "preempts any state rule discriminating on its face against arbitration," as well as

15

state "rules that . . . 'derive their meaning from the fact that an agreement to arbitrate is at issue.'" *Kindred Nursing Centers Ltd. Partnership v. Clark*, 137 S.Ct. 1421, 1426 (2017) (quoting *Concepcion*, 563 U.S. at 341). Under the FAA savings clause, "state law, whether of legislative or judicial origin," remains applicable to arbitration agreements "*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry v. Thomas,* 482 U.S. 483, 492 n. 9 (1987) (emphasis in original). But "[a] state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with" § 2 of the FAA.  *Perry*, 482 U.S. at 492 n. 9.

Applying these principles here, PNW Owners argues that Senate Bill 265 does not fall within the FAA's saving clause because it targets arbitration by name. Highlighting the word "arbitration," PNW Owners note that Senate Bill 265 invalidates any "agreement concerning venue . . . unless the agreement requires that *arbitration* occur" in Montana and complies with other statutorily specified requirements.  Mont Code. Ann. § 27-5-323(2)(a) (emphasis added). Because Senate Bill 265 applies only to venue provisions in agreements to arbitrate, PNW Owners argue it singles out arbitration agreements in contravention of the principles expressed in *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681 (1996).

In *Casarotto*, a Montana law declared arbitration clauses unenforceable unless notice that the contract was subject to arbitration was displayed on the first page of the contract. *Casarotto*, 517 U.S. at 683. The United States Supreme Court held "that Montana's first-page notice requirement, which govern[ed] not 'any contract,' but specifically and solely contracts 'subject to arbitration,'" conflicted with and was therefore preempted by the FAA. *Casarotto*, 517 U.S. at 683. In reaching its holding, the Supreme Court explained that the "goals and policies of the FAA . . . are antithetical to threshold limitations placed specifically and solely on arbitration provisions." *Casarotto*, 517 U.S. at 688. Because applying the Montana law "would not enforce the arbitration clause in the contract between" the parties, the Supreme Court concluded it was preempted by the FAA. *Casarotto*, 517 U.S. at 688.

Analogizing to *Casarotto*, PNW Owners argue that Senate Bill 265 places threshold limitations on the enforceability of arbitration provisions, namely, by invalidating venue provisions in arbitration agreements if they do not satisfy certain requirements that are not applicable to contracts generally. Just as the law at issue in *Casarotto* would not enforce the arbitration clause in the contract between the parties, PNW Owners argue Senate Bill 265 would similarly disregard the terms of the arbitration clause in the O&O Agreement between the parties and is thus preempted by the FAA.

17

In its opposition, Talen takes the position that PNW Owners' preemption argument is foreclosed by the Montana Supreme Court's decision in *Keystone, Inc. v. Triad Systems Corp.*, 971 P.2d 1240 (Mont. 1998). *Keystone* held that the FAA did not preempt Mont. Code Ann. § 27-5-323, which at the time provided that "[n]o agreement concerning venue involving a resident of this state is  valid unless the agreement requires that arbitration occur within the state of Montana." Keystone, 971 P.2d at 1244 (quoting Mont. Code Ann. § 27-5-323). *Keystone*'s preemption analysis relied on *Casarotto*, which the Court read as standing "for the proposition that a state law may not 'place arbitration clauses on an unequal footing' from general contract provisions." *Keystone*, 971 P.2d at 1245 (quoting *Casarotto*, 517 U.S. at 686). *Keystone* then pointed to the more general provisions of Mont. Code Ann. § 28-2-708,[3] which had "been applied to invalidate forum selection clauses that would have the effect of forcing Montana residents to litigate disputes outside of Montana." *Keystone*, 971 P.2d at 1244. Because § 28-2-708 "invalidates choice of forum provisions in contracts generally" while § 27-5-323 "does the same to arbitration agreements," the Court determined that Montana law

---

[3] Today's version of Mont. Code Ann. § 28-2-708 is substantively the same as the version in effect when *Keystone* was decided, and provides as follows:

> Every stipulation or condition in a contract by which any party to the contract is restricted from enforcing the party's rights under the contract by the usual proceedings in the ordinary tribunals or that limits the time within which the party may enforce the party's rights is void.

Mont. Code Ann. § 28-2-708.

"does not distinguish between forum selection clauses which are part of contracts generally and forum selection clauses found in agreements to arbitrate." *Keystone*, 971 P.2d at 1245. Applying *Casarotto*, the Court found the lack of such a distinction was evidence that § 27-5-323 did not conflict with the FAA. *Keystone*, 971 P.2d at 1245. The Court was "further persuaded that Montana's statutes are consistent with the FAA because neither statute nullifies either party's obligation to arbitrate their dispute. Rather, they preserve the obligation to arbitrate and constitute no more of an intrusion than on any other general contract entered into in" Montana. *Keystone*, 971 P.2d at 1245. Accordingly, *Keystone* held that § 27-5-323 was not preempted by the FAA. *Keystone*, 971 P.2d at 1245.

Talen argues that the holding in *Keystone* extends beyond what is now Mont. Code Ann. § 27-5-323(1) and applies to Senate Bill 265, as codified in subsection (2) of § 27-5-323. As Talen reads it, subsection (2) simply specifies that a particular kind of contract – those concerning Montana electrical generation facilities – is subject to the same venue restrictions set forth in subsection (1). Talen notes that, as articulated in Mont. Code Ann. § 28-2-708, Montana public policy generally disfavors forum selection clauses that would transfer venue outside of the state. According to Talen, subsection (2) of § 27-5-323 merely includes arbitration agreements concerning Montana electrical generation facilities within this longstanding Montana public policy.

19

In reply, PNW Owners argue that the holding in *Keystone* was limited to what is now subsection (1) of § 27-5-323, and does not apply to Senate Bill 265. The Court agrees with PNW Owners that Talen's reliance on *Keystone* is misplaced for  three main reasons.  First, a key part of the *Keystone* court's rationale, that Mont. Code Ann. § 28-2-708 presumptively invalidates choice of forum provisions in contracts generally, has since been significantly undermined, if not invalidated, by subsequent caselaw. In two cases decided after *Keystone*, the Montana Supreme Court held that "forum selection clauses are not presumptively void as against public policy" under Montana law. *Polzin v. Appleway Equipment Leasing Inc.*, 191 P.3d 476, 482 (Mont. 2008) (citing *Milanovich v. Schnibben*, 160 P.3d 562, 564 (Mont. 2007)). As discussed in *Rattler Holdings, LLC v. United Parcel Service, Inc.,* 505 F.Supp.3d 1076, 1084 (D. Mont. 2020), *Polzin* and *Milanovich* marked an abrupt departure from prior Montana Supreme Court caselaw, including *Keystone*, holding that forum selection clauses are presumptively void as against the public policy embodied in Mont. Code Ann. § 28-2-708. *See also Frontline Processing Corporation v. Merrick Bank Corp.*, 2013 WL 12130638, at *3-4 (D. Mont. May 29, 2013). Although *Rattler* declined to expressly consider whether *Keystone* had been overruled, it concluded based on a full examination of the caselaw that Montana's "public policy is not so strong as to

20

invalidate all forum selection clauses" and does not "overcome the federal presumption that such clauses are valid." *Rattler*, 505 F.Supp.3d at 1082, 1084.

Talen acknowledges that under this post-*Keystone* line of caselaw, "Montana law does not 'automatically' invalidate forum selection clauses." (Doc. 93, at 17). This undercuts the *Keystone* court's core reasoning that because § 28-2-708 "invalidates choice of forum provisions in contracts generally" and § 27-5-323 "does the same to arbitration agreements," Montana law did not distinguish between forum selection clauses in contracts generally and those in arbitration agreements. *Keystone*, 971 P.2d at 1245. The same cannot be said here. As PNW Owners correctly point out, Senate Bill 265 automatically invalidates a venue provision in an arbitration agreement if it involves an electrical generation facility in Montana and does not comply with specific statutory requirements, but under post-*Keystone* caselaw, § 28-2-708 would not automatically invalidate a litigation forum selection provision in the same contract. (Doc. 99, at 8). Senate Bill 265 thus discriminates on its face against arbitration, thereby manifesting the kind of unequal treatment that *Casarotto* prohibits.

Second, the United States Supreme Court has rejected another key component of the *Keystone* court's reasoning and made clear that "an equal treatment principle cannot save from preemption general rules 'that target arbitration either by name or by more subtle methods.'" *Lamps Plus, Inc. v.*

*Varela*, 139 S.Ct. 1407, 1418 (2019). In other words, even "a neutral rule that gives equal treatment to arbitration agreements and other contracts alike" does not save it from preemption under the FAA if the rule targets "arbitration either by name or by more subtle methods, such as by interfering with fundamental attributes of arbitration." *Lamps Plus,* 139 S.Ct. at 1418.

Even assuming that § 28-2-708 and § 27-5-323(1) together create a general, neutral rule that applies equally to invalidate forum selection provisions in arbitration agreements and other contracts alike, Senate Bill 265 is distinct from subsection (1) and has no generally applicable counterpart. Senate Bill 265 targets arbitration, both by name and by more subtle methods, by interfering with the fundamental attributes of the arbitration procedures agreed to by the parties. Senate Bill 265 targets arbitration by name, aiming specifically at arbitration agreements involving electrical generation facilities that do not provide for arbitration in Montana and that do not adhere to other specific requirements, including application of Montana law and a panel of three arbitrators.

Senate Bill 265 also targets arbitration by more subtle methods because it interferes "with fundamental attributes of arbitration." *Concepcion*, 563 U.S. 333, 344 (2011). Talen maintains that, like the statutes at issue in *Keystone*, Senate Bill 265 is consistent with the FAA because it preserves the parties' basic obligation to arbitrate. See *Keystone*, 971 P.2d at 1245 (finding that § 22-2-708 and what is now

22

§ 27-5-323(1) were "consistent with the FAA because neither statute nullifie[d] either party's obligation to arbitrate their dispute"). But such a narrow construction of the fundamental attributes or benefits of arbitration is not supported by *Concepcion* and other United States Supreme Court caselaw that post-dates *Keystone*. In light of the FAA's purpose of ensuring that arbitration agreements are enforced according to their terms, the Supreme Court has held that parties may agree "to arbitrate according to specific rules," and are afforded "discretion in designing arbitration processes" so as "to allow for efficient, streamlined procedures tailored to the type of dispute." *Concepcion*, 563 U.S. at 344. Parties can specify, "for example, that the decisionmaker be a specialist in the relevant field." *Concepcion*, 563 U.S. at 344-45. Likewise, contractual terms that "specify with whom the parties choose to arbitrate their disputes and the rules under which that arbitration will be conducted" are fundamental and must be "rigorously enforce[d]." *American Exp. Co. v. Italian Colors Restaurant*, 570 U.S. 228, 233 (2013) (internal citations omitted).

Contrary to these principles, Senate Bill 265 effectively invalidates the fundamental terms of the O&O Agreement's arbitration provision, which establishes rules to govern the arbitration of a dispute between the parties. In particular, the parties agreed that arbitration of a controversy arising out of or relating to the O&A Agreement shall proceed before "an Arbitrator having

23

demonstrated experience in the matter submitted," and "shall be conducted in Spokane, Washington, pursuant to the Washington Arbitration Act, RCW Chapter 7.04 as the same may be amended from time to time." (Doc. 39-2, at 42 ¶ 18). Senate Bill 265 interferes with these fundamental agreed-upon attributes by requiring that arbitration take place in Montana before a panel of three arbitrators, and be governed by Montana law. Senate Bill 265 thus targets arbitration agreements by more subtle methods, interfering with the parties' chosen rules and procedures. Consequently, even if § 28-2-708 and § 27-5-323 together treat all contracts equally, Senate Bill 265 is not a generally applicable contract defense because it targets arbitration both by name and by more subtle methods.

Third, as pointed out above, Senate Bill 265 is codified at Mont. Code Ann. § 27-5-323(2), and is substantively different from the statute at issue in *Keystone*, § 27-5-323(1). As discussed above, Senate Bill 265 does more than restrict venue to the state of Montana. It targets arbitration agreements that do not adhere to additional requirements not generally applicable to other contracts, including that arbitration be governed by Montana law and proceed before a panel of three arbitrators. Thus, as PNW Owners accurately point out, even if it were true that the venue restriction in § 27-5-323(1) puts arbitration agreements on equal footing with contractual venue provisions generally in Montana, there is no statutory

24

parallel to Senate Bill 265 that restricts non-arbitration agreements in the same manner.[4]

In sum, Senate Bill 265 does not apply equally to all contracts, but specifically and only to venue provisions within agreements to arbitrate. See *Blair*, 928 F.3d at 825 ("A rule is generally applicable if it 'appl[ies] equally to arbitration and non-arbitration agreements.'") (quoting *Sakkab v. Luxottica Retail N. Am. Inc.*, 803 F.3d 425, 432 (9th Cir. 2015)). As reflected in the plain text, Senate Bill 265 applies only to venue provisions in agreements to arbitrate, thereby targeting arbitration by name. In addition, as discussed above, Senate Bill 265 targets arbitration by more subtle means.  For these reasons, Senate Bill 265 is not a generally applicable contract defense and is thus preempted by the FAA.

Having determined that Senate Bill 265 is not a generally applicable contract defense because it specifically targets arbitration, the Court need not address PNW Owners' argument that Senate Bill 265 is not a generally applicable contract defense because it applies only to venue provisions in a particular subset of contracts, those involving a Montana electrical generation facility.

> 2. Senate Bill 265 presents an obstacle to accomplishing the objectives of the FAA

---

[4] During oral argument, PNW Owners identified one additional material distinction between the statute codified by Senate Bill 265 and the statute addressed in *Keystone*. Unlike § 27-5-323(1), Senate Bill 265 applies retroactively to petitions to compel arbitration made after January 1, 2021. (Doc. 32-2).

Even if Senate Bill 265 is not preempted on the ground that it is not a generally applicable contract defense, PNW Owners argue it is preempted because it presents "an obstacle to the accomplishment of the FAA's objectives." *Concepcion*, 563 U.S. at 343. PNW Owners note that the primary purpose of the FAA is to "'ensur[e] that private arbitration agreements are enforced according to their terms.'" *Concepcion*, 563 U.S. at 344 (quoting *Volt*, 489 U.S. at 478). Thus, parties may agree "to arbitrate according to specific rules" and have discretion in designing the arbitration process, so as to "allow for efficient, streamlined procedures tailored to the type of dispute." *Concepcion*, 563 U.S. at 344. PNW Owners maintain that Senate Bill 265 stands as an obstacle to the FAA's objectives because it prohibits the parties from enforcing the agreed upon arbitration procedures set forth in the O&O Agreement.

In its opposition, Talen again falls back on *Keystone* and reiterates its position that Senate Bill 265 is consistent with the FAA because it preserves the overall obligation to arbitrate. *Keystone*, 971 P.2d at 1245. Talen also cites *Blair*, which indicated that in determining whether a law stands as an obstacle to accomplishing the objectives of the FAA, courts look to whether the law "will deprive parties of the benefits of arbitration." *Blair*, 928 F.3d at 828 (quoting *Concepcion*, 563 U.S. at 436). Talen argues the arbitration rules and procedures specified in Senate Bill 265 - including venue, applicable law, and the number of

26

arbitrators – do not deprive the parties of the benefits of arbitration.  Because Senate Bill 265 preserves the parties' fundamental obligation to arbitrate disputes arising under the O&O Agreement, Talen argues it does not deprive the parties of the benefits of arbitration and so does not stand as an obstacle to the FAA's objectives.

To the extent Talen maintains based on *Keystone* that Senate Bill 265 does not stand as an  obstacle to arbitration simply because the parties are still bound to arbitrate their disputes, its argument is an oversimplification and ignores subsequent United States Supreme Court caselaw. Under *Concepcion*, the FAA preempts "rules that would 'interfere with [t]he fundamental attributes of arbitration" – in particular, its informality, expeditiousness, and relative inexpensiveness." *Newton v. American Debt Services, Inc.*, 854 F.Supp.2d 712, 728 (N.D. Cal. 2012) (quoting *Concepcion*, 563 U.S. at 344). *Concepcion* held that "changes brought about by the shift from bilateral arbitration to class-arbitration" are "fundamental." *Concepcion*, 563 U.S. at 347. *Concepcion* provided other examples of rules that might affect that fundamental nature of arbitration, "such as a rule requiring adherence to the Federal Rules of Evidence, a rule requiring judicially monitored discovery in arbitration, and a rule requiring an ultimate disposition of the arbitration by a panel of twelve lay arbitrators (*i.e.,* a jury)." *Newton*, 854 F.Supp.2d at 728 (citing *Concepcion*, 563 U.S. at 342).

PNW Owners argue that Senate Bill 265 presents an obstacle to the FAA's primary objective of enforcing arbitration agreements according to their terms because it prevents the parties from enforcing the agreed-upon arbitration procedures set forth in the O&O Agreement's arbitration provision. (Doc. 89, at 19-20). PNW Owners focus on Senate Bill 265's requirement that arbitration proceed before a panel of three arbitrators. While the O&O Agreement's arbitration provision states that disputes shall "be submitted to an Arbitrator having demonstrated expertise in the matter submitted" (Doc. 39-2, at 42), Senate Bill 265 would require arbitration before of a panel of three arbitrators, and says nothing about their required expertise. PNW Owners contend, and the Court agrees, that enforcing this requirement would deprive the parties of the "lower costs, greater efficiency and speed" offered by the single-arbitrator procedure agreed to by the parties, thereby interfering with the fundamentals of arbitration and standing as an obstacle to the FAA's primary objective.  (Doc. 99, at 11). See *Concepcion*, 563 U.S. at 342, 345 (recognizing that parties can specify "that the decisionmaker be a specialist in the relevant field," and suggesting that a rule requiring arbitration in front of a panel of lay arbitrators could interfere with the fundamentals of arbitration).

For all of the reasons set forth above, the Court concludes that Senate Bill 265 is preempted by the FAA because the legislation is not a generally appliable

28

contract defense and stands as an obstacle to the enforcement of the FAA's primary objective of enforcing private arbitration agreements according to their terms. Accordingly, PNW Owners are entitled to summary judgment on their third claim for relief.

Because the Court recommends that PNW Owners' motion for summary judgment on their third claim for relief that Senate Bill 265 is preempted by the FAA be granted, the Court need not address the constitutional challenges raised in PNW Owners' motion for summary judgment on their second and third claims for relief. If presiding United States District Court Judge Susan P. Watters disagrees with this recommendation, however, it would then be necessary to address the constitutionality of Senate Bill 265. Accordingly, and for purposes of completeness, will address the PNW Owners' motion for summary judgment on their first and second claims for relief at this time.

## B.   Senate Bill 265 violates the Contracts Clause of the United States Constitution

PNW Owners also move for summary judgment on their first claim for relief against Talen and NorthWestern, seeking a declaratory judgment that Senate Bill 265 is unconstitutional as applied to the O&O Agreement under the Contracts Clause of the United States Constitution. (Doc. 32, at 24).

The Contracts Clause prohibits states from passing any "Law impairing the Obligation of Contracts." U.S. Const., art. 1, § 10, cl. 1. The United States

29

Supreme Court has established a "two-step test" to determine whether a state law unconstitutionally impairs a contract. *Sveen v. Melin*, 138 S.Ct. 1815, 1821 (2018). Under this test, courts must consider "(1) whether the state law has operated as a substantial impairment of a contractual relationship," and if so, (2) "whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Sveen*, at 1821-22 (quotation marks and citations omitted). PNW Owners argue that Senate Bill 265 fails at both steps.

> 1. Senate Bill 265 substantially impairs PNW Owners' rights under the O&O Agreement

The substantial impairment inquiry "has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *In re Seltzer*, 104 F.3d 234, 236 (9th Cir. 1996) (quoting *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)). Only the third component is at issue here.

A law substantially impairs a contract if it "deprives a private party of an important right, thwarts performance of an essential term, defeats the expectations of the parties, or alters a financial term[.]" *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 890 (9th Cir. 2003) (citations omitted). PNW Owners maintain that Senate Bill 265 substantially impairs the O&O Agreement because it deprives them of important rights and defeats their expectations under three key provisions of the contract's arbitration clause. The Court agrees.

First, the arbitration clause provides that the parties shall resolve disputes arising out of or relating to the O&O Agreement through arbitration conducted by a single arbitrator with "demonstrated expertise in the matter submitted." (Doc. 39-2, at 42). In contrast with the terms of the O&O Agreement's arbitration provision, Senate Bill 265 invalidates an "agreement concerning venue involving an electrical generation facility in this state" if it does not require arbitration to proceed "before a panel of three arbitrators…unless all parties agree in writing to a single arbitrator." (Doc. 32-2, at 2; Mont. Code Ann. § 27-5-323(2)(a)). Talen argues PNW Owners evidently do not consider adjudication by a single arbitrator to be an important contractual right because they refused to accept Talen's most recent proposal, which called for just one arbitrator. (Doc. 93, at 24). But PNW Owners explain that they rejected Talen's proposal because it contained other provisions that negated the benefits of a single arbitrator. (Doc. 99, at 14). Because Senate Bill 265 effectively invalidates the parties' agreed arbitration procedure, which provides for one arbitrator with expertise in the field rather than three, the legislation deprives PNW Owners of an important right under the contract. See e.g, *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 559 U.S. 662, 683 (2010) (recognizing that "parties are generally free to structure their arbitration agreements as they see fit, …may agree on rules under which any arbitration will proceed," and "may choose who will resolve specific disputes"); *American Exp.*

31

*Co. v. Italian Colors Restaurant*, 570 U.S. 228, 233 (2013) (contractual terms that "specify with whom the parties choose to arbitrate their disputes and the rules under which that arbitration will be conducted" must be "rigorously enforced").

Second, the O&O Agreement's arbitration clause identifies the parties' agreed venue. It provides that any arbitration must take place in Spokane, Washington, and, if the parties cannot agree on arbitrator, one will be appointed by the Spokane County Superior Court. (Doc. 39-2, at 42). Senate Bill 265 directly abrogates this forum selection provision because it invalidates "[a]n agreement concerning venue involving an electrical generation facility" in Montana "unless the agreement requires that arbitration occur" in Montana. (Doc. 32-2; Mont. Code Ann. § 27-5-323(2)(a)). Talen asserts that this forum-selection provision is not important, and is unenforceable, because it contravenes Montana' public policy. (Doc. 93, at 25). As discussed above, however, Montana's "public policy is not so strong as to invalidate all forum selection clauses" and does not "overcome the federal presumption that such clauses are valid." *Rattler*, 505 F.Supp.3d at 1082, 1084. Because Senate Bill 265 overrides the parties' selection of a Washington court to choose the arbitrator and the state of Washington as the location for arbitration, the legislation interferes with PNW Owner's expectations and deprives them of important rights under the contract. See e.g. *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. Of Texas*, 571 U.S. 49, 66 (2013) ("When parties have

32

contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations. A forum-selection clause, after all, may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms; it may, in fact, have been a critical factor in their agreement to do business together in the first place.").

Third, the arbitration clause establishes the parties' agreed choice of law to govern the arbitration: The Washington Arbitration Act. (Doc. 39-2, at 42). This choice of law provision is further bolstered by Section 34(c) of the O&O Agreement, which provides that Section 18, the arbitration clause, "shall be construed in accordance with the laws of the State of Washington." (Doc. 39-2, at 52). Senate Bill 265, however, mandates that arbitration be governed by Montana law, thereby overturning the parties' agreement that Washington law govern. (Doc. 32-2; Mont. Code Ann. § 27-5-323(2)(a)). PNW Owners argue this is significant because there are several substantive and potentially outcome-altering differences between the Washington and Montana arbitration acts, including that Washington's act provides for provisional remedies and permits summary adjudication, while Montana's act does not. (Doc. 89, at 25). By providing for application of Montana law, Senate Bill 265 interferes with PNW Owners' expectation that arbitration shall be governed by Washington law, and would

33

deprive them of their right to procedures available under Washington law, such as provisional remedies and summary adjudication.

Talen counters that Senate Bill 265's application of Montana law is of no consequence because, regardless of Senate Bill 265, the O&O Agreement's selection of Washington law to govern arbitration would be invalidated under Montana's choice of law principles. (Doc. 93, at 25-26). But as PNW Owners point out in reply, absent Senate Bill 265, the parties would arbitrate in Washington and an arbitrator would not apply Montana's choice of law principles at all. Moreover, PNW Owners are entitled to defend the O&O Agreement's choice of law provision and have the arbitrator decide what law to apply, and Senate Bill 265 would eliminate that right by automatically requiring application of Montana law to arbitration proceedings.

In a final sweeping argument, Talen additionally maintains that Senate Bill 265 cannot be said to substantially impair PNW Owners' rights under the O&O Agreement because parties operating in heavily regulated industries, like electrical generation, know their "contractual rights [are] subject to alteration by state [] regulation." (Doc. 93, at 22 (quoting *Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 416 (1983)). In *Energy Reserves*, a natural gas supplier claimed that a Kansas statute imposing price controls on the intrastate gas market substantially impaired its rights under contractual indefinite price escalator

clauses. *Energy Reserves*, 459 U.S. at 403-09. The Supreme Court rejected the supplier's contract clause claim, concluding that the statute did not substantially impair any contractual rights because Kansas had "regulated the production, transportation, distribution, and sale of natural gas" for more than 75 years, and the evidence suggested the supplier "knew its contractual rights were subject to alteration by state price regulation." *Energy Reserves*, 459 U.S. at 414 n. 18, 416.

Talen also relies on *Mussetter Distrib., Inc., v. DBI Beverage, Inc.*, 685 F.Supp.2d 1028, 1031-32 (N.D. Cal. 2010) for essentially the same proposition. In *Mussetter,* a beer distributor claimed that a California statute requiring arbitration in some cases to determine the fair market value of beer distribution rights substantially impaired its rights under a distribution agreement with beer manufacturer. The court rejected the beer distributor's contract clause claim for several reasons, and in doing so noted that California had regulated "the beer industry in various ways dating back more than five decades." *Mussetter*, 685 F.Supp.2d at 1033. Notably, the court found based on the evidence of record that the beer distributor "was aware of the proposed legislation, even at the very time the third amendment to the distribution agreement was being executed by the parties." *Mussetter*, 685 F.Supp.2d at 1034. Thus, the court concluded that "in a real world sense, [the beer distributor] can be said to have been 'purchasing into an enterprise already regulated in the particular to which it now objects' such that it

'purchased subject to further legislation upon the same topic.'" *Mussetter*, 685

F.Supp.2d at 1034 (quoting *Veix v. Sixth Ward Building & Loan Ass'n of Newark*,

310 U.S. 32, 38 (1940)).

*Mussetter*'s reasoning on this point segues directly into PNW Owners

responsive argument. PNW Owners rely on *Veix*, which reasoned that a party who

enters into a contract in an industry that is "already regulated in the particular to

which [the party] now objects," shall be said to have contracted "subject to further

legislation upon the topic." *Veix*, 310 U.S. at 38. In other words, as PNW Owners

put it, the question here is not whether the electrical generation industry is

regulated generally, but whether it is "regulated in the particular" to which PNW

Owners now object, such that they could have expected "further legislation upon

the same topic." (Doc. 99, at 12-13, quoting *Veix*, 310 U.S. at 38). To be sure,

Montana has long regulated the electrical generation industry generally, including

for example, by enacting regulatory schemes governing actions like ratemaking.

See e.g. Mont. Code Ann., Title 6, Chapter 3. But Talen does not argue that

Montana has ever regulated the industry in the particular to which PNW Owners

now object, namely, by enacting regulatory schemes governing the rules and

procedures applicable to the arbitration of private contractual disputes.

Notwithstanding the regulated nature of the electrical generation industry in

general, there is no indication that it would have been foreseeable to the parties that

36

Montana would, decades later, undertake to regulate the arbitration of private contractual disputes within the industry. Because Senate Bill 265 has retroactive effect and imposes requirements on arbitration that are completely contrary to the parties' contractual expectations, the legislation substantially impairs the PNW Owners' rights under the O&O Agreement.

Having concluded that Senate Bill 265 substantially impairs the O&O Agreement, the Court must next consider whether it is a reasonable and appropriate means of advancing a significant and legitimate public purpose.

      2.    <u>Senate Bill 265 does not advance a significant and legitimate public purpose</u>

Where, as here, a state law substantially impairs a contract, "the inquiry turns to the means and ends of the legislation," *Sveen*, 138 S.Ct. at 1822. A state law that substantially impairs a contract will still be upheld if it is "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S.Ct. at 1822 (citation omitted). More specifically, the court must first determine whether there is "a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." *Energy Reserves*, 459 U.S. at 411-12 (internal citation omitted). If the regulation has a legitimate public purpose, the "next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public

37

purpose justifying [the legislation's] adoption.'" *Energy Reserves*, 459 U.S. at 412 (citation omitted).

The threshold "requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves*, 459 U.S. at 412. In *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 238-40 (1978), the Supreme Court struck down a Minnesota statute requiring private employers with more than 100 employees, of whom at least one was a Minnesota resident, to pay a pension funding charge if the employer terminated its own pension plan or closed an office in the state. The Supreme Court noted that the law had "an extremely narrow focus" aimed only at limited group of private employers and could "hardly be characterized…as one enacted to protect a broad societal interest rather than a narrow class." *Spannaus*, 438 U.S. at 248-49. See also *Treigle v. Acme Homestead Association*, 297 U.S. 189, 196, 197 (1936) (striking down a state statute that dealt only with the "private rights" of parties to the bylaws of building and loan associations because it did not address any existing economic emergency as alleged by the appellee, and "merely attempt[ed], for no discernible public purpose, the abrogation of contracts between" the parties).

Here, Senate Bill 265 does not advance a significant and legitimate public purpose because, as in *Treigle*, it interferes with the purely private rights of the

parties to the O&O Agreement. In addition, as in *Spannaus*, Senate Bill 265 has an extremely narrow focus aimed at abrogating venue provisions and altering the mechanism for dispute resolution in contracts involving electrical generation facilities in Montana. In fact, PNW Owners have come forward with evidence that the Montana legislature enacted Senate Bill 265 to target the arbitration procedures provided for in the O&O Agreement specifically. NorthWestern noticed its intent to initiate arbitration pursuant to the O&O Agreement on February 9, 2021, and served its initial arbitration demand on March 9, 2021. (Doc. 90, at ¶5). On March 24, 2021, Senate Bill 265's sponsor, Senator Fitzpatrick, testified that "it's important that [Senate Bill 265] is retroactive[e] because we have such an important issue coming up in the NorthWestern arbitration," referring to NorthWestern's then-pending demand for arbitration under the O&O Agreement.[5] (Doc. 88-2, at 24-25).

Talen responds by citing Senate Bill 265's declared legislative purpose, that: "electrical generation facilities located in Montana have significant implications for the economy, environment, and health and welfare of Montana consumers;" and "arbitration of disputes concerning Montana electrical generation facilities

---

[5] If the Court considers evidence of legislative intent, Talen requests leave under Rule 56(d) to conduct discovery to showing "that the Montana legislature is right, and the PNW Owners are wrong." (Doc. 93, at 31). But Talen does not specify what facts it hopes to elicit that could not be found in publicly available records, or otherwise explain why discovery on this topic is needed.

outside of Montana threatens Montana's laws, policies, and the interests of Montana in securing and maintaining a reliable source of electricity." Senate Bill 265, 67th leg. (Mont. 2021) (Doc. 32-2, at 1). Where, as here, the state is not a contracting party, Talen argues that "courts must properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *RUI One Corp. v. City of Berkely*, 371 F.3d 1137, 1147 (9th Cir. 2004). See also *Colton Crane Co. LLC v. Terex Cranes Wilmington, Inc.*, 2010 WL 11519316, at *2 (C.D. Cal. June 2, 2010) (rejecting a contracts clause challenge to a California statute because the legislature "identified a significant and legitimate public purpose behind the Act," and "courts properly defer to legislative judgment" as to necessity and reasonableness).

PNW Owners do not dispute that, on its face, the stated public purpose of Senate Bill 265 is significant and legitimate. Nor do PNW Owners take issue with the notion that, as a general rule, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves,* 459 U.S. at 413. But that deference, PNW Owners maintain, does not mean courts must always take statements of legislative intent at face value. (Doc. 99, at 16). See *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 731 (8th Cir. 2019) (The "mere assertion of a conceivable public purpose is insufficient to justify a substantial

impairment of contractual rights. . . . Whether the law passes constitutional muster requires a more discerning inquiry into the Act's structure and design.").

PNW Owners rely on *Nieves v. Hess Oil Virgin Islands Corp.*, 819 F.2d 1237, 1249 (3d Cir. 1987), which recognized that "[l]egislation aimed retroactively to benefit or burden a few identifiable persons is particularly vulnerable to the charge that it is not reasonably related to the asserted public purpose." In *Nieves*, the Virgin Islands legislature retroactively eliminated application of the borrowed employee doctrine as a bar to pending tort suits. *Nieves*, 819 F.2d at 1239. The retroactive provision controlled the outcome in six personal injury lawsuits that were pending against Hess Oil Virgin Islands Corporation ("Hess") at the time of its enactment. *Nieves*, 819 F.2d at 1241. The legislature declared that the purpose of the legislation was "to assist persons who are injured while on the job" and protect workmen's compensation resources. *Nieves*, 819 F.2d at 1248. Hess did not dispute that, on its face, "elimination of the borrowed employee doctrine serve[d] a legitimate public purpose." *Nieves*, 819 F.2d at 1249. Instead, Hess contended that there was "no valid public purpose served by the retroactive application provision because this provision was special interest legislation aimed against Hess." *Nieves*, 819 F.2d at 1249. Noting that the legislative history indicated that the legislature was aware of the major impact the retroactive application provision would have on Hess, *Nieves* concluded that because "the retroactive application provision was

designed to abolish Hess's tort immunity on behalf of those six plaintiffs, it can hardly be viewed as general legislation for the public welfare." *Nieves*, 819 F.2d at 1250.

Here, as in *Nieves*, it is difficult to see how Senate Bill 265 can be viewed as general legislation for the public welfare, when on its face it applies only to narrow class of private contracts, in particular, those "concerning venue involving an electrical generation facility" in Montana. Testimony presented by state lawmakers and representatives of Talen, NorthWestern, and PNW Owners at the March 24, 2021 committee hearing on Senate Bill 265 centered primarily, if not exclusively, on Colstrip and the fact that NorthWestern had initiated arbitration under the O&O Agreement to determine the future of Units 3 and 4.  (Doc. 88-2). Testimony by Representative Andrea Olsen reflects concern over the very issue now before the Court – whether retroactive application of legislation aimed at venue provisions in contracts involving just one type of company, electrical generation facilities in Montana, amounted to "outright special legislation for one or a handful of companies" (Doc. 88-2, at 21-22). Even more to the point, Senator Fitzpatrick testified that retroactive application of Senate Bill 265 was "important" in light of the "NorthWestern arbitration", and said "again, I think it goes back to this very important public policy issue is whether the West Coast utilities should be able to shut down Colstrip." (Doc. 88-2, at 25). By its terms, Senate Bill 265 retroactively

abrogates the contractual rights of specific, identified parties, and in doing so, it can hardly be viewed as general legislation for the public welfare, notwithstanding the Montana legislature's declared purpose.

For these reasons, the Court concludes that Senate Bill 265 substantially impairs the PNW Owners' rights under the O&O Agreement without advancing a significant and legitimate purpose.[6] Because Senate Bill 265 thus violates the Contract Clause of the United States Constitution, PNW Owners are entitled to summary judgment on their first claim for relief.

### C.    Senate Bill 265 violates the Contracts Clause of the Montana Constitution

PNW Owners further move for summary judgment on their second claim for relief against Talen and NorthWestern, requesting a declaratory judgment that Senate Bill 265 is unconstitutional as applied to the O&O Agreement under the Contracts Clause of the Montana Constitution. (Doc. 32, at 28). Like its federal counterpart, the Montana Constitution prohibits the Montana legislature from passing any law that impairs the obligation of contracts. Mont. Const. Art. II § 31.

Montana courts apply essentially the same test that federal courts apply to the United States Constitution's Contracts Clause: "(1) Is the state law a substantial

---

[6] Having so concluded, the Court need not consider whether the articulated public purpose for Senate Bill 265 is "based on reasonable conditions" and of an "appropriate character" to that public purpose. *Energy Reserves,* 459 U.S. at 412.

impairment to the contractual relationship; (2) Does the state have a significant and legitimate purpose for the law; and (3) Does the law impose reasonable conditions which are reasonably related to achieving the legitimate and public purpose?" *Seven up Pete Venture v. State,* 114 P.3d 1009, 1021 (Mont 2005) (citing *Carmichael v. Worker's Comp. Court*, 763 P.2d 1122, 1125 (Mont. 1988)). The Montana and United States contracts clauses are generally "interpreted as interchangeable guarantees against legislation impairing the obligation of contract." *City of Billings v. Co. Water Dist. of Billings Heights*, 935 P.2d 246, 251 (Mont. 1997) (quotation marks and citations omitted). Because the analysis is substantively the same, Senate Bill 265 violates the Contracts Clause of the Montana Constitution for all of the same reasons that it violates the Contracts Clause of the United States Constitution. PNW Owners are therefore entitled to summary judgment on their second claim for relief

## III.   **Plaintiffs' Motion for Partial Summary Judgment on their Fourth and Fifth Claims for Relief**

PNW Owners move for summary judgment on their fourth and fifth claims for claims for relief seeking a declaration that Senate Bill 266 is unconstitutional under the Contracts Clause and Commerce Clause of the United States Constitution.

Although Knudsen is the sole defendant against whom these claims are brought, he has not filed a response brief and takes no position on the underlying

44

merits at this time. Instead, Knudsen has responded with a motion to stay resolution of PNW Owners' claims challenging Senate Bill 266 pending the outcome of arbitration proceedings between PNW Owners, Talen, and Northwestern. (Doc. 116). Alternatively, Knudsen moves under Federal Rule of Civil Procedure 56(d) for a six-month extension to respond to PNW Owners' motion for summary judgment on its claims challenging Senate Bill 266, on the ground that it needs time to conduct discovery. (Doc. 116). Finally, Knudsen contends that judicial economy warrants a stay on summary judgment proceedings in light of motions that are pending in related litigation involving the Colstrip owners.

Talen joins in PNW Owners' request for a six-month stay under Rule 56(d) to allow for discovery before a ruling by the Court on the summary judgment motion, but otherwise takes no position on Knudsen's motion to stay. (Doc. 129, at 6). PNW Owners and NorthWestern both oppose the motion to stay in its entirety. (Docs. 126, 127).  Because it presents a threshold issue, the Court will address Knudsen's motion to stay before turning to the merits of PNW Owners' summary judgment motion.

### A.   Attorney General Knudsen's Motion to Stay

1. Whether to stay PNW Owners' claims challenging Senate Bill 266 pending arbitration

Knudsen first asks the Court to stay PNW Owners' claims challenging Senate Bill 266 pending arbitration of the Colstrip owners' dispute over what vote is required to close Units 3 and 4 under the terms of the O&O Agreement, and what the Colstrip owners' funding obligations are absent a unanimous vote to close the Project.

"It is well established 'that where [a] contract contains an arbitration clause, there is a presumption of arbitrability." *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1284 (9th Cir. 2009) (citing *AT&T Techs, Inc. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986)). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Comedy Club*, 553 F.3d at 1284.

Knudsen argues that PNW Owners' constitutional claims related to Senate Bill 266 are based on their interpretation of the O&O Agreement, which they read as allowing for closure of Units 3 and 4 without a unanimous vote by the owners. Until the Colstrip owners have arbitrated their dispute over what the O&O Agreement says, both with respect to the votes necessary to close the Project and other contractual obligations, Knudsen contends that PNW Owners' constitutional claims are not ripe for judicial review.

Looking to the Amended Complaint, Knudsen notes that PNW Owners allege in support of their commerce clause claim that Senate Bill 266 "prevents

[them] from exercising their contractual rights to vote to close the Colstrip units with less-than-unanimous consent and to propose and vote to close one or both units." (Doc. 32, at ¶ 120). And to support their contracts clause claim, PNW Owners allege that Senate Bill 266 violates O&O Agreement provisions that "give[] each Committee member the right to not approve the budget for Colstrip's operating costs so long as the Committee member does not 'unreasonably' withhold its approval of the budget"; "give[] Committee members the right to withhold approval for Capital Additions and Elective Capital Additions for any reason"; and "give[] the Committee the right to close Unit 3, Unit 4, or both if certain quorum requirements are satisfied and Committee members with a total of 55% of the Project Shares vote to close the units." (Doc. 32, at ¶¶ 129, 132, 138).

Because these factual allegations, or "interpretive assumptions" (Doc. 117, at 4), are disputed by the parties to the O&O Agreement and are the subject of NorthWestern's arbitration demand, Knudsen takes the position that PNW Owners' constitutional claims challenging Senate Bill 266 must be stayed pending arbitration.[7] See Mont. Code Ann. § 27-5-115(4) ("An action or proceeding involving an issue subject to arbitration must be stayed if an order or application for arbitration has been made under [the Uniform Arbitration Act]").

---

[7]     Knudsen further points out that PNW Owners have petitioned to compel arbitration of the same underlying disputes in a related case pending in this district, *Avista Corp. et al. v. Northwestern Corp., et al.*, Cause No. 2:21-90-SPW-TJC.

PNW Owners and NorthWestern disagree, and argue that the underlying disputes that are subject to arbitration are not relevant to the issues raised in PNW Owners' summary judgment motion. (Doc. 121, at 25-26; Doc. 127, at 7-10). PNW Owners note that Knudsen relies on factual allegations in the Amended Complaint to support his motion to stay, instead of focusing on the arguments actually advanced in their summary judgment motion. As addressed in more detail below, PNW Owners' motion for summary judgment argues that Senate Bill 266 is unconstitutional for a variety of reasons, none of which requires adjudication of the vote required to close Colstrip or the owners' funding obligations under the terms of the O&O Agreement. For example, the summary judgment motion argues Senate Bill 266 is unconstitutional because it: (1) effectively eliminates the PNW Owners' "right to arbitrate" whether a unanimous vote is required to close Colstrip and nullifies their "right to advocate" their position on the issue during arbitration (Doc. 104, at 16-17); (2) impairs the PNW Owners' right to vote against a proposed budget for reasons unrelated to an attempt to bring about closure with less-than-unanimous consent, and to vote against a variety of other matters (Doc. 104, at 21-22); (3) subjects PNW Owners to a fine of up to a $100,000 per day for engaging in "any 'conduct' that could bring about a closure without unanimous consent," including simply proposing the closure of, or voting to close, the Project (Doc. 104, at 18-19); (4) subjects PNW Owners to a fine of up to $100,000 per day

48

for refusing to pay a monthly bill for operation of Colstrip, which would otherwise trigger default provisions and remedies under the O&O Agreement (Doc. 104, at 22) and; (5) burdens out-of-state utilities with a choice between paying an exorbitant daily fine or, to avoid the fine, remaining invested in a Montana electrical plant that produces power the utilities will not be able to use to serve their customers in Washington and Oregon after 2025 and 2029 (Doc. 104, at 29).

Importantly, none of these summary judgment arguments requires the Court to rule on whether the O&O Agreement requires a unanimous vote to close Colstrip, or to rule on the merits of any other dispute that is subject to arbitration. Because the Court can rule on the summary judgment motion without addressing the issues that are subject to arbitration, Knudsen has not shown that it is necessary to stay PNW Owners' claims challenging Senate Bill 266 pending arbitration.

### 2.   Whether to grant a Rule 56(d) continuance

Alternatively, Knudsen moves under Federal Rule of Civil Procedure 56(d) for a six-month extension to respond to PNW Owners' summary judgment motion on the ground that it needs additional time to conduct discovery. (Doc. 116).

Rule 56(d) "provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 678 (9th Cir. 2018) (internal quotation marks omitted). The rule states that when the party opposing summary judgment "shows

by affidavit or declaration that, for specified reasons, it cannot present facts

essential to justify its opposition, the court may: (1) defer considering the motion

or deny it; (2) allow time to obtain affidavits or declarations or take discovery; or

(3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

"A party seeking additional discovery under Rule 56(d) must 'explain what

further discovery would reveal that is 'essential to justify [its] opposition' to the

motion[] for summary judgment." *Stevens*, 899 F.3d at 678 (alterations in original)

(quoting *Program Eng'g, Inc. v. Triangle Publications, Inc.*, 634 F.2d 1188, 1194

(9th Cir. 1980)). Because "the whole point of discovery is to learn what a party

does not know or, without further information, cannot prove," a party seeking

relief under Rule 56(d) cannot be expected to "predict with accuracy precisely

what further discovery *will* reveal." *Stevens*, 899 F.3d at 678 (emphasis in

original). Nevertheless, the "evidence sought must be more than 'the object of pure

speculation.'" *Stevens*, 899 F.3d at 678 (quoting *California v. Campbell*, 138 F.3d

772, 779-80 (9th Cir. 1998)).

Thus, to warrant a stay under Rule 56(d), the party seeking additional

discovery must show that "(1) it has set forth in affidavit form *the specific facts* it

hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-

after facts are essential to oppose summary judgment." *Stevens*, 899 F.3d at 678

(internal quotation marks omitted). Ultimately, whether to grant relief under Rule

56(d) is within the court's discretion. See *Getz v. Boeing Co.*, 654 F.3d 852, 867-68 (9th Cir. 2011).

In support of his motion, Knudsen has filed a declaration from defense counsel, Aislinn Brown. (Doc. 118). Brown's declaration refers to Knudsen's first set of discovery requests, which were served on PNW Owners in November 2021 and are attached as an exhibit to the declaration. (Doc. 118-1). In addition to the questions set forth in the attached discovery requests, Brown's declaration lists sixteen categories of information that Knudsen claims he needs in order to meaningfully oppose PNW Owners' summary judgment motion. (Docs. 118, at 3-5). These submissions do not meet the requirements of Rule 56(d).

First, Knudsen has not adequately identified the specific facts he hopes to elicit through discovery. The supporting declaration simply lists sixteen categories of information that Knudsen sought in his first set of discovery requests, but does not identify what specific facts might be revealed in response to those requests. Where, as here, a supporting declaration lists categories of evidence and refers to discovery requests without articulating what specific facts in the documents sought would assist in opposing summary judgment, the requirements of Rule 56(d) are not satisfied. See e.g. *Pacific Rim Land Dev. LLC v. Imperial Pac. Int'l (CNMI), LLC*, 2021 WL 4872460, at *1 (9th Cir. Oct. 19, 2021) (finding a declaration that "identified the documents sought but not the facts within those documents that

51

would assist . . . in opposing summary judgment" did not satisfy Rule 56(d));

*Hansen v. Liberty Mutual Fire Ins. Co.*, 2012 WL 4611013, at *7 (D. Nev. Sept.

30, 2012) (Rule 56(d) not satisfied where the party seeking to postpone summary

judgment pending additional discovery provided a "laundry list of discovery

requests" but "fail[ed] to articulate what specific facts they believe[d] further

discovery would reveal."); *Clauder v. County of San Bernardino*, 2016 WL

145864, at *4 (C.D. Cal. Jan. 11, 2016) ("Plaintiff's counsel's laundry list of

additional discovery does not identify with specificity the facts he hopes to obtain"

and is not sufficient to satisfy the requirements for a Rule 56(d) continuance.)

Second, Knudsen has not established that the information he seeks is

essential to oppose PNW Owners' motion for summary judgment, as required to

obtain a continuance under Rule 56(d). See *Garrett v. City & County of San*

*Francisco*, 818 F.2d 1515, 1518 (C.D. Cal. Jan. 11, 2016) (a party seeking a Rule

56(d) continuance "must make clear" that the facts sought through additional

discovery "would preclude summary judgment"). To begin with, the Rule 56(d)

declaration is deficient because it simply asserts that Knudsen, as a non-party to

the O&O Agreement, "is severely disadvantaged in [his] ability to respond" and

unspecified "facts and defenses must be fleshed out before any dispositive motion

is entertained" (Doc. 118, at 3 ¶¶ 8, 11), but does not explain why any of the facts

that might be obtained through additional discovery are essential to oppose PNW Owners' motion for summary judgment on the constitutionality of Senate Bill 266.

Equally important, Knudsen's motion and supporting declaration do not link any of the discovery sought to the specific grounds for PNW Owners' motion. The proposed discovery topics listed in the supporting declaration correspond to the information sought in Knudsen's discovery requests, and fall into what PNW Owners fairly describe as four main categories: (1) legal mandates in Washington and Oregon and the need to transition away from Colstrip (Doc. 118, at 3-5; Doc. 118-1 (Request for Production ("RFP") Nos. 3, 6, 8, 9, 15, 18 and Interrogatory Nos. 1, 10, 11, 14)); (2) the Colstrip owners' contract disputes and arbitration (Doc. 118, at 3-5; Doc. 118-1 (RFP Nos. 1, 2, 4, 5, 7, 10, and Interrogatory Nos. 6, 12)); (3) past budget approvals (Doc. 118, at 3-5; Doc. 118-1 (RFP Nos. 11, 12)) and; (4) how Senate Bill 266 impairs, harms, and burdens PNW Owners (Doc. 118, at 3-5; Doc. 118-1 (Interrogatory Nos. 2, 3, 4)).

Knudsen does not adequately explain why any of this information is necessary to oppose PNW Owners' summary judgment motion. With respect to the first category, information about legal mandates imposed by Washington and Oregon can be found in publicly available records, and it is undisputed that PNW Owners are taking steps to transition away from Colstrip. As to the second category, PNW Owners' constitutional challenges to Senate Bill 266 are

independent of the contract disputes subject to arbitration, and PNW Owners have produced the parties' arbitration demands, responses, and related correspondence. As to the third category, Knudsen does not explain how information about past budget approvals is necessary to oppose PNW Owners' summary judgment motion, which argues that Senate Bill 266 is unconstitutional because, among other things, it impairs the right of the PNW Owners to vote "no" on current or future proposed budgets. Finally, as to the fourth category, Knudsen does not explain what facts that might be obtained through discovery are necessary to rebut the actual and ongoing harms identified above.

Because Knudsen has not adequately identified the specific facts he hopes to elicit through discovery, and has not established that the information he seeks is essential to oppose PNW Owners' motion for summary judgment, his Rule 56(d) request for a continuance to respond to PNW Owners' summary judgment motion is properly denied.

### 3.   Whether to grant a stay in light of related litigation

Finally, Knudsen contends that judicial economy warrants staying these summary judgment proceedings in light of motions that are pending in related litigation involving the Colstrip owners. (Doc. 117, at 11-12). In May 2021, Talen filed suit against PNW Owners and NorthWestern alleging claims based on Senate Bill 265. *Talen Montana, LLC v. Avista Corporation et al.,* Cause No. 1:21-cv-58-

SPW-TJC. In that action, Talen seeks to enforce Mont. Code Ann. § 27-5-323, as amended by Senate Bill 265, to require arbitration of the parties' dispute over the votes required to close Colstrip to take place in Montana before a panel three arbitrators. *Talen*, 1:21-cv-58-SPW-TJC (Doc. 56, at 5). Talen moved to remand the case to state court, where it was originally filed, and United States Magistrate Judge Timothy J. Cavan has recommended that the motion to remand be granted. *Talen*, 1:21-cv-58-SPW-TJC (Doc. 56). Judge Cavan's Findings and Recommendation on the motion to remand is awaiting review by presiding United States District Court Judge Susan P. Watters. In the meantime, in June 2021, PNW Owners moved to consolidate the pending matter with the *Talen* case. (Doc. 44). That motion has been stayed, pending a ruling on the motion to remand in *Talen*. (Doc. 101).

Knudsen argues that if the motion to remand is ultimately denied and this case is consolidated with *Talen*, PNW Owners' summary judgment motion may be mooted. (Doc. 117, at 12). The Court fails to see how PNW Owners' motion for summary judgment will be mooted if the two cases are consolidated. But regardless, the *Talen* action raises claims based entirely on Senate Bill 265 and arbitration, which have nothing to with the claims asserted by PNW Owners in the pending motion for summary judgment challenging Senate Bill 266. Consequently, and for the reasons detailed above, Knudsen's motion to stay is properly denied.

## B.      Article III's Case or Controversy Requirement is Satisfied

Talen raises a preliminary argument in opposition to summary judgment

that, if correct, would preclude the Court from addressing PNW Owners'

constitutional claims on the merits. As it did at the preliminary injunction stage,

Talen contends that PNW Owners claims challenging the constitutionality of

Senate Bill 266 are not ripe, and so present no actual case or controversy as

required for the Court to exercise jurisdiction.

"Article III of the Constitution empowers [courts] to adjudicate only 'live

cases or controversies," not 'to issue advisory opinions [or] to declare rights in

hypothetical cases." *Clark v. City of Seattle*, 899 F.3d 802, 808 (9th Cir. 2018)

(quoting *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134, 1138 (9th

Cir. 2000)).  A plaintiff may have Article III standing to challenge a statute based

on a threat of prosecution. See *Babbitt v. United Farm Workers Nat'l Union*, 442

U.S. 289 (1979).

Talen takes the position that PNW Owners' claims are unripe under the

three-part test for such pre-enforcement challenges set forth in *Thomas*. When

evaluating a pre-enforcement challenge based on a threat of prosecution, courts

must consider: (1) "whether the plaintiffs have articulated a 'concrete plan' to

violate the law in question;" (2) "whether prosecuting authorities have

communicated a specific warning or threat to initiate proceedings;" and (3) "the

56

history of past prosecution or enforcement under the challenged statute." *Thomas*, 220 F.3d at 1139.

Talen argues PNW Owners have not satisfied any of these factors because they have not come forward with any evidence that they have a concrete plan to violate Senate Bill 266, and there is no evidence that prosecuting authorities have communicated a specific warning or threat to enforce Senate Bill 266. To the contrary, Talen notes that in response to PNW Owners' motion for a preliminary injunction, the State represented that it "does not anticipate enforcing Senate Bill 266 in the immediate future." (Doc. 57, at 2). Talen maintains that the State has thus disclaimed any intention of enforcing Senate Bill 266 against PNW Owners, and would in any event be prohibited from immediately doing so in light of the preliminary injunction that is now in place. As to the third factor, Talen notes there is no history of past enforcement under Senate Bill 266, which would supports its position that PNW Owners' claims are not ripe for determination.

PNW Owners counter that the *Thomas* test does not apply here, however, because they have already suffered actual harm as a result of Senate Bill 266, and are not claiming injury based only on the risk of prosecution itself. See *Nat'l Audubon Soc. v. Davis*, 307 F.3d 835, 855 (9th Cir. 2002) (if the plaintiff has already suffered "actual, ongoing . . . harm" that is "fairly traceable" to the challenged law, then the *Thomas* test is irrelevant and the plaintiff has Article III

standing). According to Talen, however, PNW Owners have not asserted actual ongoing harm and have instead focused on potential harm tied to the risk of prosecution.

Contrary to Talen's reading of the record, PNW Owners do assert, and have provided evidence demonstrating, that they have suffered actual and ongoing harm as a result of Senate Bill 266 in three ways. First, PNW Owners have presented declaration testimony demonstrating that they had planned to call a vote on May 19, 2021 to close Colstrip Unit 3, but did not do so out of fear that even calling for a vote could be considered "conduct" punishable by the imposition of a fine of up to $100,000 per day under Senate Bill 266. (Doc. Doc. 39-2, at ¶42; Doc. 105, at ¶ 4). Talen questions the credibility of this assertion on the ground that PNW Owners did not take any of the preliminary steps necessary under the O&O Agreement to initiate such a vote. Talen argues it should be allowed to conduct discovery on whether PNW Owners actually intended to call a vote and what steps they took towards doing so. But whether PNW Owners took the preliminary steps identified by Talen is of no moment, because they have come forward with evidence demonstrating that they ultimately decided not to take any steps toward calling a vote in light of the of the threat posed by Senate Bill 266. PNW Owners have demonstrated that Senate Bill 266 "effectively coerced" them from taking action they had the right to take under the O&O Agreement, such that they have

already been harmed by Senate Bill 266, and that harm is ongoing. See

*MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. at 118, 129 (2007). As previously

determined at the preliminary injunction stage, "[a] plaintiff's inaction in failing to

violate the law to eliminate or mitigate the treat of adverse enforcement actions

cannot also make the issue unripe." (Doc. 100, at 12-13 ¶ 24 (citing *MedImmune*,

549 U.S. at 128-129). This purely legal conclusion applies equally on summary

judgment.

Second, PNW Owners argue Senate Bill 266 has and will continue to harm

them because it constrains their ability to freely advocate their position on what

vote is required under the O&O Agreement to close a Colstrip unit. Talen responds

that PNW Owners' conduct belies this argument, noting that they have repeatedly

advocated their position both in response to NorthWestern's arbitration demand

and during this litigation, "including in this very motion." (Doc. 129, at 16). But as

PNW Owners point out in reply, and as discussed above, they are not advocating

for or asking the Court to adopt their position on the vote required for closure.

Their summary judgment motion does not ask the Court to decide whether the

O&O Agreement requires a unanimous vote to close Colstrip. That question, PNW

Owners say, "is for arbitration, and it is there that [Senate Bill] 266 constrains

[their] advocacy." (Doc. 146, at 9). The Court agrees. As previously determined at

the preliminary injunction stage, "given the broad swath of prohibited conduct

under [Senate Bill] 266, PNW Owners are harmed at the bargaining and arbitration stages of the proceedings because they cannot freely advocate for non-unanimous closure of Units 3 and 4." (Doc. 100, at 12 ¶ 22). That determination holds true on summary judgment, and Talen has not come forward with any evidence to the contrary.

Third, PNW Owners argue Senate Bill 266 has and will continue to harm them because it constrains their decisions during the Colstrip budgeting process. PNW Owners cite Senator Fitzpatrick's committee hearing testimony, which reflected that Senate Bill 266 resulted in part out of "concern at the time [that] the refusal of the West Coast operators to participate in the budget making process was ultimately going to lead to the closure of the plant." (Doc. 103, at ¶9).  As PNW Owners further point out, Knudsen made clear when responding to their motion for a preliminary injunction in the summer of 2021 that he had not enforced Senate Bill 266 yet because there was a 2021 budget in place, reasonably suggesting to PNW Owners there was a risk of enforcement if they were to vote "no" on any future operations and capital budget proposals by Talen. (Doc. 103, at ¶ 17; Doc. 57; Doc. 105, at 9). When Knudsen made those representations in June and August of 2021, and while the parties were briefing this summary judgment motion, there was no 2022 budget in place for Colstrip. On January 20, 2022, however, the

Project Committee approved Colstrip's 2022 budget.[8] (Doc. 153, at 2; Doc. 153-1, at ¶ 3). Because the 2022 budget has since been approved, Talen asks the Court to disregard PNW Owners' "assertions and arguments respecting the 2022 budget." (Doc. 153, at 2). But Talen reads PNW Owners' argument too narrowly as focusing exclusively on the 2022 budget. Fairly read, their argument is that Senate Bill 266 constrains their right to vote "no" on any future budget proposal, not just the 2022 budget proposal. Regardless of the status of the 2022 budget, the evidence cited above creates a chilling concern for PNW Owners that voting "no" on future Talen-proposed budgets would lead to the enforcement of Senate Bill 266 and potentially significant financial liability.

PNW Owners further claim they suffered irreparable harm as a matter of law upon passage of Senate Bill 266. (Doc. 146, at 9). "The mere passage of [a] law" violating the Contract Clause warrants injunctive relief because it is "passage of the law" that impairs the contract. *Donahoe v. Mangano*, 886 F.Supp.2d 126, 152 (E.D.N.Y. 2012) (holding that irreparable harm can be demonstrated in part by substantial impairment of negotiations otherwise governed under the contract). "Where threatened action by *government* is concerned," a plaintiff is not required "to expose himself to liability before bringing suit to challenge the basis for the

---

[8] Talen's motion for leave to supplement its opposition to PNW Owners' summary judgment motion with this information (Doc. 153) is hereby granted.

threat – for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction." *MedImmune*, 549 U.S. at 128-29 (emphasis in original). As stated in the Court's preliminary injunction order addressing the issue of irreparable harm, PNW Owners "are faced with expensive potential liability should they proceed with their planned course of action to transition away from Colstrip Units 3 and 4. Their decision in the interim to comply with the law cannot be held against them as they seek an injunction." (Doc. 100, at 13 ¶ 24).

As set forth in the order granting PNW Owners' motion for a preliminary injunction, "[h]arm occurs, and a claim is ripe under the Contracts Clause, upon passage of the legislation when a law interferes with valid expectancy interests, creating an 'actual, concrete, and particularized' injury." (Doc. 100, at ¶ 21 citing *Lazar v. Kronckce*, 862 F.3d 1186, 1198-99 (9th Cir. 2017)). Senate Bill 266 provides a remedy in the form of punitive civil fines if PNW Owners do not meet their funding obligations or engage in any conduct to a bring about the closure of a Colstrip unit without seeking and obtaining unanimous consent of all co-owners. Because this alternative remedy is not contemplated by the O&O Agreement, Senate Bill 266 interferes with PNW Owners' valid expectancy interests. PNW

Owners' claims challenging the constitutionality of Senate Bill 266 are thus ripe for adjudication.

### C. Senate Bill 266 violates the Contracts Clause of the United States Constitution

PNW Owners move for summary judgment on their fifth claim for relief, seeking a declaration that Senate Bill 266 violates the Contracts Clause of the United States Constitution.

As discussed above, to  determine whether a state law unconstitutionally impairs a contract,  courts must consider "(1) whether the state law has operated as a substantial impairment of a contractual relationship," and if so, (2) "whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Sveen*, at 1821-22 (quotation marks and citations omitted). PNW Owners argue that Senate Bill 266 fails at both steps of this two-part test.

#### 1. Senate Bill 266 substantially impairs PNW Owners' rights under the O&O Agreement

To reiterate, the substantial impairment inquiry "has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *In re Seltzer*, 104 F.3d 234, 236 (9th Cir. 1996) (quoting *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)). Only the third component is at issue here.

In determining whether an impairment is substantial, courts consider the extent to which the law undermines the parties' contractual bargain, interferes with a party's reasonable expectations, and prevents a party from safeguarding or reinstating its rights. *Sveen*, 138 S.Ct. at 1822 (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, at 244-46 (1978)). A law substantially impairs a contract if it "nullifies express terms of [a party's] contractual obligations and imposes a completely unexpected liability in potentially disabling amounts." *Spannaus*, 438 U.S. 234, 247 (1978).

PNW Owners maintain that Senate Bill 266 substantially impairs their rights under the O&O Agreement because it effectively nullifies and modifies essential contract terms, and imposes an unexpected liability of up to $100,000 per day on PNW Owners for exercising their contractual rights. The Court agrees.

a.  *Senate Bill 266 substantially impairs PNW Owners' contract right to vote "no" on annual budgets*

Section (2)(1)(a) of Senate Bill 266 prohibits "[t]he failure or refusal of an owner of a jointly owned electrical generation facility in the state to fund its share of operating costs associated with a jointly owned electrical generation facility." (Doc 39-1). Section (2)(2)(a) authorizes civil fines of up to $100,000 for each violation, with each day of a continuing violation constituting a separate offense. (Doc. 39-1).

PNW Owners argue that Section 2(1)(a) substantially impairs their contractual right to arbitrate disputes, including budget disputes, and several contractual voting rights, including most fundamentally their right under Section 17(f)(ii)[9] of the O&O Agreement to vote "no" on an annual budget. Talen counters that Senate Bill 266 has no impact on this contract voting right because PNW Owners do not have a contractual right to refuse paying their share of Colstrip's operating costs. The O&O Agreement requires Talen, as the Operator, to pay costs of operation and construction in accordance with prudent utility practice. (Doc. 39-2, at 26 § 3(c)). Talen then bills the co-owners their share of those costs, which they have a contractual obligation to pay. (Doc. 39-2, at 32 § 10(c)). Thus, Talen argues, the funding provision of Senate Bill 266 "is nothing new" and "does not require anything different from what the O&O Agreement already requires, namely, that PNW Owners pay their share of costs that are consistent with prudent utility practice." (Doc. 129, at 25). Talen maintains PNW Owners' funding obligations are the same under Senate Bill 266 and the O&O Agreement, and that

---

[9] This portion of Section 17 provides: (f) Operator shall submit each of the matters listed below to the Committee for approval, which approval must be by a vote of the Operator's Committee member, plus at least two other Committee members so that the Committee members voting for approval represent at least 55% of the total Project Shares: … (ii) Construction and operating budgets and changes therein …. (Doc. 39-2 at 39-40).

Senate Bill 266 does not eliminate PNW Owners' right to vote "no" on a budget that is inconsistent with prudent utility practices.

What Talen's argument overlooks, however, is that Senate Bill 266 ignores the O&O Agreement's arbitration provision and provides for significant potential financial penalties not agreed to by the parties. Under the O&O Agreement, if PNW Owners voted "no" to a Talen proposed budget and voted in support of a different budget, any resulting dispute would be subject to arbitration. But under Senate Bill 266, PNW Owners point out, Colstrip budgets would effectively be subject to oversight by Knudsen and Montana courts – not an arbitrator – to evaluate whether a proposed budget is consistent with prudent utility practices, and whether PNW Owners' rejection of a Talen-proposed budget is a "refusal . . . to fund" operating costs potentially subjecting them to significant financial penalties. (Doc. 146, at 14-15). For these reasons, Section (2)(1)(a) of Senate Bill 266 substantially impairs PNW Owners' contractual voting rights and their contractual right to arbitrate disputes, including budget disputes.

> b.    *Senate Bill 266 substantially impairs PNW Owners'*
> *contract right to engage in conduct to close Colstrip*

Section 2(1)(b) prohibits "[c]onduct by one or more owners of a jointly owned electrical generation facility in the state to bring about permanent closure of a generating unit of a facility without seeking and obtaining the consent of all co-owners of a generating unit." (Doc. 39-1). Section (2)(2)(a) authorizes civil fines of

up to $100,000 for each violation, with each day of a continuing violation constituting a separate offense. (Doc. 39-1).

PNW Owners argue that Section 2(1)(b) substantially impairs their contract right to engage in conduct to close Colstrip in three ways. First, they maintain that Section 2(1)(b) effectively eliminates their contract right to arbitrate whether a less than unanimous vote is required to close Colstrip. (Doc. 104, at 16-17). The O&O Agreement provides that project users who are unable to resolve a dispute through negotiations have the right to demand arbitration, and the arbitrator's decision "shall be conclusive and binding upon the Project Users." (Doc. 39-2, at 42). The Colstrip owners are currently embroiled in a dispute over whether the O&O Agreement requires unanimous consent of the co-owners to close Units 3 and 4. PNW Owners argue Section 2(1)(b) effectively eliminates their right to arbitrate this dispute, because advocating their position that some or all of Colstrip can be shut down with less than a unanimous vote could be considered "conduct … to bring about permanent closure of [Colstrip] without seeking and obtaining the consent of all co-owners" that is subject to a fine of up to $100,000 per day.  (Doc. 39-1).

Talen counters that this argument is based on a "serious misreading of SB 266's plain language." (Doc. 129, at 23). But because Senate Bill 266 broadly prohibits any "conduct" to bring out permanent closure, PNW Owners'

67

interpretation is reasonable. As the Court determined at the preliminary injunction stage, "given the broad swath of prohibited conduct under SB 266, PNW Owners are harmed at the beginning and arbitration stages of the proceedings because they cannot freely advocate for non-unanimous closure of Units 3 & 4." (Doc. 11, at 12 ¶ 22). To the extent Talen contends that advocating for non-unanimous closure during arbitration would not be considered "conduct" with the meaning of Senate Bill 266, it is notable that Knudsen has not taken that position, and in fact has not responded at all to PNW Owners' motion on the merits. Thus, PNW Owners' first argument that Section 2(1)(b) substantially impairs their contract right to arbitrate their dispute over the vote necessary to close Colstrip is well-taken.

Second, PNW Owners contend that Section 2(1)(b) substantially impairs their contractual right to propose the closure of, or vote to close, one or both of the Colstrip units. (Doc. 104, at 19). Reading several provisions together, the O&O Agreement provides that non-operators like PNW Owners have the right to propose closure of the Project or one of its units, and the right to vote in favor of such a proposal. (Doc. 39-2, at 39-53). PNW Owners argues Section 2(1)(b) substantially impairs this right because, regardless of whether unanimity is required, simply calling for a vote to close Colstrip and voting in favor of such a proposal could be considered prohibited "conduct" subject to a civil fine of up to $100,000 per day.

Again, Talen counters that PNW Owners are misreading the statute and takes the position that simply calling for a vote on a proposal to close Colstrip would not be considered "conduct" with the meaning of Senate Bill 266. Given that Knudsen has not taken the same position however, and in light of the broad statutory language, the Court finds Talen's arguments unpersuasive. Thus, the Court agrees with PNW Owners that Section 2(1)(b) substantially impairs their contract right to propose the closure of, or vote to close, Colstrip.

Third, PNW Owners argue Senate Bill 266 substantially impairs the contractual relationship under the O&O Agreement because it provides for up to a $100,000 per-day fine for violating Section 2(1)(b). (Doc. 104, at 18). A statute operates as a substantial impairment of a contractual relationship if it "imposes a completely unexpected liability in potentially disabling amounts" for conduct otherwise allowed under the contract. *Spannaus*, 438 U.S. at 247. In addition to the arbitration remedy contemplated by O&O Agreement, PNW Owners could face a $100,000 per-day fine for violating Section 2(1)(b), which can fairly be described as a "completely unexpected liability in potentially disabling amounts" that was not agreed to by the parties. *Spannaus*, 438 U.S. at 247. In doing so, Senate Bill 266 substantially impairs the PNW Owners rights under the O&O Agreement.

2.     Senate Bill 266 does not advance a significant and legitimate public purpose

69

As addressed above, where, as here, a state law substantially impairs a contract, the court must consider whether the law is "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S.Ct. at 1822 (citation omitted). If the law has a legitimate public purpose, the court next considers whether the impairment "of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Energy Reserves*, 459 U.S. at 412 (citation omitted).

The threshold "requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves*, 459 U.S. at 412. A law with "a very narrow focus" that is "aimed at specific" companies does not address "an important general social problem." *Energy Reserves*, 459 U.S. at 412 n. 13 (citing *Spannaus,* 438 U.S. at 247-48 and n. 20). See also *Treigle v. Acme Homestead Ass'n*, 297 U.S. 189, 197-98 (1936) (striking down a state statute that dealt only with the "private rights" of parties to bylaws because the statute did not address any existing economic emergency as alleged by the appellee and "merely attempt[ed], for no discernable public purpose, the abrogation of contracts between" the parties); *Nieves v. Hess Oil Virgin Islands Corp.*, 819 F.2d 1237, 1249 (3d Cir. 1987) ("Legislation aimed retroactively to benefit or burden a few identifiable persons is particularly

vulnerable to the charge that it is not reasonably related to the asserted public purposes.").

Here, Senate Bill 266 does not advance a significant and legitimate public interest because, as reflected in the timing, legislative record, and substance of the legislation, it is narrowly aimed at preventing PNW Owners from taking action to close Units 3 and 4 or objecting to Talen-proposed budgets, as permitted in the O&O Agreement. As in *Treigle*, Senate Bill 266 interferes with the purely private rights of the parties to a pre-existing contract, the O&O Agreement. In addition, as in *Spannaus*, Senate Bill 266 is narrowly focused on Montana electrical generation facilities and, even more specifically, is aimed directly at the owners of Colstrip. See *Equip. Mfrs. Inst. v. Janklow,* 300 F.3d 842, 861 n. 22 (8th Cir. 2002) ("There is no broad public policy interest in readjusting contractual rights and obligations in pre-existing contracts.").

That Senate Bill 266 is aimed directly and specifically at the Colstrip owners and their pre-existing contractual relationship under the O&O Agreement is abundantly clear from the legislative history cited by PNW Owners in support of their motion. On February 23, 2021, Senate Bill 266's sponsor, Senator Steve Fitzpatrick introduced the bill "as an important piece of legislation because it allows us to have greater control over the Colstrip facility." (Doc. 39-6, at 7). He referred to the "West Coast owners of the facility" as "refusing or objecting to pay

for the maintenance of the facility," and spoke of Colstrip's significance as a

source of electricity and power, and its importance to Montana economy. (Doc. 39-

6, at 7-9). In Senator Fitzpatrick's words, "[t]his bill really – what it does is it

allows us, the State of Montana to have an ongoing role in the operation of the …

Colstrip facility." (Doc. 39-6, at 9). During committee testimony on March 24,

2021, Senator Fitzpatrick summarized Senate Bill 266 with the following:

> And what it says very simply is that if a facility – unless there's unanimous
> consent to close an electrical generation facility or unanimous consent to not
> perform maintenance, those can be subject to this law, this unfair trade
> practices act, and then there's a penalty in it. And I think everybody knows
> what's going on here. We know that out in Colstrip there's been a really big
> push by the West Coast utilities to get out of Colstrip.

(Doc. 39-6, at 72).  Given such testimony, it is apparent that Senate Bill 266 has a

"very narrow focus" in that it is aimed directly at Colstrip's owners.  *Energy*

*Reserves Group*, 459 U.S. at 312 n.13 (describing *Spannaus).*

Talen nevertheless argues that Senate Bill 266 passes constitutional muster

because it advances several broad and important public purposes as set forth in the

preambulatory clause:

> WHEREAS, electrical generation facilities located in Montana have
> significant implications for the economy, environment, and health and
> welfare of Montana consumers; and
> WHEREAS, closure of electrical generation facilities without the unanimous
> consent of all co-owners threatens the reliable supply of electricity for
> Montanans; and
> WHEREAS, failure or refusal to fund operations of Montana electrical
> generation facilities by facility owners without the consent of all owners
> threatens the safety of workers at the facility, threatens Montana's interest in

environmental remediation of the facility, and threatens the reliable supply
of electricity for Montana consumers;

WHEREAS, electrical generation facility owners who fail to fun their share
of operating costs without the unanimous consent of all co-owners or seek
closure of an electrical generation facility without the unanimous consent of
all co-owners of the facility place on Montana local government units and
Montana electricity consumers the burdens of disruption in facility
operations or closure of the facility; and

WHEREAS, Montana statute prohibits unfair or deceptive acts or practices
in the conduct of trade or commerce in accordance with section 30-14-103
MCA, and provides for civil action by the Department of Justice to enforce
compliance with statute and for temporary, preliminary, and permanent
injunctive relief and civil fine.

(Doc. 39-1, at 1). Because the State is not a party to the O&O Agreement, Talen

argues the Court must defer to the Montana legislature's judgment as to the

necessity and reasonableness of Senate Bill 266. See *RUI One Corp.*, 371 F.3d at

1147.

PNW Owners do not dispute that, on its face, the stated public purpose of

Senate Bill 266 is significant and legitimate. Nor do PNW Owners take issue with

the notion that, as a general rule, "courts properly defer to legislative judgment as

to the necessity and reasonableness of a particular measure." *Energy Reserves,* 459

U.S. at 413. As discussed in more detail above, however, this general rule does not

mean the Court must always take statements of legislative intent at face value. See

*Ass'n of Equip. Mfrs.,* 932 F.3d at 731; *Nieves,* 819 F.2d at 1249. "The *stated*

objectives" of a law are not sufficient to demonstrate a legitimate public purpose if

"the *substance* of the" law "serve[s] a different objective." *Assoc. Builders &*

73

*Contractors, Golden Gate Chapter Inc. v. Baca*, 769 F. Supp. 1537, 1550 (N.D. Cal. 1991) (emphasis in original) (holding that a "prevailing wage" ordinance impaired a private collective bargaining agreement and did not advance a legitimate public purpose because the ordinance did not serve its stated objectives and instead operated for the benefit of certain union members).

Here, the substance of Senate Bill 266 does not address any of its asserted objectives. For example, as PNW Owners rightly point out, Senate Bill 266 does not authorize the State to act based on actual effects on the supply of electricity, worker safety, or environmental remediations, and it does not prevent Colstrip from closing, it just requires a unanimous vote to do so. Section 2(1)(a)'s budget provision does not require the operator to propose budgets that are consistent with prudent utility practices or that protect worker safety or the environment. With respect to Section 2(1)(b)'s unanimity provision, the Court indicated at the preliminary injunction stage that it "fail[ed] to see...how non-unanimous closure imperils those [stated] interests differently than unanimous closure." (Doc. 100, at 9 ¶ 12). The same holds true now. The Court is not persuaded by Talen's argument that because NorthWestern serves customers in Montana, unanimous and non-unanimous closure could threaten Montana's energy supply differently.

For these reasons, the Court concludes that Senate Bill 266 substantially impairs the PNW Owners' rights under the O&O Agreement without advancing a

significant and legitimate purpose.[10] Because Senate Bill 266 thus violates the Contract Clause of the United States Constitution, PNW Owners are entitled to summary judgment on their first claim for relief.

### D.     Senate Bill 266 violates the Commerce Clause

PNW Owners move for summary judgment on their fourth claim for relief, seeking a declaration that Senate Bill 266 violates the Commerce Clause of the United States Constitution.

The Commerce Clause of gives Congress the exclusive power "[t]o regulate Commerce . . . among the several states." U.S. Const., art. I, § 8, cl. 3. The Commerce Clause contains a negative command, known as the dormant Commerce Clause, which limits the authority of the states to enact legislation affecting interstate commerce. *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992). The dormant Commerce Clause "prohibits economic protectionism – that is, 'regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330 (1996) (quoting *Associated Industries of Mo. v. Lohman*, 511 U.S. 641, 647 (1994)).

When a "state statute amounts to simple economic protectionism," courts apply a "virtually *per se* rule of invalidity," which can be overcome only by a

---

[10] Having so concluded, the Court need not consider whether the articulated public purpose for Senate Bill 266 is "based on reasonable conditions" and of an "appropriate character" to that public purpose. *Energy Reserves,* 459 U.S. at 412.

showing that the state has no other means to advance a legitimate local purpose. *Wyoming*, 502 U.S. at 545-55 (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978). "A finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose or discriminatory effect." *Nat'l Meat Ass'n v. Deukmejian*, 743 F.2d 656, 659 (9th Cir. 1984) (citing *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984)). See *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 593-94 (8th Cir. 2003) (explaining that where a state constitutional amendment is motivated by a discriminatory purpose, the amendment must be stricken down as unconstitutional unless the state can demonstrate it has "no other method by which to advance [its] legitimate local interests").  If a state statute does not discriminate against interstate commerce, it may still violate the dormant Commerce Clause if it fails what "has come to be known as the *Pike* balancing test," which asks "whether the burden [the statute]imposed on interstate commerce is clearly excessive in relation to the putative local benefits." *Pharm. Rsch. & Mfrs. of Am. v. Cty. of Alameda*, 768 F.3d 1037, 1044 (9th Cir. 2014).

PNW Owners argue Senate Bill 266 violates the Commerce Clause because it amounts to simple economic protectionism, both in its purpose and its effect. (Doc. 104 at 28). Talen counters that Senate Bill 266 does not discriminate against interstate commerce because it is neutral on its face and in effect, in that its

funding and unanimity provisions apply equally to all owners of a jointly owned electrical generation facility in Montana, without respect to their geographic location. Talen further argues that Senate Bill 266 survives the *Pike* test because any incidental burden interstate commerce is outweighed by the local benefits as set forth in the preambulatory clause. (Doc. 129, at 31). The City of Colstrip's amicus brief similarly argues that Senate Bill 266 is not discriminatory and passes the *Pike* test. (Doc. 168, at 12-17).

1. <u>Discriminatory purpose</u>

Discriminatory intent, whether conferring a benefit on a local producer or a harm on an out-of-state producer, violates the Commerce Clause. (Doc. 100, at 10 ¶ 15, citing *Bacchus Imports*, 486 U.S. at 272). In *Bacchus*, the Supreme Court held that a facially neutral statute exempting certain locally produced alcoholic beverages from an excise tax violated the Commerce Clause in light of legislative history showing that the statute was intended to aid local industry. *Bacchus*, 486 U.S. at 271-272. See also *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 352–53 (1977) (striking down a facially neutral North Carolina statute prohibiting apple producers from putting grade labeling on apple boxes, citing evidence that the statute was intended to discriminate against Washington apple producers).

While Senate Bill 266 is not facially discriminatory in that there is no explicit mention of out-of-state corporations, the uncontroverted legislative history

demonstrates that the purpose of Senate Bill 266 is to promote local economic activity by keeping Colstrip open to the detriment of the out-of-state PNW Owners. As pointed about above, Senator Fitzpatrick introduced the bill on February 23, 2021 "as an important piece of legislation because it allows us to have greater control over the Colstrip facility" and referred to the fact that the "West Coast owners of the facility" were "refusing or objecting to pay for the maintenance" of Colstrip. (Doc. 39-6, at 7-8). He testified that "[w]e have out-of-state corporations who are acting in a way that … could destroy a valuable asset for the people of Montana," (Doc. 39-6, at 56), and explained:

> [W]hat we're doing is we're pushing back against really regulators in other states who are trying to impose kind of their new green deal type of public policy in the state of Montana, and its hurting Montana. And so I think we have every right to stand up and say no, and use any means necessary here at the legislature to make sure that our interests aren't trampled by the environmental views in the states of Washington and Oregon.

(Doc. 39-6, at 54). In committee testimony on March 24, 2021, Senator Fitzpatrick referred again to "a really big push by the West Coast utilities to get out of Colstrip," and described what they were "fundamentally doing is coming into the state of Montana and destroying an asset that is a value to the people of Montana, an asset that employs people, pays a tremendous amount of taxes, is important for our economy, [and is] important for users of energy facilities in the state of Montana." Doc. 39-6, at 72-73).

78

When Governor Greg Gianforte signed Senate Bill 266 into law on May 3, 2021, he issued the following statement: "Affordable power generated in Colstrip helped build Seattle's big tech economy, but now woke overzealous regulators in Washington State are punishing the people of Colstrip with their anti-coal agenda. Montana stands with Colstrip, which is why I proudly sign SB 265 and 266." (Doc. 39-6, at 4 ¶ 8).

The uncontroverted legislative record and Governor Gianforte's signing statement make clear that Senate Bill 266 was passed for the discriminatory purpose of fostering local economic activity to the detriment of the out-state-corporations seeking Colstrip's closure. See *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 593-94 (8th Cir. 2003) (citing statements by drafters of amendment to the state constitution as direct  evidence of intent to discriminate against out-of-state businesses). Senate Bill 266 accomplishes this discriminatory purpose by putting each out-of-state PNW Owner in the position of having to choose between paying a fine of up to $100,00 per-day for failing to fund its share of operating costs or engaging in conduct to bring about closure, or remaining invested in a Montana electrical generating facility that produces power they will

not be able to use to serve their customers in Washington and Oregon after 2025 and 2029.[11]

      2.    <u>Discriminatory effect</u>

A statute has a discriminatory effect on interstate commerce if it favors or promotes local economic activity by imposing a burden on out-of-state interests. *Bacchus*, 468 U.S. at 273. Even a statute that applies to in-state and out-of-state interests evenhandedly will amount to economic protectionism if is "intended . . . to prevent the loss of economic activity economic activity already in the State" and its effect is to "prevent[] current business from  being diverted elsewhere." *Westinghouse Elec. Corp. v. Tully*, 466 U.S. 388, 406 (1984). See also *Toomer v. Witsell*, 334 U.S. 385, 391 (1948) (holding that South Carolina law requiring boats to dock at a South Carolina port discriminated against interstate commerce even though it applied evenhandedly to boats with in-state and out-of-state owners, because it used the threat of fines "to divert to South Carolina employment and business which might otherwise go to" another state); *C&A Carbone, Inc. v. Town*

---

[11] PNW Owners have presented declaration testimony demonstrating that they face legislative mandates to eliminate coal-fired resources like Colstrip from their allocation of electricity for the customers in Washington and Oregon. (Doc. 103, at 3 ¶ 4). Talen claims there is no such legislative mandate, and requests leave under Rule 56(d) to conduct discovery regarding the PNW Owners' "alleged need to close Colstrip" in response to that legislation. (Doc. 129-2, at 4). But Talen does not identify what specific facts it hopes to elicit, or otherwise explain why it believes PNW Owners have incorrectly interpreted the Oregon and Washington legislation.

*of Clarkstown, N.Y.*, 511 U.S. 383, 391-94 (1994) (holding that a local ordinance requiring all nonhazardous solid waste in the town to be deposited at a local transfer station discriminated against interstate commerce even though it applied evenhandedly to "in-state or in-town processors" and out-of-state processors, because it sought "to ensure the long-term survival of the designated facility" and had the effect of "favor[ing] local enterprise by prohibiting patronage of out-of-state competitors").

Here, Senate Bill 266 discriminates against interstate commerce because it uses the threat of fines to ensure the continued operation of Colstrip, and effectively requires PNW Owners to continue sourcing electricity from Montana, instead of acquiring the same amount of power from third-parties in states other than Montana. Because Senate Bill 266 is discriminatory both in its purpose and its effect, the virtually per se rule of invalidity provides the proper standard and the *Pike* balancing test does not apply. Defendants have not shown there is no other method by which to advance the State's legitimate local interests, as required to overcome the per-se rule of invalidity.  The Court therefore concludes that Senate Bill 266 violates the Commerce Clause because it has both the purpose and effect of fostering local economic activity by keeping Colstrip open, and discriminating against out-of-state entities in the process.

> **E.**    **Permanent Injunctive Relief**

Permanent injunctive relief is appropriate where a challenged statute "is unconstitutional and should not be enforced" against the plaintiffs. *Monforton v. Motl*, 2014 WL 12543855, at *3 (D. Mont. Feb. 11, 2014). PNW Owners have already obtained preliminary injunctive relief prohibiting Knudsen from enforcing Senate Bill 266 during the pending of this litigation. (Doc. 100). The standard for obtaining permanent injunctive relief is "essentially the same" except that it requires "actual success" on the merits. *Winter v. NRDC, Inc.*, 555 U.S. 7, 32 (2008).

For all of the reasons discussed above, PNW Owners have demonstrated actual success on the merits of their claims challenging Senate Bill 266, and have also established irreparable harm as required to obtain a permanent injunction. As it did at the preliminary injunction stage, the balance of the equities weighs in favor of PNW Owners, and the issuance of permanent injunction would serve the public interest. (Doc. 100, at 13-14). Permanent injunctive relief is therefore appropriate.

## IV.   NorthWestern's Motion to Compel Arbitration and Appoint a Magistrate Judge to Oversee Arbitration Procedure Negotiations

NorthWestern moves pursuant to 9 U.S.C. § 4 for an order compelling arbitration and appointing a magistrate judge to oversee negotiations of the

processes and procedures by which that arbitration will proceed. [12] As explained at the outset, the parties disagree on whether this motion is moot in light of the Bankruptcy Court's recent Stipulation and Order. NorthWestern takes the position that the motion is not moot until the parties have resolved all issues regarding arbitration procedures, Talen takes the position that the motion is moot, and PNW Owners take no position on whether the motion is moot. (Doc. 189, at 4).

Although the parties have not reached an agreement as to each and every arbitration procedure, they have stipulated to proceed with arbitration pursuant to the Bankruptcy Court's Stipulation and Order. Because the parties have agreed to proceed with arbitration, an order compelling arbitration is not necessary at this time.

As discussed above, the Court is recommending that PNW Owners' motion for summary judgment challenging Senate Bill 265 be granted. If, following review of the undersigned's recommendation by presiding United States District Judge Susan P. Watters, the parties still cannot agree on material arbitration

---

[12] Section 4 of the FAA provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court, which, save for such agreement, would have jurisdiction under title 28 … for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

procedures, NorthWestern can renew its request for a magistrate judge to oversee negotiations of arbitration procedures at that time.

## V.   **Conclusion**

For the reasons discussed above,

IT IS ORDERED that: (1) Defendant State of Montana's Motion to Stay (Doc. 116) is DENIED; and (2) Northwestern Corporation's Motion to Compel Arbitration and Appoint a Magistrate Judge to Oversee Arbitration Procedure Negotiations (Doc. 120) is DENIED without prejudice.

IT IS RECOMMENDED that: (1) Plaintiffs' Motion for Partial Summary Judgment Regarding their First, Second, and Third Claims for Relief (Doc. 88) be GRANTED; and (2) Plaintiffs' Motion for Partial Summary Judgment Regarding their Fourth and Fifth Claims for Relief (Doc. 102) be GRANTED.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendation of the United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies

//

//

//

//

served on opposing counsel within fourteen (14) days after entry hereof, or

objection is waived.

DATED this 28th day of September, 2022.

Kathleen L. DeSoto
United States Magistrate Judge